## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ABHIJIT DAS, MITRA DAS, MUKTI L. DAS, and TROCA HOLDINGS LLC, for themselves, and as assignees of BOSTON EAST TYNGSBORO HOLDINGS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE LOWELL FIVE CENT SAVINGS BANK, DAVID WALLACE, JOHN PRATT JR., RICHARD D. REAULT, STEVEN J. BRAKE, ESQ, and BRIAN K. LEE, ESQ., <br><br> Defendants. | **Civil Action No.:** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Abhijit Das ("Beej Das"), Dr. Mitra Das ("Mitra Das"), Dr. Mukti L. Das ("Mukti Das")(Beej Das, Mitra Das, and Mukti Das are collectively the "Das Family"), and Troca Holdings LLC, for itself and as assignee of Boston East Tyngsboro Holdings LLC ("Troca Holdings")(collectively the "Plaintiffs") assert this action against Defendants, The Lowell Five Cent Savings Bank ("Lowell Five" or the "Bank"), David Wallace ("Wallace"), John S. Pratt Jr. ("Pratt"), Steven J. Brake ("Brake"), Brian K. Lee ("Lee"), and Richard D. Reault ("Reault") (collectively the "Defendants").

As outlined below, Defendants engaged in a prolonged series of unconscionable and unlawful acts to damage the reputation, financial standing and legal status of Plaintiffs. In a calculated breach of their agreements with Plaintiffs, the Defendants violated Federal RICO statutes — laws designed to curtail exactly this form of organized criminal activity; utilized

predatory, unfair, deceptive and abusive trade and banking practices; abused the provisions of the Bank Secrecy Act to levy and promote unfounded criminal accusations against Beej Das; committed fraud upon the courts of the Commonwealth of Massachusetts and the United States Bankruptcy Court for the District of Massachusetts ("Bankruptcy Court"); and employed deceitful tactics to corrupt administrative and judicial proceedings. Central to Defendants' malicious campaign was the deliberate doctoring of critically important documents and the falsification of bank records, actions taken with the primary intent of manufacturing evidence against Beej Das and disabling and destroying Plaintiffs. The acts alleged in this Complaint represent not only a blatant disregard for legal and ethical norms but also a serious and willful perversion of the justice system, causing considerable, substantial, and irreparable harm to the reputation and financial interests of Plaintiffs.

## **<u>INTRODUCTION</u>**

1.     Lowell Five, a mutual bank founded in 1854 with assets over $1 billion, engaged in a systematic campaign to defraud, deceive, defame, harm, damage and destroy Troca Holdings and the Das Family, investors in a small, minority-owned community-centric boutique hotel for which Lowell Five was a lender.

2.     Defendants engaged in coordinated activities to defraud, deceive, abuse, threaten and intimidate Plaintiffs to prevent and restrain Plaintiffs' exercise of their contractual and state and federal Constitutional rights.

3.     The primary avenue Defendants pursued to disinvest Plaintiffs of the hotel was discrediting and undermining Plaintiffs' public persona, Beej Das, using manufactured and false evidence that would give rise to and support criminal charges the Bank would foster and promote to destabilize both Troca Holdings and the Das Family, which stood behind it.

4.      In 2014, a primarily minority-based group of investors, of which the Das Family was a part, identified a turnaround opportunity at a deteriorating hotel in Tyngsborough, Massachusetts and entertained offers from financial institutions, including Defendant Lowell Five, to access the critical capitalization their intended investment required.

5.      Believing they had found a token minority client of principally naïve and compliant Indian-Americans they could control and that would happily run the hotel as an exclusive playground for the Lowell Five's most preferred clients, the wealthy and segregated patrons of the adjacent Vesper Country Club, Lowell Five and Wallace, Lowell Five's Chief Executive Officer, zeroed in on and excitedly pursued Plaintiffs with enticing offers of non-recourse financing and introductions into their social and political circles.

6.       Relying on the assertions and promises of Defendants Lowell Five and Wallace, Plaintiffs obtained purchase and renovation financing through Lowell Five (in this regard, Plaintiff Troca Holdings, as assignee of Boston East Tyngsboro Holdings LLC may hereinafter be referred to as the "Borrower").

7.      Never intending to honor the offers it used to lure and snare the Borrower, Lowell Five, Wallace and Pratt, Lowell Five's Senior Vice President and Chief Credit Officer, once Borrower was signed, sealed and delivered, quickly balked at and ultimately refused to provide the full and critical amount of promised financing, thereby setting the Plaintiffs spiraling down a path of financial hardship and ruin.

8.      This intended walk-back by Lowell Five, Wallace and Pratt was ignited and fueled when Lowell Five and Wallace realized Plaintiffs' intent to break the hotel from its proven, long-standing history of restrictive, exclusive, and discriminatory practices and transform the dated and segregated property into a modern luxury boutique hotel, restaurant, and entertainment venue

readily available to a client base that reflected the diversity and vitality of the greater Lowell, Massachusetts area.

9.      In August 2017, Lowell Five's and Wallace's effort to cut Plaintiffs off from their contractually defined capital supply became personalized as a witch-hunt against Beej Das when Wallace became annoyed at Beej Das's candidacy in the primary election for the open United States Congressional seat for the Massachusetts 3rd District, a candidacy that included opposition to and public criticism of longstanding political and financial benefactors of Lowell Five and Wallace, including former Congressman and current University of Massachusetts President Marty Meehan ("Meehan"), and Meehan's former advisor, (now Congresswoman) Lori Trahan ("Lori Trahan"), whose husband, David C. Trahan ("David Trahan"), is a local builder with significant financial ties to Lowell Five.

10.      As an underrepresented minority, lawyer and business operator, Beej Das felt that he and many in his district were neglected by their representation in Congress. The Democratic party in the Third District, once home to moderates such as former Congressman Paul Tsongas, had been overtaken by those aligned with local powerbrokers, something he objected to. A supporter of small business owners, entrepreneurs, gig economy workers and the trades, Beej Das felt he could bring a fresh approach that would help unify an increasingly polarized national political landscape.

11.      Neither Wallace nor any other employee of Lowell Five supported or contributed to Beej Das's campaign and, in fact, Wallace went out of his way to personally advise Beej Das that Meehan and David Trahan would "destroy" Wallace if he made any contribution to Beej Das's campaign.

12.      Lowell Five and Wallace actively supported Lori Trahan's candidacy.

13.     From January 30, 2015 to the date they foreclosed on Plaintiffs' hotel in May 2020, Lowell Five, Wallace and Pratt refused to fully fund under Lowell Five's loan despite having a contractual obligation to provide $650,000 in renovation financing without recourse. The intended result being both the Borrower's inability to make payments on a timely basis and, ultimately, the failure of the hotel in which the Plaintiffs had heavily invested.

14.     Thereafter, Lowell Five, Wallace and Pratt evaded due process and deployed extrajudicial and illegal tactics to damage, defame and displace Plaintiffs, principally by aiming fabricated evidence at Beej Das and the Das Family.

15.     Angered by Plaintiffs' efforts to exercise their rights in the face of Lowell Five's, Wallace's, and Pratt's efforts to suppress them, Defendants undertook more aggressive tactics to disinvest Plaintiffs of the hotel by initiating their crusade against Beej Das, thereby making him a highly toxic pariah and liability to Troca Holdings.

16.     Commencing in mid-2018 and continuing through October 11, 2023, Lowell Five and the other Defendants pursued a series of coordinated activities, including promoting intentionally misleading and false evidence and testimony, that would deceive a state court and, most damagingly, push and delude federal prosecutors to investigate and bring charges against Beej Das, initially for bankruptcy fraud, but when that failed, for campaign finance violations.

17.     In light of the evidence that has emerged in various legal proceedings, including United States v. Das, 21cr10200-RGS (the "Das Trial"), Defendants' activities to commence, promote, influence and affect a federal investigation – and later, a criminal trial – were part of the Bank's core strategy to maintain a coordinated and concerted multi-year effort to demean, defame, and ultimately destroy a political adversary and the most widely-known investor of a disfavored and targeted client, a non-preferred minority-owned business.

18.     Among other methods, Lowell Five leveraged powerful tools available to banks under the provisions of the Bank Secrecy Act, 12 U.S.C. § 1951 et seq. (the "BSA"), most specifically the use of so-called "Suspicious Activity Reports" (or "SARs").

19.     Knowing the BSA would shield them from nearly all liability for misuse of the BSA's reporting tools, Defendants Lowell Five, Pratt, and Wallace invented a false narrative of "suspicious" behavior by Beej Das in filing SARs to various federal agencies, ultimately even taking the extraordinary step of intentionally falsifying records to incriminate Beej Das.

20.     Defendants Lowell Five, Wallace, Pratt, Brake and Lee orchestrated a chorus of intentionally misleading and false evidence, including a doctored appraisal in a state court case and the testimonies of several Lowell Five employees and one Lowell Five Board of Directors member at the Das Trial.

21.     The Das Trial revealed a prejudicial practice in which Lowell Five treated and reported conduct by Beej Das, a disfavored minority client of Lowell Five as "suspicious" to federal authorities while treating similar or more suspect conduct by a favored non-minority client of Lowell Five as unworthy of inquiry under the very same BSA regulations.

22.     Testimony at the Das Trial proved that, despite specific and contrary instructions by Beej Das, or in five instances, his colleague at Boston East India Hotels LLC (the "Hotel Company", Lowell Five, its management including Wallace and Pratt, through the complicity of three bank tellers and two bank managers, repeatedly and intentionally altered at least seventeen transactional banking records after Beej Das and/or his colleague had left the bank branches where they had conducted the transactions.

23.     Lowell Five falsely recharacterized what were actually (1) withdrawals from Beej Das's campaign account to Beej Das personally (each a "Campaign Loan Repayment" and

collectively the "Campaign Loan Repayments") and (2) distinct and subsequent loans from Beej Das to other corporate accounts (each a "Corporate Loan" and collectively the "Corporate Loans") as direct transfers from Beej Das's campaign account to those other corporate accounts ("L5 Direct Transfers") instead.

24.     Lowell Five, Wallace and Pratt knew that the Loan Repayments and Corporate Loans requested by Beej Das were legal and permissible, while the L5 Direct Transfers Lowell Five falsely recorded on its own initiative were improper, suspect and illegal.

25.     Had Lowell Five simply characterized banking instructions given to it by a disfavored client as "suspicious" while deciding to treat similar or actually questionable conduct by a favored client of Lowell Five as appropriate and normal, it would have violated its equal protection obligations under state and federal law.

26.     What Lowell Five did was significantly worse, however. Lowell Five specifically and intentionally overrode the instructions they were given with these transactions and replaced them with the Bank's own instructions, thereby creating false records with the very "suspicious activity" that Lowell Five could then report to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").

27.     Faced with following the clear, unambiguous and legally permissible instructions of a minority client against whom it had become hostile or disregarding its client's instructions and reporting false "suspicious activity" the bank itself had concocted, Lowell Five chose the path that improperly benefitted itself and subjected and exposed its client and civil adversary to significant and completely undue criminal liability.

28.     Indeed, shielded by the highest levels of secrecy of the aptly named BSA, Lowell Five was able to repeatedly, in silence and without any external scrutiny, torpedo, derail and destroy Beej Das, and, in turn, its disfavored minority-owned client, Troca Holdings.

29.     In stark contrast, Lowell Five did not mischaracterize loan repayments or falsify records from Lori Trahan's campaign account at Lowell Five or seek to inquire how Lori Trahan subsequently used the loan repayment funds from her campaign account at Lowell Five.

30.     Lowell Five singled out Beej Das and flagged his subsequent use of his funds, repaid from his Congressional account for appropriateness and conformity to standards Lowell Five had arbitrarily set for Das.

31.     Lowell Five did not similarly investigate Lori Trahan, who also repaid loans made to her Congressional account at Lowell Five. Lowell Five did not similarly set standards for the appropriateness of Lori Trahan's use of her own money.

32.     Contrary to its treatment of Beej Das, Lowell Five took affirmative steps to protect Lori Trahan, its favored client, even when the facts more clearly suggested questionable activity. For example, a loan check from Lori Trahan and David Trahan was reported by Lori Trahan and her campaign to the Federal Election Commission (the "FEC") as a Q1 2018 loan, when, in fact, it was deposited to the campaign's Lowell Five account on April 9, 2018, nine days after the close of the Q1 2018 reporting period in which Lori Trahan's campaign committee claimed receipt of the loan. Even on that later date, the check would not clear. Lowell Five quietly held the check until it would clear, stamped the check again -- as received on the later date -- and processed the deposit.

33.     Not only did Lowell Five treat questionable conduct by a favored client of Lowell Five as appropriate, normal, and even worthy of protection, it actually altered those transactional

records to protect that client when the issue came to light and under Congressional oversight scrutiny. By contrast, Lowell Five treated its disfavored minority clients differently, going so far as to falsify records to create a suspicious paper trail.

34.    For its minority client, Lowell Five acted as the judge and biased jury, while for its white client, Lowell Five was happy to serve as an advocate and facilitator.

35.    The malicious use of provisions of the BSA by Lowell Five was intentional. Defendants Lowell Five, Wallace, Pratt, Brake and Lee knew of the broad protection afforded to banks under the BSA. As they were aware, there is no direct private cause of action for intentional or even malicious SARs reporting – or failure to report.

36.    Having failed to easily obtain the Das Family's acceptance of unwarranted financial constraints and obligations, Wallace and Pratt and their counsel, Brake and Lee, amongst others, invested significant resources to illegally harness and direct powerful banking regulations and various instrumentalities of state and federal government to destroy Troca Holdings, the Das Family, their friends, and their investments and even incarcerate Beej Das.

37.    Lowell Five knew that filing of SARs against Beej Das would destroy Beej Das's ability to conduct banking activities with other banks and financial institutions.

38.    Because of its banking relationship with him and corporate interests he managed, Lowell Five knew where Beej Das had his commercial banking relationships. Lowell Five filed its SARs, based on falsified bank records, specifically to disrupt those relationships with other financial institutions.

39.    As Lowell Five intended, American Express terminated Beej Das's personal and corporate accounts in the third quarter of 2018, during his congressional campaign, materially impacting his finances and that of his congressional campaign.

40.     This would not be the last time that Lowell Five falsified records in order to harm Beej Das and Plaintiffs. Lowell Five and the Defendants' modus operandi appears to be: if the facts don't support them, simply falsify the facts; truth notwithstanding.

41.     Lowell Five, Wallace and Pratt enlisted the services of its management, employees, lawyers and associates in government to create and perpetuate a criminal enterprise aimed at destroying Plaintiffs.

42.     As further outlined below, over a five-year period, Defendants orchestrated a wide array of fraudulent and criminal activities, including doctoring documents submitted to courts and lying on submissions to the Bankruptcy Court, to achieve its misbegotten objectives.

43.     Wallace, Pratt, Lowell Five, and Reault's intentional and illegal activities are also part of a pattern of practice of discriminatory behavior towards minorities, including Hispanics and Black Americans.

44.     Plaintiffs seek to bring Defendants' actions to light and remedy years of abuse. This Complaint is the culmination of Plaintiffs' search for justice in this matter.

## **PARTIES**

**Plaintiffs:**

45.     Troca Holdings is a Massachusetts Limited Liability Company with its registered address located at 733 Turnpike Street, Suite 226, North Andover, MA 01845.

46.     Mitra Das is an individual residing at 104 Blueberry Hill Lane, North Andover, MA 01845.

47.     Mukti Das is an individual residing at 104 Blueberry Hill Lane, North Andover, MA 01845.

48.     Beej Das is an individual residing at 333 E Palmetto Park Rd, TH-406, Boca Raton, FL 33432.

49.     Mukti Das, Mitra Das, and Troca Holdings ("BETH Assignees") acquired the claims of Boston East Tyngsboro Holdings LLC ("BETH" or "Borrower") against Lowell Five by purchasing the rights to said claims through an asset sale in the Bankruptcy Court (Case No. 19-41901), which was approved by Court order on July 15, 2021. Accordingly, Boston East Tyngsboro Holdings LLC is not a party to this action; BETH Assignees bring forth this action individually and as assignees of BETH's claims against Lowell Five.

**Defendants:**

50.     Lowell Five is a Massachusetts Savings Bank with its registered address at One Merrimack Plaza, Lowell, Massachusetts 01852. Upon information and belief, Lowell Five is state chartered bank regulated primarily by the Massachusetts Division of Banks and has a principal place of business of 30 International Place, Tewksbury, MA 01876.

51.     Wallace, individually and as CEO/President of Lowell Five, residing at 35 Horse Hill Street, Dunstable, MA 01827-2709.

52.     Pratt, individually and in his role as Senior Vice-President Collections for Lowell Five, residing at 29 Ottawa Street, Lowell, MA 01850-1011.

53.     Brake is an attorney and partner in the Litigation Department of the Boston law firm of Nutter McClennen & Fish LLP and, according to its website, served on the firm's Executive Committee for nine years. Brake represents Lowell Five. Brake's registered work address is 155 Seaport Blvd., Boston, MA 02210.

54.     Lee is an attorney and partner in the Litigation Department of the Boston law firm of Nutter McClennen & Fish LLP and, according to its website, excels at "developing and

implementing creative strategies" for his clients. Lee's registered work address is 155 Seaport Blvd., Boston, MA 02210.

55.     Reault is a former member of the Select Board for the Town of Tyngsborough; Reault owns and operates New England Beekeeping, Carlisle Honey and Honeybound Meadery, and has long-term financial dealings with Lowell Five. Reault resides at 10 Louis Ave, Tyngsboro, MA 01879.

<u>JURISDICTION AND VENUE</u>

56.     Plaintiffs are two Massachusetts citizens, a Massachusetts limited liability company, and one Florida citizen bringing suit against a Massachusetts chartered Bank and five individuals, each of whom are being sued in their individual capacities and, in four instances, in their representative capacities as officers, employees, or agents of the defendant Bank pursuant to the civil provisions of the federal RICO statute, 18 USC Section 1962 *et seq.*, alleging that the defendant Bank constituted an "enterprise" within the meaning of the statute, and that each of the individual defendants engaged in multiple wrongful acts constituting "racketeering" under the statute, which conduct fell within the statutory list of proscribed activities; to wit: extortion, fraud, fraud committed by a financial institution and predatory lending practices; all of which caused grievous injury and loss to Plaintiffs.

57.     This action is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

58.     This action also invokes the provisions of Fair Debt Collection Practices Act ("FDCPA") under 15 U.S.C. § 1692e(2)(A). Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).

59.     Additionally, this claim is brought pursuant to 42 U.S.C. § 1981 insofar as on numerous occasions each of the individual defendants and the Bank did deprive each of the Plaintiffs of rights, privileges and immunities guaranteed to them by the federal Constitution, all to their severe loss and damage; specifically Plaintiffs were deprived of their rights to be free from discrimination based upon their race and ethnicity, as well as their rights not to be victimized by fraud, by institutional bank fraud, by misrepresentation, by defamation, by false arrest and by wrongful conversion of their property.

60.     Plaintiffs also invoke this Court's jurisdiction under 28 U.S.C. §§1331 and 1343 on the ground that this action arises under the First and Fourteenth Amendments to the U.S. Constitution and under 42 U.S.C. §§1981, 1983, 1985 and 1986. Plaintiff invokes this Court's jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

61.     Additionally, Plaintiffs are bringing this lawsuit based upon various state claims against all defendants based on the common law of the Commonwealth of Massachusetts which the Court may consider within its jurisdiction over pendant and/or ancillary state claims.

62.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that the majority of Plaintiffs and all the Defendants reside in this district and this is the district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTS

*Plaintiffs' and Defendants' Relationship Starts with the Hotel Purchase*

63.     In January 2013, the Das Family formed and invested in the Hotel Company, a minority-owned hotel development and management company. A year later, the Hotel Company began evaluating the purchase of the Stonehedge Inn and Spa, a thirty-room inn with a storied history in Tyngsborough, Massachusetts (the "Inn" or "Hotel").  The Inn, which had not been

renovated in years, was dilapidated and required significant capital investment for critical repairs, renovation and modernization, a fact well known to Lowell Five.

64.     At the end of May 2014, a Lowell Five executive proposed a meeting with representatives of the Hotel Company. At that meeting, Lowell Five promised "a very simple approach to meet [the Hotel Company's] financing needs"; offered to finance the acquisition and rehabilitation of the Inn; and suggested a follow-up meeting with Wallace, Lowell Five's President.

65.     At their meeting two weeks later, Wallace advised the Hotel Company that his bank had a keen interest in replacing Enterprise Bank ("Enterprise"), a local competitor of Lowell Five as the lender for the Inn. Wallace promised a loan with attractive terms, stating "we want that project from Enterprise" and "will be aggressive to support you and your group." Wallace made a point to acknowledge that Enterprise regularly held events at the Inn and pledged to support the Inn in a more substantial way than Enterprise.

66.     In addition to the promised favorable loan terms, Wallace proffered lucrative business relationships with Vesper Country Club ("Vesper") to benefit the Hotel Company. Vesper is an exclusive country club near the Hotel, of which Wallace is a prominent member.

67.     Wallace's father, Gerald R. Wallace, who served as President of Lowell Five from 1971 to 1994, was on the executive committee at Vesper, which gained notoriety in 1991 because at the time it had "not had a black member in its 116-year history" and "relegated women to 'associate membership.'"

68.     Noting his father's leadership there, Wallace told Plaintiffs that he held significant standing and influence at Vesper and promised to grant the Das Family access to Vesper, which

he called an "exclusive members-only country club", and link Vesper member's club accounts to the Inn, which would have substantially increased the Inn's revenue.

69.     Based on the representations and promises of Wallace and Lowell Five to provide favorable terms and lucrative business relationships, the Hotel Company submitted a loan application on behalf of the Borrower for sufficient financing to both purchase and perform capital improvements essential for the successful operation of the Inn.

70.     In mid-July 2014, Lowell Five advised the Hotel Company that it had completed its review of the loan application and of the Borrower, that the loan application had been approved, and that the "feedback has been very positive thus far."

71.     A few days later, Lowell Five issued its final commitment for the loan (the "Loan Commitment"), attached as Exhibit AA1 hereto, in which it offered to lend the Borrower $3,850,000 ("Loan Amount") with no personal guarantee, an interest rate of 4.85% for 25 years, interest only payments during the loan's first year, and a 3% prepayment penalty "if refinanced with another financial institution" during the first 60 months (the "Prepayment Penalty").

72.     Given that the Borrower was an entity formed only a few weeks earlier with no operating history, Lowell Five's underwriting, review and approval process was likely entirely subjective and not based on any substantive or objective factors.

73.     The Loan Commitment required and specifically defined as a "Pre-Closing Condition" a "property appraisal satisfactory to the Bank in scope and form evidencing a loan to value not to exceed 65%" ("LTV") "both as-is and as-complete" prior to the Closing Date (the "LTV Pre-Closing Condition"). On July 28, 2014, Lowell Five received an appraisal for the Inn (the "2014 Appraisal") providing a valuation of the Inn's market value "as is" and "as completed"

below the LTV thus permanently satisfying the LTV Pre-Closing Condition according to its express terms.

74.     On August 1, 2014 (the "Closing Date"), the Hotel Company and Borrower completed their acquisition of the Inn and executed financing documents ("Closing Documents" or "Loan Documents"), relevant documents of which are attached as Exhibit AA2 hereto, for the loan between Lowell Five and the Borrower (the "Loan").

75.     None of the documents presented or signed on the Closing Date or at any time prior, including the Closing Documents themselves, contained personal recourse or personal guarantees of any kind; the Closing Documents Lowell Five prepared stated "that as to each of the Business Loan Agreement and the Related Documents that no Member or other direct or indirect beneficial owner of Borrower shall have any personal liability for payment or performance of the Indebtedness or any other obligations of Borrower to [Lowell Five]."

76.     As evidenced by the Closing Documents and the Loan, Lowell Five agreed to lend the Loan Amount, of which $3,200,000 was to be advanced to Borrower as acquisition financing on the Closing Date ("Acquisition Financing"), with the remaining $650,000 to be provided thereafter, upon Borrower's request, for future renovations and improvements to the Inn ("Renovation Financing").

77.     While it is standard industry practice to share and discuss property value appraisals prior to closing, Lowell Five did not produce the 2014 Appraisal or disclose the values contained therein until well after the Closing Date. No appraisal value was communicated to the Borrower on the Closing Date or in the Closing Documents. Clearly the LTV Pre-Closing Condition had already been satisfied, as the appraised value was no longer relevant to the Closing Documents or the Loan.

78.     Accordingly, on the Closing Date, Lowell Five simply advised the Borrower and Hotel Company that the LTV Pre-Closing Condition, a condition precedent to the closing of the Loan, had been satisfied. Further, because no property valuation was communicated or provided in the Closing Documents or on the Closing Date, a continuing LTV test for the Loan would have been impossible.[1]

79.     The Hotel Company's underwriting of the Inn's acquisition and financial projections were based on renovations to the Inn over the first twelve months from the Closing Date, deploying Loan proceeds from the Renovation Financing. The Loan featured interest only payments for the first year after the Closing Date, consistent with the Hotel Company's renovation timeline.

80.     Renovation Financing was a material and essential component of the Loan between Borrower and Lowell Five.

81.     Lowell Five was keenly aware that the Inn required significant renovations and that Borrower would be relying on the Renovation Financing to complete them because as part of its presentations to Lowell Five, Borrower provided a generalized work plan which outlined specific renovations and improvements that the Loan would be financing.

82.     Pursuant to the Loan, Lowell Five provided Acquisition Financing to the Borrower on the Closing Date.

---

[1] An LTV test takes a loan's principal balance as the numerator and divides it by the appraisal's valuation, as the denominator. For the test to work, therefore, a known "value" must be used as the denominator. The Closing Documents evidenced a loan obligation of a certain amount secured by certain assets defined therein. The Closing Documents contemplated no LTV test because, as of the Closing Date, no appraised value was disclosed, provided, mentioned or otherwise made available to the Borrower.

83.     Starting soon after the Closing Date, Borrower requested Lowell Five provide Renovation Financing to reimburse Borrower for renovation and improvement expenses incurred by Borrower.

84.     Soon after the Closing Date, Borrower began to implement its renovation and improvement plan and made several requests for financing and Lowell Five advanced $115,000 to Borrower based on those requests.

*Lowell Five Breaches Its Obligation to Lend*

85.     Without any warning, on January 30, 2015, with remaining available credit of $535,000 in Renovation Financing, Lowell Five advised Borrower for the first time that it would not extend further advances because of a "65% maximum L/V ratio limitation" and refused to advance Borrower the remaining portion of the Renovation Financing.

86.     The only "65% maximum L/V ratio" was the condition precedent to the Loan contained in the Commitment Letter, which was satisfied upon the closing of the Loan.

87.     None of the Closing Documents reference an LTV. To the contrary, the Closing Documents set forth Lowell Five's obligation to provide Borrower the Renovation Financing and the only conditions under which Lowell Five "shall not be obligated to advance such funds to the extent of said $650,000.00" are if "(a) the maximum amount of the Note has been reached or is outstanding; (b) Borrower has breached the terms, provisions, representations, requirements, or promises contained in the Note or any other Related Document subject to Borrower's applicable notice and grace period rights; (c) Borrower makes a request after the expiration of the initial 12-month period allowing advances to be made hereunder; (d) or the Note is in default" (the "Funding Exception Conditions").

88.     As of January 30, 2015, when Lowell Five first refused to provide Renovation Financing, none of the Funding Exception Conditions existed.

89.     Lowell Five acknowledged that the Funding Exception Conditions were the sole exceptions to its obligations to provide Renovation Financing in a letter from its counsel to Borrower dated August 15, 2019, when it refused Borrower's last demand for Renovation Financing, dated July 18, 2019. *See* Nutter McClennen 93A Response, attached hereto as Exhibit AA3 at 2.

90.     Lowell Five intentionally withheld the bulk of the Renovation Financing – over 80% – to put the Borrower in the predicament where it would not be able to complete renovations without adding the additional consideration of offering personal guarantees.

91.     A mere six months into the term of the loan, Lowell Five's planned and unsupported imposition of an LTV cap to deprive Borrower of critically required Renovation Financing for the purpose of wrestling additional consideration that it was not otherwise entitled to from members of the Das Family was unfair, deceptive, and abusive and pushed the Borrower towards insolvency.

*Lowell Five Forces Modified Terms Upon Plaintiffs*

92.     To further benefit itself, Lowell Five sprung a proposed "Change in Terms Agreement" ("Amendment #1"), attached hereto as Exhibit AA4, in which it offered only $300,000 of the remaining $535,000 Renovation Financing and advised Borrower that it would not advance any additional Renovation Financing to Borrower until Amendment #1, which would establish the personal guarantees of both Mukti and Mitra Das, as husband and wife, and Beej Das, their son (collectively "Guarantors"), was executed.

93.     Faced with severe economic hardship due to Lowell Five's continuing refusal to provide the critical Renovation Financing, the Guarantors, under duress, signed Amendment # 1

on June 4, 2015. Amendment # 1 featured a burn-off provision that Guarantors insisted on be included that dictated that "the guarantees shall be removed" upon "the achievement of a loan-to-value ratio of 65% or less" (the "Burn-off Provision").

94.     Even after Guarantor's execution of Amendment #1 – and the capture of additional consideration to which it was not contractually entitled, Lowell Five only provided funding that was well short of the Renovation Financing it had agreed to provide on the Closing Date without any personal guarantees.

95.     In less than one year's time, Lowell Five had reaped substantive, tangible benefits from its predatory, unfair, deceptive, and abusive lending practices.

*Notwithstanding Lowell Five's Failure to Lend, Plaintiffs Increase Hotel's Value*

96.     Notwithstanding the nearly insurmountable challenges Lowell Five's refusal to provide Renovation Financing presented to Plaintiffs and the Hotel Company, far from abandoning the Inn and the renovations they had embarked upon, Plaintiffs and the Hotel Company made significant capital improvements from 2015 to 2017, which greatly enhanced the valuation of the Hotel.

97.     As a result of those improvements, in June 2017, Lowell Five commissioned a new appraisal (the "2017 Appraisal"), attached hereto as Exhibit AA21, pages 307-498.

98.      Lowell Five assured the Borrower that the appraisal would consider the millions of dollars of renovations and repairs that Plaintiffs had added to the Hotel – improvements and investments, and the resulting increase in asset valuation that Lowell Five was well aware of because of Plaintiffs' banking activities at Lowell Five.

99.     In the 2017 Appraisal which was dated and delivered to Lowell Five on June 6, 2017, Cushman & Wakefield reached a "Value Conclusion" of $5,500,000 for the Inn. *See* Exhibit AA21 at 309.

100.    Despite numerous requests over the next two years, Lowell Five steadfastly refused to release the 2017 Appraisal to Plaintiffs or explain its findings.

101.    Lowell Five issued a "Change of Terms Agreement" ("Amendment #2") the very next month after the Appraisal was delivered, dated July 1, 2017, attached as Exhibit AA6 hereto, listing a principal balance of $3,491,864.56 under the Loan. *See* Exhibit AA6 at 1.

*LTV Drops Below 65% and Loan Guarantees Burn Off*

102.    A fact then known only to Lowell Five, therefore, was that as of July 1, 2017, the LTV of the outstanding indebtedness under the Loan, calculated by taking the principal balance of $3,491,864.56 as the numerator divided by the "Value Conclusion" of $5,500,000 as the denominator, had dropped to 63.49% – firmly under the 65% threshold to trigger the Burn-off Provision and the removal of the Guarantors' personal guarantees.

103.    Despite frequent requests by the Plaintiffs, Lowell Five withheld and concealed this knowledge and proceeded to fraudulently pursue the Guarantors under the Loan, an effort that continues to the present day.

*Despite Its Increased Value Lowell Five was Upset with New Diversity at Hotel*

104.    Despite the capital improvements to the Inn and the increasing valuations for the property from 2014 to 2017, Wallace's displeasure festered with Borrower's successful push to broaden and diversify the clientele at the Inn – an effort spearheaded by Beej Das and encouraged by the Hotel and Hotel Company's investors, a diverse group of non-institutional individuals.

105.     The Inn had been repositioned from catering to the wealthy and largely white guests to consumers and guests who increasingly reflected the cultural and ethnic diversity of the region and neighboring Lowell, Massachusetts. The Inn's food menu, once geared to a nearly completely European palette, had added Indian, Chinese and South American items to attract and serve a broader audience. Live music performances from an eclectic and racially diverse group of performers had replaced the piped in classical music that Wallace and his cloistered associates preferred.

106.     Wallace, a wealthy member and frequent patron of the largely segregated Vesper, expressed dissatisfaction with its changing face, which included the newfound presence of minorities in the client base. When Wallace believed he had found the "model minorities" – rubes who would quietly and compliantly continue to run a segregated and elite hotel of his choosing, he offered Plaintiffs the world and promoted Lowell Five's partnership with Plaintiffs in print advertising and on billboards and buses.



*Lowell Five was happy to promote its "dedicated" partnership
with Plaintiffs – its "minority client" - before it sought to destroy them.*

107.   Once Wallace and Lowell Five realized that Troca Holdings, the Das Family and

Beej Das possessed and communicated articulate and independent thoughts, sought diversity and

inclusion, and even encouraged and possessed political aspirations and beliefs, Wallace spoke

openly about the need to find the Inn new ownership and management that wanted to reestablish

the property as an exclusive and familiar retreat for the nearly homogenous membership of Vesper,

including the political patrons of Defendants.

108.    Wallace's desires are not surprising when one considers the "Governance and Leadership" of Wallace's own organization, the Lowell Five Cent Savings Bank, and the "Executive Committee" thereof that, together, patently highlight the disparity between them and the racial and ethnic diversity of its namesake, the City of Lowell, which boasts of a population of 23% Asian, 18% Hispanic, and 8% Black.  Having already used Plaintiffs to "prove" publicly that Lowell Five promoted and believed in racial diversity, for Lowell Five and Wallace, Plaintiffs and their inconvenient viewpoints of diversity and inclusion were no longer needed and were now to be summarily disregarded.

## Executive Committee



Top Row (L to R): James C. Shannon, III, CPA, David E. Wallace, A. Justin McCarthy, James A. Hall (Retired) – Bottom Row (L to R): Michael S. Reilly, Robert A. Caruso and Amy J. Hoey

*Lowell Five's website (2017) shows the lack of diversity of its Executive Committee, which serves a city that is 23% Asian, 18% Hispanic, and 8% Black.*

# Executive Committee



Top row (L to R): Michael S. Reilly, Amy J. Hoey, MS, BSN, RN-BC, A. Justin McCarthy, James C. Shannon, III, CPA

Front row (L to R): Robert A. Caruso, Chairman, David E. Wallace.

*Lowell Five's website (2023) shows the of lack of racial and cultural diversity of its Executive Committee has remained unchanged.*

*Lowell Five: Political Powerbroker to "The Good Old Boys Network"*

109.    In late September 2017, Beej Das announced his candidacy for the open 3rd District Congressional seat, of which the City of Lowell was a prominent part. Beej Das had seen first-hand the cronyism of local politics in the district and wanted to offer its voters a new perspective.

110.    While Wallace disfavored Beej Das's push to diversify the Inn, Das's political activism, which included public criticism of Meehan, a former office holder of the Congressional seat, thoroughly angered Wallace and the senior leadership of Lowell Five.  *See, e.g.* Chris Lisinski, Littlefield, Das Blast UML Debate, Lowell Sun (Apr. 27, 2018, 12:00 AM), updated July 11, 2019, 12:00 AM, https://www.lowellsun.com/2018/04/27/littlefield-das-blast-uml-debate/ (last visited Feb. 17, 2024) attached as Exhibit AA7.

111.    Lowell Five benefitted from and enjoyed strong and long-standing financial and political ties with Meehan, who, at the time, maintained millions of dollars in his campaign account at Lowell Five.

112.    It was Lowell Five and its then President, Wallace's father Gerald Wallace, that hastily arranged a home equity loan for Meehan in the final weeks of his 1992 Congressional primary election campaign. Meehan used those monies to fund a last-minute advertising blitz, which helped defeat his opponent, incumbent Congressman Chet Atkins.

113.    While Meehan was not on the ballot in the election during the 2017/2018 race in which Beej Das was running, Meehan's former staffer, Lori Trahan was, and she was accorded the exclusive and active support of Meehan and Defendants Wallace and Lowell Five.

114.    Lori Trahan's husband, David Trahan, is a well-connected builder with significant business ties to Lowell Five.

115.    Wallace and other employees of Lowell Five contributed to Lori Trahan.

116.    Neither Wallace nor any other member of the Lowell Five team contributed funds to Beej Das's campaign.

117.    During a meeting in which Beej Das attempted to solicit Wallace's contribution to his campaign, Wallace warned Beej Das that Meehan and David Trahan would "destroy" Wallace and Lowell Five if Wallace made any contribution to Beej Das's Congressional campaign.[2]

---

[2] According to Wallace's friend, unsuccessful candidate for Lowell City Council and Lowell Five Board of Trustees member, Deborah Belanger, Wallace told Belanger that Wallace did not contribute to the Das campaign because "he and Das's politics did not align." This despite the fact that Wallace, who is a regular contributor to WinRed, a fundraising platform endorsed by the Republican National Committee, enthusiastically supported and donated to Lori Trahan, a Democrat.

118.    At the same meeting, Beej Das, when asked by Wallace how he planned to finance his campaign, told Wallace that he had sold a condo he jointly owned with his mother since 1998, in Kolkata, India ("India Condo").

119.    In the 2017-2018 campaign cycle, private citizens were prohibited from contributing more than $2,700 to any one candidate or campaign per election (meaning the primary and the general election were two separate elections).

120.    No such limitation exists for small financial institutions controlled by the same private citizens. Such institutions are free to "lend" unlimited amounts of money to candidates they deem worthy (as Lowell Five did for Meehan) and withhold for no apparent reason, funds for businesses associated with candidates deemed unworthy (as Lowell Five did for Beej Das). Lowell Five has a long history of using this loophole to its improper advantage.

*Defendants' Growing Hostility Towards Plaintiffs*

121.    Throughout 2017 and 2018, the relationship between Lowell Five and Plaintiffs grew increasingly contentious.

122.    Lowell Five continued to withhold the remaining Renovation Financing in breach of its contractual obligations.

123.    Lowell Five continued to deny the release of Guarantors' guarantee, contrary to its obligations in Amendment #1

124.    The Inn continued to suffer economic injury stemming from Lowell Five's failure to provide Renovation Financing despite the important renovations that had been completed by the Borrower and Hotel Company

125.    The Inn had gained a new reputation welcoming a diverse set of individuals of all backgrounds and ethnicities contrary to the exclusive, segregated enclave for the adjacent country club that Wallace wished the Inn to remain.

126.    Beej Das's political campaign and public advocacy were adverse to Lowell Five's "chosen" candidate in the 2018 Massachusetts Third District Congressional race and hostile to Lowell Five's friends and benefactors, such as Meehan.

127.    As a first-time candidate for federal office, Beej Das faced extensive challenges in fundraising that he hoped would improve as the campaign progressed. To allow for this progression to unfold and to provide legitimacy to his campaign, Beej Das would utilize the fact that there was no limit on the amount a candidate could lend (and subsequently repay) to their own campaign.

128.    Beej Das lent his campaign a significant sum of money in December 2017 and paid for campaign expenses using his personal credit cards throughout 2017 and into 2018.  He had been advised that without such loans, his congressional campaign would not have been taken seriously by either the press or political pundits.  Even with those loans, it would prove that his congressional campaign lacked the financial and political capital to be viable.

129.    Accordingly, commencing in late January 2018, Beej Das began to repay himself some of the loans he had made to his Congressional campaign ("Das for Congress"). The Hotel Company, which had begun to languish and suffer as a result of his decreased attention to its needs and management during the campaign, and the assets it managed had liquidity needs that Beej Das had concluded he would help fill from his personal resources.

130.    Beej Das's decision to repay his campaign loans and use those funds for Hotel Company expenses other than servicing Lowell Five's loan further angered Lowell Five, Wallace and Pratt.

*Lowell Five Established Clear Guidelines for Checking Transactions*

131.    Beej Das did not have a personal account at Lowell Five. *See* Exhibit AA9 at 6:14-16.

132.    Therefore, any Campaign Loan Repayment to Beej Das had to be in the form of a check written on the Das for Congress account payable to Beej Das, a bank check from the Das for Congress account payable to Beej Das, a cash withdrawal from the Das for Congress account, or a wire transfer from the Das for Congress account to an account in the name of Beej Das.

133.    Lowell Five established checking deposit and withdrawal guidelines for its tellers (the "L5 Checking Guidelines"), which are attached hereto as Exhibit AA8.

134.    The L5 Checking Guidelines and their applicability to any Campaign Loan Repayment to Beej Das was confirmed by Linda Firth ("Firth"), Lowell Five's North Andover branch manager. *See* Testimony of Linda Firth, U.S. v. Abhijit Das, No. 21-10200-RGS, at 12:21-17:10 (Fed. Dist. Ct. 2023), attached as Exhibit AA9.

135.    Firth confirmed that a cash withdrawal by Beej Das from the Das for Congress account followed by a deposit of the cash (or portion thereof) from Beej Das to an account for the Hotel would be a correct method that Beej Das could follow if he wanted to repay a loan from the Das for Congress campaign to himself and thereafter loan those funds to the Hotel. *See* Firth Testimony, at 45:4-46 and 12:21-17:10, attached as Exhibit AA9.

136.    No L5 Direct Transfer was possible from the Das for Congress account to a bank account in Beej Das's name at Lowell Five since no such account in Beej Das's name existed at Lowell Five.

*Top Secret: Lowell Five's Intentional and Repeated Abuse of the Bank Secrecy Act (BSA)*

137.    The BSA imposes various recordkeeping and reporting requirements on banks and other financial institutions aimed at preventing money laundering and financial crimes. Enforcement of the BSA is carried out by federal regulatory agencies; the BSA does not provide a private right of action for individuals or entities to sue banks for violations of its provisions. Proving violations of the BSA can be challenging because SARs filed by banks under the BSA are confidential and banks are generally prohibited from disclosing whether they have filed a SAR on any individual or transaction.

138.    With full knowledge that its actions under the BSA would be shielded from inquiry or oversight, Lowell Five devised an illegal scheme to punish Beej Das, and thereby Troca Holdings and the Das Family, for failing to capitulate to Lowell Five's heavy-handed tactics in servicing the Loan and for standing up for their contractual and constitutional rights.

139.    On January 26, 2018, Beej Das made a Campaign Loan Repayment from Das for Congress of $10,000, as a bank check addressed to Abhijit Das signed by Lowell Five employee Sopath Eath ("Eath").

140.    Lowell Five recorded the transaction as a withdrawal on the Das for Congress account at Lowell Five, as it had been instructed to do by Beej Das. The bank marked the box for "official check." The withdrawal record and Lowell Five Treasurer Check are shown on pages 1

and 2 of Exhibit AA10, attached hereto, which in its entirety are collectively the "Das for Congress Campaign Loan Repayments."[3]

141.    On January 30, 2018, Beej Das made a Campaign Loan Repayment from Das for Congress of $10,000, as a bank check addressed to Abhijit Das signed by Lowell Five employee Mallorie Marchand ("Marchand").

142.    Lowell Five recorded the transaction as a withdrawal on the Das for Congress account at Lowell Five, as it had again been instructed to do by Beej Das. The bank marked the box for "official check." The withdrawal record and Lowell Five Treasurer Check are shown on pages 3 and 4 of Exhibit A9A, attached hereto.

143.    On February 3, 2018, Beej Das made a Campaign Loan Repayment from Das for Congress of $9,000, as a cash withdrawal.

144.    Lowell Five recorded the transaction as a withdrawal on the Das for Congress account at Lowell Five, as it had again been instructed to do by Beej Das. The bank marked the box for "Cash Returned and wrote $9,000." The withdrawal record is shown on page 5 of Exhibit AA10, attached hereto.

145.    Altogether, Lowell Five processed three Campaign Loan Repayments, dated January 26, 2018, January 30, 2018 and February 3, 2018, as Beej Das had authorized and instructed.

*Lowell Five Fabricates an Entire Set of Transactions to Report as Suspicious*

146.    Starting February 7, 2018, however, Lowell Five and its management decided to disregard the direct, unambiguous and consistent instructions of Beej Das and took the

---

[3] Exhibit A9A is also Government Exhibit 41 from the Das Trial, and is attached in its entirety, with only page numbers added internally for reference.

extraordinary step of fabricating a trail of false transactions by Beej Das that it could point to as illegal.

147.    That day, Beej Das requested a Campaign Loan Repayment from Das for Congress of $10,000, as a cash withdrawal.[4] As a subsequent transaction, Beej Das requested a deposit, a $10,000 Corporate Loan, to one of the entities managed by the Hotel Company that had a bank account at Lowell Five.

148.    Lowell Five knew that it could not safely file SARs on its minority client's perfectly legal transactions while at the same time not filing SARs on similar transactions by other, more-favored clients, such as loan repayments from Lori Trahan's congressional campaign to Lori Trahan.

149.    Therefore, unlike the three times before when Beej Das had presented the exact same instructions for loan repayments directly to him personally, on this occasion, Lowell Five redefined and recorded the transaction as a L5 Direct Transfer -- an "internal transfer" from the Das for Congress account to an account ending in 8047. The bank marked the box for "Transfer to Acct #" and wrote "$10,000." The withdrawal record is shown on page 6 of Exhibit AA10, attached hereto.

150.    Lowell Five employee Marchand, who testified at the Das Trial on October 10, 2023, told the jury under oath that Lowell Five had been instructed by Beej Das to process the Campaign Loan Repayment as a withdrawal and thereafter, a second transaction with a deposit from Beej Das to the account ending in 8047, thereby properly and legally effectuating a loan repayment from the Das for Congress campaign account and initiating a loan from Beej Das to the

---

[4] As noted above, Beej Das did not have a personal bank account at Lowell Five, so any funds from the Campaign Loan Repayments that Beej Das wanted to utilize quickly needed to be withdrawn in cash and then redeposited to avoid the delays attendant to being sent back and forth between another financial institution.

corporate account.[5]  *See* Testimony of Mallorie Marchand, U.S. v. Abhijit Das, No. 21-10200-RGS, at 3:9-15 (Fed. Dist. Ct. 2023) attached as <u>Exhibit AA11</u>.[6]

151.    Lowell Five employee Ashley LaBonte ("LaBonte"), who testified at the Das Trial the same day as Marchand, also told the jury under oath that Beej Das instructed Lowell Five to process the Campaign Loan Repayment as a withdrawal and thereafter, a second transaction with a deposit from Beej Das to another account. *See* Testimony of Ashley LaBonte, U.S. v. Abhijit Das, No. 21-10200-RGS, at 5:17-25 and 6:22-24 (Fed. Dist. Ct. 2023) attached as <u>Exhibit AA12</u>.[7]

152.    While LaBonte told the jury that she found Beej Das's completely legal request "very shady," (*See* LaBonte Testimony, at 5:17-25, 7:1 and 11:6-25 attached as <u>Exhibit AA12</u>) what apparently wasn't shady to Lowell Five or LaBonte, was the fact that the management of the bank decided to deliberately disregard the instructions from its client without his knowledge or consent, thereby intentionally falsifying the records of the transaction. Indeed, LaBonte testified that the transaction slips would be altered and falsified "after [Beej Das] left, after the transaction was done." *See* LaBonte Testimony, at 9:1-21 attached as <u>Exhibit AA12</u>.

153.    Indeed, LaBonte's testimony revealed that she had no knowledge of "the rules of the Federal Election Commission and how to record repayments of a loan from a candidate" and that her assessment that the transactions were "shady" was based on a lack of knowledge of the FEC rules. *See* LaBonte Testimony, at 14:4-11 attached as <u>Exhibit AA12</u>.

154.    After being advised of the FEC rules at the Das Trial, LaBonte also acknowledged that Beej Das's instructions, which were overridden by Lowell Five and its management, "would

---

[5] These instructions are consistent with the FEC's rules and regulations pertaining to loans from candidates and the repayment thereof.
[6] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the transcripts.
[7] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the transcripts.

[have] accurately show[n] that he's the one who got the money from the political campaign." *See* LaBonte Testimony, at 14:1-3 attached as <u>Exhibit AA12</u>.

155.    A thorough analysis of the testimony of Lowell Five's bank tellers reveals that the tellers neither knew the proper protocols for conducting the transactions that Beej Das requested, nor did they originally find the transactions notably objectionable.

*Lowell Five and its Management Coached its Tellers to Support a False Narrative*

156.    Years before the Das Trial, in June 2020, the Federal Bureau of Investigation (FBI) interviewed several Lowell Five employees who had interactions with Beej Das at Lowell Five's various branches. As a safety net to minimize deviation from its script, Lowell Five installed Tom Hosey, a manager at Lowell Five ("Hosey") at each FBI interview with each Lowell Five employee to coach and police the Bank's witnesses through the interviews. *See* <u>Exhibit AA11</u> at 5:16-25 and <u>Exhibit A12</u> at 15:10-16 and 15:21-23.

157.    Prior to these interviews, Hosey sent an email to the FBI describing several of Beej Das's transactions at the bank, including dates, names of tellers handling them, and Lowell Five's narrative of the details thereof.  The narrative provided by Hosey to the FBI, as later revealed at the Das Trial, was largely a fabrication.

158.    Emphasizing Lowell Five's position in the driver's seat coordinating the criminal investigation into their civil adversary, Hosey concluded his email by advising the FBI "take a look at your convenience, and then we can discuss our next steps here."

159.    To orchestrate Lowell Five's guided interviews, Hosey provided the FBI with seven handpicked tellers who purportedly had specific and relevant interactions with Beej Das; Hosey himself authored the allegations regarding the content of these interactions.

160.    Of the seven tellers on Hosey's list, only two confirmed the representations made by Hosey to the FBI.

161.    Many of the tellers Lowell Five handpicked had minimal and insignificant interactions with Beej Das.

162.    The FBI also did not interview a former Lowell Five teller, because, as Hosey wrote to the FBI, she "no longer works for the Bank."

163.    The pattern of Lowell Five's interactions with the FBI suggests that unless Lowell Five was able to control a witness, and thus, steer the investigation, that witness became unimportant or unnecessary for the FBI to interview or otherwise investigate.

164.    Also conspicuously missing from the list of tellers provided to the FBI by Lowell Five were tellers who had extensive interactions with Beej Das, one of which provided access to exculpatory evidence which was contrary to the narrative that Lowell Five has pushed.[8]

165.    Lowell Five's narrative to the FBI and FinCEN was that Beej Das and Plaintiffs were engaged in a series of questionable activities that both improperly sourced and expended campaign funds.

166.    It was only after coaching from Lowell Five's management, directed by Wallace, Pratt, Brake and Lee that certain tellers were convinced to go along with a narrative that supported Lowell Five's fictional record.

167.    Notwithstanding the coaching by management, during cross examination at the Das Trial, White & Case attorney Michael Kendall uncovered Lowell Five's fabrication of the record upon which it thereafter filed SARs against Beej Das. *See* LaBonte Testimony, at 11:1-3 – 13:25 attached as Exhibit AA12.

---

[8] The teller made a $1,500 campaign contribution to Lori Trahan's 2018 campaign.

168.     According to the stunning admissions of Lowell Five bank tellers Carmen Tzilotzioras ("Tzilotzioras"), LaBonte, and Marchand, despite being specifically instructed by Beej Das – in each instance – Lowell Five intentionally and repeatedly treated Campaign Loan Repayments (each a set of two transactions by Beej Das – (1) a loan repayment from the Das for Congress campaign account at Lowell Five to Beej Das and (2) a subsequent loan from Beej Das to various other accounts at Lowell Five) as  L5 Direct Transfers (Lowell Five's decision to merge the two transactions into a single direct transfer from the Das for Congress campaign account at Lowell Five to the various other accounts at Lowell Five).

169.     Lowell Five's tellers, Tzilotzioras, Marchand, LaBonte, each testified that Lowell Five decided to alter the banking instructions provided by Beej Das without his knowledge, and often after he had left the bank branch. *See* Exhibit AA12 at 9:19-21.

170.     This pattern of Beej Das (a) requesting a Campaign Loan Repayment from Das for Congress as a cash withdrawal and, thereafter as a subsequent transaction, Beej Das requesting a deposit to one of the entities managed by the Hotel Company that had a bank account at Lowell Five, and (b) Lowell Five altering and falsifying the record to reflect Beej Das's banking record as a single L5 Direct Transfer was repeated eleven additional times: (i) on February 8, 2018 for $13,000, with Lowell Five's falsified notation indicating a "Transfer to Acct [ending in] 8047" (Exhibit AA10, at 7), (ii) on February 9, 2018 for $9,500, with Lowell Five's falsified notation indicating a "Transfer to Acct [ending in] 8047" (Exhibit AA10, at 8), (iii) on February 9, 2018 for $7,000, with Lowell Five's falsified notation indicating a "Transfer to Acct [ending in] 3741" (Exhibit AA10, at 9), (iv) on February 13, 2018 for $18,000, with Lowell Five's falsified notation indicating a "Transfer to Acct [ending in] 8047" (Exhibit AA10, at 10), (v) on March 26, 2018 for $20,000, with Lowell Five's falsified handwritten notation indicating a "transfer to Acct [ending

in] 8047" (Exhibit AA10, at  17), (vi) on March 29, 2018 for $5,000, with Lowell Five's falsified notation indicating a "Transfer to Acct [ending in] 6955" (Exhibit AA10, at 18), (vii) on April 5, 2018 for $15,000, with Lowell Five's falsified typed statement indicating an "internal transfer to acct [ending in] 8047" (Exhibit AA10, at 20), (viii) on May 8, 2018 for $5,000, with Lowell Five's falsified typed statement indicating an "Internal Transfer to acct [ending in] 8047" (Exhibit AA10, at 25), (ix) on May 10, 2018 for $8,000, with Lowell Five's falsified typed statement indicating an "Internal Transfer to acct [ending in] 6955" (Exhibit AA10, at 26), (x) on May 11, 2018 for $4,000, with Lowell Five's falsified typed statement indicating an "Internal Transfer to acct [ending in] 3085" (Exhibit AA10, at27), and (xi) on May 19, 2018 for $3,000, with Lowell Five's falsified typed statement indicating an "Internal Transfer to acct [ending in] 8047" (Exhibit AA10, at 28).

171.    Having falsified the bank records to show "internal transfers" that Beej Das did not request, Lowell Five then took the extraordinary step of filing SARs relying on its own falsified records.

172.    Lowell Five falsified the records first because it knew that the transactions that Beej Das requested were legal but the falsified transactions that Lowell Five created were not.

173.    At the Das Trial, Jaime Amrhein ("Amrhein") of the Federal Election Commission (the "FEC"), confirmed that treating the transactions as Campaign Loan Repayments and thereafter as Corporate Loans, as Lowell Five had been instructed by Beej Das, would not violate FEC rules.

174.    Amrhein also testified that treating the Campaign Loan Repayments and Corporate Loans as a single L5 Direct Transfer, as Lowell Five's falsified records suggested, did violate FEC rules.

175.    Lowell Five's practice was to investigate Beej Das's subsequent use of his own funds after they had been withdrawn from the Das for Congress account at Lowell Five.

176.     According to Lowell Five, Beej Das's use of his money deviated from standards Lowell Five had arbitrarily set for him. Lowell Five was angered that Beej Das loaned his personal funds to all businesses managed by the Hotel Company, not just the asset for which Lowell Five was a lender. Because Beej Das was not doing what Lowell Five believed he should do with his money, Lowell Five believed he should not be able to do anything with it.

177.     Therefore, having investigated what Beej Das chose to do with Campaign Loan Repayments, Lowell Five then decided on its own account and of its own volition to recharacterize each of the Campaign Loan Repayments as a L5 Direct Transfer.

178.     Lowell Five knowingly falsified Beej Das's transaction records to create FEC violations and then elected to report them.

179.     Lowell Five branch manager and tellers alike were unfamiliar with the rules of the FEC and how it regulates loans from candidates. *See* Firth Testimony, at 20:4-12 attached as Exhibit AA9 and Testimony of Sophavy Eath, U.S. v. Abhijit Das, No. 21-10200-RGS, at 3:9-17 (Fed. Dist. Ct. 2023) attached as Exhibit AA13.[9]

180.     Lowell Five, Wallace and Pratt used its tellers, who Lowell Five head teller Tzilotzioras referred to as "the girls or the boys" and their complete unfamiliarity with FEC and campaign loans to skewer Beej Das by easily corralling them to support a false narrative. *See* Testimony of teller Carmen Tzilotzioras, U.S. v. Abhijit Das, No. 21-10200-RGS, at 4:1-13 (Fed. Dist. Ct. 2023) attached as Exhibit AA14.[10]

---

[9] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the transcripts.
[10] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the transcripts.

*Lowell Five Presented a False, One-Sided Narrative to the FBI, FinCEN and Jury*

181.    Despite Lowell Five's abandonment of the Inn, Mitra Das held a steadfast confidence in its ultimate success and, on different occasions over the years, where immediate cash to maintain the business was required, demonstrated this confidence by providing small but critical personal loans to stem those cash-flow needs.

182.    In January 2019, the Inn's operator obtained financing through which, in part, it repaid Mitra Das for her prior cash advances. Mitra Das, in turn on January 28, 2019, used this repayment to repay, from her personal checking account at Lowell Five, a loan she had taken from a family acquaintance, Toby Chaudhury.[11]

183.    Mitra Das was repaying one of three personal loans that she had taken from family friends in December 2017 to provide a cash buffer for emergency expenses at the Hotel Company and maintain liquidity in her accounts.

184.    She and her son, Beej Das, had sold the India Condo so that Beej Das could use those proceeds for his Congressional campaign.

185.    Lowell Five was aware that the India Condo was being sold to finance Beej Das's campaign and that it had been sold because (a) Beej Das had communicated his sale of the India Condo as a method to finance his campaign to Wallace during an in-person meeting, and (b) Shelley George, a teller at the Lowell Five branch in North Andover, Massachusetts ("George"), had notarized documents required for the sale of the India Condo.

186.    Both Wallace and George were contributors to Lori Trahan, who ran against Beej Das; George contributed $1,500 to Lori Trahan's campaign, while Wallace contributed $500.

---

[11] Beej Das and Toby Chaudhury were acquaintances and both grew up in the Boston area. Toby Chaudhury and two other family friends lent Mitra Das money during a period of time that Beej Das was stepping away from the business the Das Family had invested heavily in.

187.    Neither Wallace, George, nor any other representative of Lowell Five advised the FBI of the exculpatory evidence regarding the sale of the India Condo or any knowledge thereof.

*Deflecting to Protect Lowell Five's Political Friends*

188.    Commencing in March 2019, several prominent news organizations raised questions about Lori Trahan's campaign and its source of its funding, especially in the final weeks leading up to her win in the Congressional primary in September 2018.[12]

189.    The press coverage would culminate in multiple Congressional investigations against Lori Trahan.

190.    One of the local financial institutions entangled in these inquiries was Lowell Five.

191.    On September 18, 2019 the Board of the Office of Congressional Ethics (OCE) forwarded to the House Committee on Ethics a report which alleged (1) that the personal loans Representative Lori Trahan made to her campaign were sourced from her husband David Trahan and (2) that Lori Trahan omitted required information related to the personal loans from her Financial Disclosure Statements and campaign reports to the Federal Election Commission (FEC). Wallace and Lowell Five were no strangers to Lori Trahan or the accusations against her.

192.    Lowell Five decided it was the right time to accelerate its multi-year campaign to damage Plaintiffs and push agencies including the Internal Revenue Service, the Department of Justice ("DOJ"), the FBI and the United States Attorney for the District of Massachusetts to investigate and ultimately prosecute Beej Das and the Borrower (collectively, the "Lowell Five Investigation").

---

[12] *See* Andrea Estes, Questions Raised About Source of Late Funds That Helped Carry Rep. Lori Trahan to Victory, Boston Globe (Mar. 3, 2019, 6:58 PM), https://www.bostonglobe.com/2019/03/03/questions-raised-about-source-late-funds-that-helped-carry-rep-lori-trahan-victory/ (last visited Feb. 17, 2024).

193.    Lowell Five's next step was to mischaracterize and present as nefarious the simple and routine repayment by Mitra Das of a personal loan.

194.    By doing so, Lowell Five achieved the added objective of deflecting attention from Lori Trahan's questionable conduct regarding contributions received from David Trahan and his company. Based largely on Lowell Five's testimony, cooperation, and instigation, the FBI commenced an investigation into the campaign of Beej Das.

*Lowell Five's Improper Influence Upon and Public Dissemination of a Federal Investigation*

195.    Knowledge of the FBI's investigation was initially limited to the FBI itself and Lowell Five, which helped initiate and stoke its flames.

196.    Seeking to obtain advantage from the existence of a federal investigation, Lowell Five leaked details of the Lowell Five Investigation to Defendant Reault, then an influential and gavel-wielding chair of the Town of Tyngsborough's Select Board and Lowell Five's chief ally in the government of Tyngsborough, where the Inn was located.

197.    After Lowell Five leaked it to him, Defendant Reault began unabashedly disclosing the existence and pendency of a "federal investigation" to others within the community, Tyngsborough and Lowell; including his political opponent and candidate for Tyngsborough selectman, Ken Pappas, and Tyngsborough's Chief of Police, Richard Howe ("Chief Howe").

*Disparate Treatment and Race*

198.    It is striking to compare Lowell Five's conduct regarding the Das Family, its disfavored minority clients, with that of its conduct with favored non-minority clients, Lori Trahan and David Trahan.

199.    Lowell Five was the custodian for campaign accounts for both Lori Trahan and Beej Das during the 2017-2018 Federal Congressional campaign season. While both campaigns

maintained accounts at Lowell Five, Lowell Five's treatment and support of Lori Trahan and her campaign stand in stark contrast to Lowell Five's rabid pursuit of Beej Das, who Lowell Five actively preyed upon, attacked, and sought to ruin.

200.    Lowell Five proceeded to accomplish its goals by providing the FBI and other federal agencies with false and misleading information, while omitting exculpatory evidence, with the intent to compel the government to participate in its prosecution of Beej Das and financially cripple Plaintiffs; transforming the federal government into an instrumentality of Lowell Five.

201.    By contrast, Lowell Five assisted Trahan in processing "donation" checks  multiple times when the funds failed to clear, date stamped the back of said check with different dates and refused to bounce the check; the check finally cleared when David Trahan's deposit of $50,000 into his joint account with Lori Trahan became available.  Lowell Five assisted Lori Trahan in circumventing campaign reporting laws and supported Lori Trahan in obscuring the transparency of her campaign's financial affairs.[13]

202.    Given its keen and intense scrutiny upon Beej Das, Lowell Five did not similarly investigate Lori Trahan, who also repaid loans made to her Congressional account at Lowell Five.

203.    Lowell Five did not set standards for the appropriateness of Lori Trahan's use of her own money as it had for Beej Das. This lack of interest in Lori Trahan was despite the fact, unlike Beej Das, Lori Trahan was already under scrutiny by the United States Congress for loans from her husband that were used in her campaign.

---

[13] While Lori Trahan's campaign's campaign finance problems have been covered in the press, the role of Lowell Five and the disparate treatment it has afforded the two candidates is perhaps equally noteworthy. *Cf.* Matthew Cunningham-Cook, *Rep. Lori Trahan Lied About Campaign Funds. The House Ethics Committee Cleared Her Anyway*. The Intercept (Jul. 27, 2020, 12:55pm), https://theintercept.com/2020/07/27/lori-trahan-campaign-finance/.

204.    The difference between Beej Das and Lori Trahan in the eyes of Lowell Five was – and is – simple.  On the one hand, Lori Trahan is part of the homogenous company the leadership of Lowell Five and Wallace keep: privileged, wealthy and part of the local political establishment. Lori Trahan campaigned on the slogan of "Born. Raised. Stayed."[14]

205.    On the other, Beej Das was actively questioning Lowell Five's banking practices, demanding transparency in the servicing of Lowell Five's loans, and most significantly, laying bare Lowell Five's predatory lending practices and exposing the politics of Lowell Five's political patrons. Lowell Five fought to keep its status quo and keep clients and borrowers of color in their proper place.

206.    According to an assistant manager at Lowell Five, a Lowell Five employee will refrain from filing a SAR on a "VIP Customer" despite having a duty to do so under banking regulations, including 12 C.F.R. § 21.11. "VIP Customers" receive special treatment and are granted courtesies that regular customers are not.

207.    Lori Trahan and David Trahan were "VIP Customers" at Lowell Five; not only did Lowell Five fail to report Lori Trahan's questionable activity, it actively participated in concealing it.

208.    It is not surprising, therefore, that Lowell Five chose to mislead the FBI about Beej Das while omitting exculpatory evidence surrounding those transactions, painting a false narrative about Beej Das while at the same time protecting Lori Trahan.

*An Emboldened Lowell Five Seeks to Foreclose on the Hotel*

---

[14] Beej Das, by contrast, was born outside the district from immigrant parents, who sought to be the first Indian-American to represent a Congressional district on the East coast.

209.    At a meeting in May 2019, Borrower again asked Lowell Five and Pratt why the Bank was unwilling to honor its commitment to lend under the Loan and again demanded the Bank confirm the release of personal guarantees from Guarantors.

210.    Emboldened by the federal investigations it helped launch and facilitate against the Borrower and Beej Das, Lowell Five was largely unresponsive. Instead, in retaliation five days later, Lowell Five issued Borrower a Final Demand Notice.

211.    Moreover, on July 1, 2019, exactly thirty days prior to the expiration of the Prepayment Penalty which it had used to hamper Borrower's ability to refinance, Lowell Five issued a Notice of Acceleration of Note ("Acceleration Notice") to Borrower, asserting that both Borrower and Guarantors were in default under the Note. *See* Nutter McClennen 93A Response Letter attached as Exhibit AA3 hereto, at 21-28.

212.    The Acceleration Notice stated that "you have the right to reinstate your mortgage by paying all sums and expenses… due under Mortgage and Note as if no acceleration had occurred… Your right to reinstate remains in effect even after acceleration, and you have the further right, including the right to assert the non-existence of a default or any other defenses to the acceleration and sale." ("Reinstatement Right"). *See* Nutter McClennen 93A Response Letter attached as Exhibit AA3 hereto, at 22, 24, 26 and 28.

213.    Borrower (a) asserted its Reinstatement Right by delivering to Lowell Five a check for $86,888.08 (representing payments on the Loan from May 2019 through August 2019, effectively bringing the Loan current), (b) questioned the Bank's assertion of a default, and (c) made several attempts to make payments under the Loan in July and August 2019, all of which Lowell Five rejected, thereby failing to honor the Reinstatement Right. *See* Reinstatement Request, attached as Exhibit AA15.

214.    Lowell Five was wrongfully dunning Borrower for late payments ostensibly due and declaring a default and foreclosing on Plaintiffs and Guarantors, knowing that Lowell Five had itself caused the default and the foreclosure by failing to provide the Renovation Financing necessary for the Hotel to generate the income required to repay the Loan.

215.    Had Lowell Five honored its agreements and extended the loan proceeds as promised in accordance with the Loan Agreement, including the Renovation Financing it had contractually agreed to, then there would have never been any personal guarantees, default or foreclosure thereafter.

*Defendants Use a Settlement Discussion to Damage Plaintiffs*

216.    In September 2019, representatives of the Borrower and Lowell Five, including Pratt, met at the Boston offices of Hinckley, Allen & Snyder LLP, Borrower's counsel, for settlement discussions (the "Settlement Meeting") and agreed, with Lowell Five's counsel present, that the meeting was for settlement purposes only.

217.    Borrower provided Lowell Five material, sensitive and privileged information, including Plaintiffs discussions with Troca Holdings' insurance carrier, Zurich American Insurance Company ("Zurich") concerning property damage to the Hotel during the Settlement Meeting.

218.    Pratt, Lowell Five and their counsel ignored their agreement, utilized the privileged information and sent (a) a letter to Borrower on October 9, 2019, with Lowell Five's counsel copied, providing what it claimed was a summary of the Settlement Meeting incorporated into a "notice in an attempt to collect a debt," and (b) a demand letter to Zurich threatening it for cooperating with its insured.   *See* Lowell Five Insurance Demand Letters attached hereto as Exhibit AA16.

219.     In their demand letter to Zurich, Pratt and Lowell Five threaten "civil action" but offer to forbear such action if Zurich agreed "that future payments will be issued to the insured and the Bank as joint payees." *See* <u>Exhibit AA16</u> at 3.

220.     Unknown to Plaintiffs until its discussions with Zurich in November 2023, Lowell Five furtively demanded and received a payment of $253,628.24 on July 24, 2020 from Zurich, a sum nearly four times the amount Lowell Five demanded in its Acceleration Notice and rejected from Plaintiffs.

221.     Lowell Five concealed its receipt of funds from Plaintiff's insurer from Plaintiffs, despite its prior demand that future payments on the policy be "issued to the insured and the Bank as joint payees."

222.     Indeed, Lowell Five hid its negotiations and receipt of $253,628.24 from the Bankruptcy Court, Bankruptcy Trustee, all Bankruptcy creditors, and even the Massachusetts Superior Court.

223.     Fraud and deceit have been hallmarks of Lowell Five, Lee and Brake's conduct regarding their dealings with Plaintiffs. In April 2022, Lowell Five, Lee and Brake spent three pages of a memorandum in support of Lowell Five's summary judgment in the State Court case discussing Lowell Five's contact with Zurich. Not only did Lowell Five, Lee and Brake conceal Lowell Five's negotiation and receipt of a $253,628.24 payout in their motions to the state court, Lowell Five, Brake and Lee suggest they had no contact with Zurich at all.

224.     Unbelievably pushing their false narrative, Lowell Five asserts that they "simply notified Cross Insurance Company, Boston East's broker… ***which was not even sent to Boston East's insurer***." (emphasis added) *See* Memorandum of Law in Support of the Lowell Five Cent Savings Bank's Motion for Summary Judgment at 16-17, Boston East Tyngsboro Holdings LLC

v. The Lowell Five Cent Savings Bank, No. 19-3481 (Mass. Super. Ct. 2022) attached as Exhibit AA25.

225.     Instead of acting with candor and transparency, Lowell Five used the payment from Zurich as part of its secret and improper business calculation and decision to move forward with the foreclosure and displacement of the Borrower and Hotel Company from the Hotel.

226.     Because of the unjust maneuvers of Lowell Five, Plaintiffs would advise Zurich several times, from January 2020 to June 2020 that they would pause their insurance claim and, at a future date continue discussions with Zurich once their posture in their dispute with Defendants allowed them to do so. *See, e.g.* Email from Abhijit "Beej" Das, President & CEO, Troca Hotels & Yachts, to Corey Canipe, National General Adjuster, Zurich North America, regarding "Re: Re: Re: Important Communication - Troca Holdings LLC" (Jan. 6, 2020) attached as Exhibit AA17 at 1, 7, 8 and 9.

*Plaintiffs Seek Protection in State and Bankruptcy Court*

227.     Lowell Five scheduled a foreclosure sale of the Hotel for December 5, 2019. On November 11, 2019, the Borrower and Guarantors filed suit against Lowell Five in the Middlesex Superior Court of the Commonwealth of Massachusetts (the "State Court Action").

228.     On December 4, 2019, the Borrower filed for Chapter 11 Bankruptcy protection in Bankruptcy Court (Case No. 19-41901)(the "Bankruptcy Proceeding").

229.     In response, and despite secretly possessing clear and irrefutable evidence that the Guarantors had been released from their personal guaranties, Defendant Lee, on January 3, 2020, filed an *Ex Parte* Motion for Approval of Attachment by Trustee Process to seize the Guarantors' bank accounts.

230.     Based on the false claims contained in Lowell Five's motion and buttressed by the credibility of Nutter McClennen & Fish LLP as a prominent Massachusetts law firm, the state court granted Lowell Five's *Ex Parte* Motion and seized Guarantors' liquid assets on January 3, 2020.

231.     In response, Borrower and Guarantors filed for dissolution of the trustee process on January 14, 2020.

232.     The 2017 Appraisal, still only in Lowell Five's possession, was critical to the state court's ruling because it demonstrated that the LTV ratio had dropped below the 65% required to trigger the Burn-Off Provision and the release of the Guarantors from the Guaranty. Without the personal guarantee, there could be no granting of an *Ex Parte* Motion to seize the Guarantors' assets.

233.     Despite its critical importance, Lowell Five and Lee withheld the 2017 Appraisal at the hearing for the dissolution of the trustee process held on February 18, 2020.

*Lowell Five and Pratt Commit Perjury*

234.     On January 17, 2020, Pratt and Lowell Five submitted an affidavit under penalties of perjury in opposition to Borrower and Guarantors' motion for dissolution of the trustee process in the State Court Action ("Pratt Affidavit"). *See* Affidavit of John Pratt in Opposition to Dissolution of Trustee Process, BETH v. L5, No. 19cv3481 (Mass. Super. Ct. 2020) attached as Exhibit AA18.

235.     Pratt committed perjury in the Pratt Affidavit.

236.     Specifically, in the Pratt Affidavit, Pratt acknowledges ordering and receiving the 2017 Appraisal. *See* Pratt Aff. at 4, ¶13 attached as Exhibit AA18.

237.    With full knowledge that the "Value Conclusion" stated on page 1 of the 2017 Appraisal was $5,500,000 - yielding an LTV of 63.49% - Pratt falsely states under oath that the appraisal "still demonstrated that the loan-to-value ratio of the Property remained above the 65% loan-to value ratio."[15] *Id.*

238.    Pratt stated, under oath, that Guarantors asserted "that the loan-to-value ratio had been met for the release of the Guarantors" but claimed that this position was "unsupported by any appraisal or other valuation evidence demonstrating this condition had been met." At the time of the Pratt Affidavit, however, Lowell Five and Pratt were in possession of the 2017 Appraisal which demonstrated on its face exactly the opposite of Pratt's sworn assertion. *See* Pratt Aff. at  5 ¶ 22 - 6 ¶ 25 attached as Exhibit AA18.

*Lowell Five and Lee Falsify Court Submissions and Perpetuate Fraud Upon a State Court*

239.    Not content that Pratt's perjury in the Pratt Affidavit would be enough, Lee and Lowell Five sent correspondence to the Honorable Diane Freniere ("Judge Freniere") on February 20, 2020 (the "Brian Lee Letter"), two days after a hearing held in the State Court Action and attached a doctored version of the 2017 Appraisal. *See* Affidavit of Mark Johnson ¶3, attached hereto as Exhibit AA19.

240.    In order to protect Pratt's perjury in the Pratt Affidavit, Lee altered and deleted the central and most critical information, the "Value Conclusion" and appraised values on page one of the 2017 Appraisal.[16]

---

[15] As of July 1, 2017, the LTV of the outstanding indebtedness under the Loan had dropped to 63.49% – calculated by taking the principal balance of $3,491,864.56 shown on Lowell Five's "Change of Terms Agreement" dated July 1, 2017 as the numerator divided by the "Value Conclusion" of $5,500,000 printed prominently on page 1 of the 2017 Appraisal as the denominator.

[16] Lee's correspondence to Hon. Diane Freniere and forwarding of a doctored appraisal, transmitted by both mail and email, was a clear and blatant violation of Federal Mail and Wire Fraud Statutes (18 U.S.C. §§ 1341, 1343).



*Cushman & Wakefield's authentic 2017 Appraisal*
*unequivocally states – on the very first page –*
*in a section labeled "Value Conclusions" the value of $5,500,000.*



*The doctored version of the 2017 Appraisal Lee submitted on behalf of Lowell Five to Judge Freniere deletes the "Value Conclusions" section heading and $5,500,000 value on the first page altogether, forcing the Court to wade through hundreds of pages and essentially guess what Cushman & Wakefield's value conclusions were.*

241.    Lee wrote to Judge Freniere that "in order to allow this Court to fully address the contentions raised yesterday pertaining to the 2017 Appraisal, I am enclosing herewith as Exhibit A a copy of the appraisal." *See* Johnson Aff. at Ex. A, attached hereto as Exhibit AA19.

242.    What Lee did not tell Judge Freniere was that he, his law firm, and Lowell Five, had altered the 2017 Appraisal to fundamentally change its content and meaning.

243.    Lowell Five and Lee deleted the information contained on the very first page, removing the central and most critical information contained therein, including the $5,500,000 "Value Conclusion."

244.    It was not until months later, in June 2020 and only after the plaintiffs in the State Court Action issued a subpoena to the appraiser, Cushman & Wakefield, that Lee released the true, unaltered version in his possession and Borrower and Guarantors received the 2017 Appraisal in its original and unadulterated condition. *See* Aff. Johnson ¶5, attached hereto as Exhibit AA19.

245.    In a reply memorandum Lowell Five submitted by in support of its Motion for Summary Judgment in the State Court Action, filed two and a half years after its fraud upon the state court, Lowell Five incredibly asserts that "the version of the 2017 Appraisal Lowell Five's counsel provided to the Court *inadvertently redacted* the value conclusions summary…" (emphasis added). *See* Reply in Support of The Lowell Five Cent Savings Bank's Motion for Summary Judgment at 6,[17] Boston East Tyngsboro Holdings LLC v. The Lowell Five Cent Savings Bank, No. 19-3481 (Mass. Super. Ct. 2022) attached as Exhibit AA20.[18]

---

[17] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the reply memorandum.

[18] In that and other court documents, Lee has suggested that because the value conclusion he and Lowell Five deleted appear elsewhere in the appraisal, the doctored appraisal is still a valid copy of the original appraisal. That contention was soundly rejected by expert Roginsky: "The fact that the value conclusion appears elsewhere does not render the appraisal with the value conclusion removed to be a valid copy of the unredacted appraisal." *See* Second Declaration of Rachel Roginsky ¶8, attached hereto as Exhibit AA24.

246.    Rachel Roginsky, a leading national hotel expert ("Roginsky") who reviewed Lee and Lowell Five's doctored 2017 Appraisal concluded that she could not "think of any legitimate reason why the value would be removed from the cover page of the report." *See* Declaration of Rachel Roginsky ¶8, attached hereto as Exhibit AA21.

247.    Notwithstanding the fraud perpetrated by Defendants Lee and Lowell Five, Roginsky stated with no uncertainty that "value conclusion from the 2014 appraisal was $5,100,000 and the conclusion in the 2017 appraisal was $5,500,000." *See* Second Declaration of Rachel Roginsky ¶10, attached hereto as Exhibit AA24.

248.    A digital forensics expert which provides independent digital forensics and electronic discovery services, analyzed the doctored 2017 Appraisal and the Brian Lee Letter and concluded that he did not know of any process "that would unintentionally hide or obfuscate information" such as the information Lee claimed was inadvertently redacted. *See* Declaration of Julian Ackert ¶11-12, attached hereto as Exhibit AA22.

249.    According to the expert, the laborious and specific steps that Lowell Five or its counsel most likely took to doctor - in nine distinct text areas -- the 2017 Appraisal Lowell Five submitted to the Court include (a) opening a copy of the initial file in a PDF editing application such as Adobe Acrobat Pro (one cannot edit a PDF file in the free Adobe Reader application); (b) manually selecting the option to edit the file (in Adobe Acrobat Pro, this option is available from the edit menu as "Edit Text & Images"); (c) navigating to each specific page to be edited; and (d) individually selecting each text area to be removed and manual deletion of each such text area (based on the expert's analysis of the 2017 Appraisal, this required individual selection of at least nine distinct text areas across the two pages). *See* Ackert Decl. ¶13 attached as Exhibit AA22.

250.    The steps a person would have to undertake to edit a PDF of the 2017 Appraisal in the way apparently done here make the claim of "inadvertence" plainly not credible and reflect yet a second deception to cover up the initial fraud perpetrated on the Court.

251.    Absent Pratt's perjury and Lee's fraud, no reasonable trier of fact could reach the conclusion that the Hotel was valued at any amount other than $5,500,000 as of the 2017 Appraisal.

252.    It is beyond question, therefore, that no personal guarantee still existed under the Loan.

253.    The value conclusion in an appraisal is used for LTV calculation because it represents the appraiser's most informed and comprehensive estimate of the property's market value.

254.    The Uniform Standards of Professional Appraisal Practice (USPAP) in the United States, sets forth the guidelines for developing and reporting appraisals and "value conclusion" reflects adherence to these standards, providing lenders and investors with a measure of confidence in the appraisal's accuracy and reliability.

255.    Financial institutions are subject to various regulatory requirements regarding the use of appraisals in lending decisions. The value conclusion is used to comply with these and other regulatory requirements, ensuring that the lending process is both fair and transparent.

256.    Indeed, Lowell Five used the value conclusion stated in the 2014 Appraisal for the calculation of the LTV used to satisfy the LTV Pre-Closing Condition.

257.    Lee's fraudulent and doctored version of the 2017 Appraisal deleted the appraiser's value conclusion from the first page of appraisal.

258.    "Without the cover page summarizing the value conclusion, it is easily overlooked among the other appraisal calculations, determined by varying appraisal methods that a non-expert

in this field is likely to overlook or misinterpret," concludes expert Roginsky. *See* Second Declaration of Rachel Roginsky ¶8, attached hereto as <u>Exhibit AA24</u>.

259.    Indeed, according to Roginsky, in all her "years of experience, I have never encountered a scenario where I have seen the value conclusions on an appraisal's cover page doctored, redacted, altered, or removed." *See* Second Declaration of Rachel Roginsky ¶9, attached hereto as <u>Exhibit AA24</u>.

260.    As a result of Lowell Five and Lee's fraud, however, Judge Freniere of the Middlesex Superior Court took the misrepresentations based upon false and doctored information in the doctored appraisal as true, as expert Roginsky opined would be likely.

261.    The doctoring of the 2017 Appraisal demonstrates that falsification of bank records is not an isolated or accidental activity for Lowell Five, its partners, associates and counsel.

262.    The doctoring of the 2017 Appraisal occurred on or before February 19, 2020 and is similar in kind and effect to the falsification of the Campaign Loan Repayments by Lowell Five between February 2018 and May 19, 2018, two years earlier.

263.    The objective facts apparently indicate that, for Defendants, convenient narratives to support their desires and charges are matters that simply can be fabricated out of thin air without compunction and, unfortunately, with the help and complicity of lawyers.

*The Devastating Consequences of Lowell Five's Fraud*

264.    In its unaltered state, the 2017 Appraisal (attached as Exhibit C to <u>Exhibit AA21</u>) proved a valuation of $5,500,000, a fact that a leading national hotel expert has confirmed. *See* Decl. Roginsky ¶ 9 attached as <u>Exhibit AA21</u>.

265.    This indisputably demonstrated that as of July 1, 2017 the Burn-off Provision had been triggered and the personal guarantees of the Guarantors were no longer in force.

266.    All of Lee's acts, (a) filing an *Ex Parte* Motion for Approval of Attachment by Trustee Process with the knowledge that no personal guarantee remained in force, (b) submitting a doctored appraisal to a state court in the Commonwealth of Massachusetts and (c) arguing that the value conclusion was some value other than the $5,500,000 stated on the cover of the 2017 Appraisal, which had been purposefully deleted, represent serious misconduct and fraud upon the state court.

267.    Lowell Five struck again on August 6, 2020, when despite possessing clear and irrefutable evidence that the Guarantors had been released from their personal guaranties and with the knowledge that the Guarantors now had awareness of the 2017 Appraisal and the true valuation of $5,500,000, Lee and Brake again seized, on behalf of Lowell Five, balances in Guarantors' bank accounts by filing a second *Ex Parte* Motion for Approval of Attachment by Trustee Process.

268.    Later that same month, as he expressed anguish that he was impoverished based on Lowell Five's conduct, for the first time in his life, Mukti Das was rushed to the Massachusetts General Hospital, having suffered a heart attack (myocardial infarction), which caused ongoing health issues that persist to this day.

*Lowell Five and Its Associates Intentionally Violate the Bankruptcy Court's Automatic Stay*

269.    Lowell Five, Brake and Lee's fraud and interference with due process was not limited to falsifying bank records, submitting a perjurious affidavit or doctoring a critical submission in the State Court Action.

270.    Lowell Five actively and intentionally interfered with the Plaintiff's rights in the Bankruptcy Proceeding, as well. In late December 2019, Lowell Five, Pratt and Wallace, devised a conspiracy to compel the Town of Tyngsborough ("Tyngsborough") to unlawfully seize

Borrower's liquor license. Lowell Five, Pratt and Wallace again turned to and worked in concert with their associate Defendant Reault.

271.    Lowell Five easily convinced Reault to act in furtherance of facilitating the unlawful seizure of Borrower's liquor license.

272.    Reault, in compliance with Lowell Five's requests, instructed Chief Howe, to seize Borrower's liquor license on January 1, 2020 in violation of the Automatic Stay provisions set forth in Section 362(a) of the Bankruptcy Code.

273.    On December 30, 2019, the Town's counsel, Attorney Adam Costa, advised Borrower's Bankruptcy counsel, Attorney Jesse Redlener, that the Town would take no action against Borrower's liquor license until ongoing legal discussions between the Town and Borrower regarding the implications of the Bankruptcy Proceeding were completed in the weeks ahead.

274.    Chief Howe, himself an attorney who was also aware of the Bankruptcy Proceeding and has knowledge of the protections afforded borrowers under the Bankruptcy Code, advised Reault on the morning of January 1, 2020 that the seizure of Borrower's liquor license would be in violation of the law and the Bankruptcy Code.

275.    Despite receiving advice from Town's counsel and Chief Howe, Reault demanded that notwithstanding the requirements of the law, Chief Howe seize Borrower's liquor license. During New Year's Day brunch on January 1, 2020, despite having been advised of the protections afforded to the Borrower under the Bankruptcy Proceeding and Bankruptcy Code, under Reault's direction, Chief Howe entered the Inn to seize the Borrower's liquor license, effectively shutting down the Inn and Borrower's business.

276.    Lowell Five and Reault made the decision to override and violate the Bankruptcy Court's Automatic Stay to send a message to the Plaintiffs: notwithstanding the law, Defendants

would ensure that Plaintiffs would neither benefit from due process nor be able to seek effective recourse in the courts.

*Lowell Five's Bankruptcy Fraud*

277.    As stated above, Lowell Five secretly sought and received a $253,628.24 payout from Zurich on Plaintiffs' insurance policy on July 24, 2020.

278.    Lowell Five has never disclosed to any party in the Bankruptcy Proceeding that it received this insurance payout from Zurich.

279.    The Trustee's Final Report ("TFR") was filed by Bankruptcy trustee Joseph H. Baldiga ("Bankruptcy Trustee") in the Bankruptcy Proceeding on October 13, 2022. *See* Joseph H. Baldiga, Trustee's Final Report, *In re* Boston East Tyngsboro Holdings LLC, No. 19-41901 (Bankr. D. Mass. Oct. 13, 2022) attached as Exhibit AA23.

280.    The TFR was circulated to Lowell Five, Lee and Brake prior to its issuance, incorporated their inputs, and was subject to their approval.

281.    Despite demanding and then receiving proceeds from the insurance policy Plaintiffs maintained, Lowell Five, Lee and Brake failed to advise the Bankruptcy Trustee, the Bankruptcy Court, or the Plaintiffs of Lowell Five's secret payment from Zurich.

282.    Lowell Five received the secret payment from Zurich after the commencement of the Bankruptcy Proceedings and before the TFR was issued and finalized.

283.    Upon information and belief, Defendants never advised the Bankruptcy Trustee that Lowell Five had received a secret payment from Plaintiffs' insurer.

284.    The TFR shows an "Insurance Claim (Estimate)" reduced to $0.00 based on the "valued determined by Trustee." *See* TFR at 3 attached as Exhibit AA23.

285.    The TFR shows only a payment of $1,250 to Lowell Five c/o Pratt in the Bankruptcy Proceeding as a "break up fee allowed by the Court Order." *See* TFR at 7 attached as Exhibit AA23.

286.    Nowhere in the TFR is the payment of $253,628.24 to Lowell Five from the insurance claim on Zurich shown because at no time did Lowell Five, Pratt, Wallace, Brake or Lee alert the Bankruptcy Court or Bankruptcy Trustee that the Bank had received such a payment.

287.    Lowell Five's failure to notify the Bankruptcy Court or Bankruptcy Trustee itself became just another of the many deliberate and fraudulent acts Defendants committed.  *See generally* TFR attached as Exhibit AA23.

*The Prevalent Role of Race at Lowell Five*

288.    When Chief Howe suspended Tyngsborough Animal Control Officer Dave Robson Sr. ("Robson") in September 2020 over racially insensitive and inflammatory social media posts he allegedly made, Defendant Reault led the charge to exonerate his racist friend, voting in November 2020 to reinstate Robson, effectively overruling the considered decision of Chief Howe. During his tenure in Tyngsborough politics and beyond, Reault has bristled at any attempt to remedy or ameliorate racial injustice or animosity within Tyngsborough. *See* Tyngsboro animal control officer moving on from job in wake of son's election loss, Lowell Sun (July 10, 2021), https://www.lowellsun.com/2021/07/10/tyngsboro-animal-control-officer-moving-on-from-job-in-wake-of-sons-election-loss/ (last visited April 7, 2024).

289.    As with Reault, racism has never been a barrier to Lowell Five and Wallace's conduct.

290.    It comes as no surprise, therefore, that Lowell Five does not take inquiries into its racist behavior seriously.

291.    In the State Court Action, Lowell Five skirted each and every discovery request regarding its racially discriminatory practices, opting to label the discovery requests ones that were "merely intended to annoy, harass, embarrass and/or oppress Lowell Five."

292.    Lowell Five's interference with the rights of the Plaintiffs in the Bankruptcy Proceeding is not conduct befitting a banking institution chartered by the Commonwealth of Massachusetts and insured by the Federal Deposit Insurance Corporation.

293.    Lowell Five knew full well that Mitra Das, a Lowell Five banking client, then in her late 70s, was (a) willing to put her personal assets behind the Borrower after it filed for Bankruptcy as part of a Debtor-in-Possession financing package ("DIP Financing")(indeed, having done so on multiple occasions), and (b) that Mitra Das had been released as a guarantor by virtue of the 2017 Appraisal that Lowell Five tightly controlled in its possession. *See* Exhibit AA9 at 29:10-25 and 30:1-17.

294.    Despite that understanding and knowledge, Lowell Five proceeded to thwart Mitra Das's good faith effort to provide DIP Financing in order to doom Borrower's attempt to restructure its operations and recapitalize its funding under the Bankruptcy Proceeding.

295.    A creditor's protection of its own interest under the Bankruptcy Code is not only justifiable, it is likely prudent.

296.    Corrupting the bankruptcy process by (a) offering perjured affidavits, (b) attempting to falsely implicate Borrower's principals for campaign finance violations and bankruptcy fraud, (c) withholding critical information and evidence from appropriate legal tribunals, and (d) intentionally hiding a large payment it received in the context of Bankruptcy Proceedings, on the other hand, is illegal conduct that Lowell Five deployed and practiced throughout the servicing of the Loan and Bankruptcy Proceeding.

*Lowell Five's Abysmal Federally Reported Minority Lending Performance*

297.    Banks such as Lowell Five that are insured by the Federal Deposit Insurance Corporation ("FDIC") submit annual reports regarding all home mortgage applications, approvals, denials and originations to the federal government as required under the provisions of the Home Mortgage Disclosure Act ("HMDA").

298.    The HMDA requires financial institutions such as Lowell Five to "maintain, report, and publicly disclose loan-level information about mortgages" that, among other things, can "shed light on lending patterns that could be discriminatory." *See generally* Consumer Financial Protection Bureau, Home Mortgage Disclosure Act (HMDA), https://www.consumerfinance.gov/data-research/hmda/ (last visited Feb. 17, 2024).

299.    For a HMDA assessment area that had a minority population of nearly 30% according to 2020 United States Census (the minority population was 24.6% in 2010, but grew in the ten years since then), in 2017 Lowell Five solicited and received only 4.7% of its home loans applications from minority applicants. *See* Community Reinvestment Act Performance Evaluation at 61, The Lowell Five Cent Savings Bank, Certificate Number: 90227 (May 14, 2018).

300.    Lowell Five's 2017 origination rate for minority applicants was no better; minority applications resulted in an origination rate of 40% -- significantly lower than 69% origination rate for white applicants. *See* CRA Performance Evaluation at 61; Consumer Financial Protection Bureau, 2017 HMDA Historic Data, https://www.consumerfinance.gov/data-research/hmda/historic-data/ (last visited Feb. 17, 2024).

301.    Defendants Lowell Five, Wallace and Pratt attempt to obscure their discriminatory practices by originating loans to business entities with no income or racial designations and

suggesting to auditors and agencies that the "bank's focus is commercial lending." *See* CRA Performance Evaluation at 3.

*Banking While Black at Lowell Five*

302.   While the appallingly low 2017 origination rates for all minority applicants at Lowell Five was and is unacceptable, black applicants, specifically, fared even worse. *See* 2017 HMDA Data, CFPB (last visited Feb. 17, 2024).

303.   Compared to loan approvals amongst Lowell Five, Enterprise Bank, Washington Savings Bank, Jeanne D'Arc Credit Union, and Sage Bank, all community and regional financial institutions serving the same area (the "Comparable Banks"), Lowell Five's average approval for black applicants was the lowest, at $210,000. *Id.*

304.   The same year, Lowell Five's average approval for its white applicants was $301,196. *Id*

305.   By contrast, the same year, Sage Bank registered an approval average for black applicants of $316,224. *Id.*

*Lowell Five's Practice of Redlining Hispanic Borrowers*

306.   In 2017, Lowell Five engaged in a pattern and practice of lending discrimination affecting predominantly Hispanic borrowers as well.

307.   Indeed, Hispanic applicants at Lowell Five did poorly.

308.   Amongst the Comparable Banks, Lowell Five's average approval for Hispanic applicants was the lowest at $132,333 despite Lowell Five's Hispanic applicants having the highest average income, $193,000, of all Hispanic applicants to the Comparable Banks.

309.   By contrast, Lowell Five's average approval for its white applicants was $301,196 despite its white applicants having 38% lower average incomes than their Hispanic counterparts.

310.    In 2017, Lowell Five's white applicants averaged $139,494 annual income vs. $193,000 for Lowell Five's Hispanic applicants). *Id.*

311.    By contrast, Enterprise Bank registered an approval average for Hispanic applicants in 2017 of $305,000 compared to $132,333 for Lowell Five's approval average for Hispanic applicants. *Id.*

312.    In 2017, Lowell Five's white loan applicants earning significantly less still received higher loan approvals than their Hispanic counterparts. *Id.*

313.    Lowell Five's law firm acknowledges that "the Fair Housing Act prohibits discriminatory housing practices on the basis of race, color, religion, sex, disability, familial status, or national origin.

314.    In Nutter's Bank Report for their banking clients, Lowell Five's law firm advises that "federal authorities may base discrimination claims on disparate impact in situations in which a housing practice (including home mortgage lending) 'actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns' on members of a protected class." *See* Nutter McClennen & Fish LLP, Nutter Bank Report: February 2024, JD Supra (February 29, 2024), https://www.jdsupra.com /post/documentViewerExternal.aspx?fid=0f93b094-151c-436d-9c77- 7d173a4b8d61 (last visited April 6, 2024).

315.    Perhaps Lowell Five wasn't listening. Indeed, in 2017, Lowell Five's discriminatory lending practices were exactly the opposite of what the law allows.

*Lowell Five Directorship for Belanger: A Reward for Beliefs and Dirty Deeds Done*

316.    Lowell Five's racially discriminatory lending practices become easier to understand by looking at the Bank's Executive Committee.  They are amplified by the fact the Bank's Board of Directors "boasts" of one minority out of eighteen positions.  A seat on the Board appears less about reflecting the diversity of the community the Bank serves and, as with member Deborah Belanger ("Belanger"), more about rewarding those eagerly doing the bidding and sharing the predispositions of the Bank's officers.

317.    In 2014, Wallace introduced Belanger, a friend and long-term associate of Wallace and Lowell Five, to Borrower and Beej Das, portraying her as quintessentially "Lowell" and extolling her virtues and talents.

318.    Based largely on her Lowell Five connections, Belanger was brought on as a paid consultant for the Das for Congress campaign.  Her belief and support of Beej Das's candidacy would prove to be based solely on her compensation status – a trait that Lowell Five and Wallace would use to bolster their scheme to undermine Plaintiffs' ownership of the Hotel.

319.    During Belanger's 2021 run for Lowell City Council, what Wallace meant by her virtues and talents would first come to light, as her platform shadowed Lowell Five's vision for the community, one which maximized opportunities and business for Lowell Five and maintained the status quo that Wallace and its executives desired.

320.    In a debate, Belanger was asked whether she believed "racism is a public health crisis." Parroting the response of another candidate, Belanger initially stated it was, but, in a stream of conscience statement, repeatedly and conversely exclaimed that "we are not a racist city at all" and noted that certain members of the older white generation she grew up with "fortunately"

remained in the communities of Lowell, although people of "different nationalities" were the ones buying their houses.

321.    Underscoring her belief that "this city is not racist," Belanger offered as evidence the fact that "my neighbors are people of color."[19]

322.    Supporting Lowell Five's business practices was one thing; Belanger would prove her real worth when she readily stepped in the role of public relations representative for Lowell Five's, Wallace's and Pratt's smear campaign against Beej Das.

323.    In October 2021, Belanger spoke publicly to the Lowell Sun newspaper about the FBI Arrest and Beej Das noting that "Beej Das's problems are 'his karma not mine.'"

324.    Notwithstanding the misappropriation of the religion, race and culture of Beej Das's birth, Belanger's press statements were patently false. It had not been some amorphous concept of "karma" that resulted in the FBI Arrest, but rather, the concerted and persistent efforts of Lowell Five and its agents, including Belanger.

325.    Belanger would provide testimony bolstering Lowell Five's false portrayal of Beej Das over two interviews, testimony riddled with inaccuracies, inconsistencies, exaggerations and falsehoods.

326.    Based on her testimony, the FBI notes that Belanger has "always been involved in different capacities in the city of Lowell." In her interviews, Belanger lists her work at the Greater Merrimack Valley Convention and Visitors Bureau, Megan's House, Das for Congress, and the

---

[19] The Lowell Sun's coverage of the September 2021 debate titled "Racism Classification Ignites Lowell City Council At-Large Debate," did not capture Belanger's subsequent statements that she ensures her car is locked everyday, commending the phone notifications the city puts out reminding her to do so. Belanger lost her campaign, coming in second to last.

Lowell Memorial Auditorium. Conveniently and conspicuously absent, however, is Belanger's position as a Lowell Five "Corporator."

327.    Having served the cause well, on May 25, 2021, exactly one week after Belanger's May 18, 2021 interview with the FBI, Wallace gave Belanger his largest political donation of 2021.

328.    More troublesome is the fact that Lowell Five's rewards for Belanger's work did not stop there. With discussions that were underway as a result of her testimony to torpedo Beej Das, less than a year after the FBI interviews that Belanger delivered in the Lowell Five Investigation, Lowell Five named its loyal and longtime associate, Belanger – an individual with no banking experience and a checkered professional career – to its Board of Directors, in February 2022.

*Perjury, Fraud, and Racketeering: The Foundation of Lowell Five's Criminal Case*

329.    Lowell Five falsified records it provided to FinCEN, the FBI, and the US Attorney, provided perjured affidavits from its senior executives and coached its tellers and employees to support a false narrative, all to eliminate a civil adversary it was not able to defeat using legal means and neutralize a persistent legal adversary and person of color it disfavored.

330.    As a result of Lowell Five's activities, pushed by Wallace, Pratt, Lee and Brake, the FBI expanded its investigation into Beej Das.  Indeed, further emboldened by the success of its efforts to enlist the FBI and United States Attorney in furtherance of its illegitimate civil objectives, Lowell Five and Lee accelerated their efforts to extinguish Plaintiffs' rights and civil claims while contemporaneously feeding and supporting the criminal investigation it had successfully launched behind the scenes.

331.    Lowell Five's efforts culminated on June 29, 2021, when FBI agents broke down Beej Das's front door, arrested him, and brought him to the United States District Court for the District of Massachusetts in Boston to be arraigned on charges that Lowell Five had long sought and actively encouraged (the "FBI Arrest").

332.    Though the criminal arraignment it sought and orchestrated was scheduled in haste and notification to Beej Das's own parents and family was apparently not possible, the top echelon of Lowell Five, Wallace and Pratt, whose schedules undoubtedly are set well in advance – were both available to attend and present to witness the arraignment of Beej Das.

333.    With the exception of Beej Das's counsel, Wallace and Pratt were the only individuals attending the arraignment who were not associated with the federal government, showcasing the level of collusion between Wallace, Pratt, Lowell Five (each an active litigant against Plaintiffs in contention civil litigation) and the federal government.

334.    Wallace and Pratt apparently keep their schedules open to attend sudden arraignments of clients they seek to destroy.

335.    The fruits of Lowell Five's collusion are both obvious and odious. The indictment against Beej Das states in Paragraph 2 "DAS operated a financially struggling hotel business." This opinion is derived nearly verbatim from (a) Lowell Five's counterclaims in the State Action, which list "significant financial losses on the hotel" (¶31), "financial difficulties" (¶34), "continued to incur significant losses and struggled" (¶35), and "financial issues" and "continuing to fail" (¶38); (b) Lowell Five's opposition to dissolution of trustee process in the State Action which recites that "Boston East was in serious financial trouble" (p. 5), and  "financial difficulties" (p. 6); and (c) Pratt's Affidavit in the State Action where he states the hotel's "financial and business position had further deteriorated" (¶38).

336.    While the propriety of the FBI's blanket reliance on the Pratt Affidavit is beyond the scope of this complaint, Pratt's blatant perjury, and the gross inaccuracies and oversimplification that evidence it, are not.

337.    Pratt and the Pratt Affidavit paint a picture divorced from reality.

338.    For example, after years of decline prior to its ownership and despite Lowell Five's failure to fund the Renovation Financing, the Borrower steadily grew revenue from the sale of hotel rooms, achieving revenue of over $952,000 in 2018, compared to $594,440 in 2010.

339.    The Pratt Affidavit ignores the well-known fact that Borrower purchased a failing hotel with extensive capital improvement needs and addressed many of those needs almost entirely without the financial support Lowell Five was contractually obligated to provide.

340.    Missing from the Pratt Affidavit and the Lowell Five narrative it inspired is the fact that when the aging Inn's sprinkler system failed during a freak winter storm in February 2016, flooding most of the property, Plaintiffs and Borrower decided to employ nearly the entire staff of the hotel for the six months that the property was closed.

341.    Mitra Das, in particular, borrowed from her own retirement savings so that payroll could be met and employees could be retained. During the same period, as it watched Plaintiffs, including its then 74-year-old client, struggle to help fix and return the Inn to operation, Lowell Five sat on hundreds of thousands of dollars of Renovation Financing that it had arbitrarily decided to withhold.

342.    Indeed, the Pratt Affidavit is completely silent on Lowell Five's central role in whatever financial difficulties the Borrower did face.

343.    The FBI affidavits used to obtain search warrants against Beej Das and his friends and colleagues feature verbatim transcription from Lowell Five's false narrative.

344.   Of particular concern is a statement, contained in an FBI affidavit that "under the terms of the loan, Lowell Five agreed to loan BETH LLC up to $3,850,000, limited to 65% of the appraised value of the Property."

345.   No such cap existed "under the terms of the loan" and indeed, until the coerced and forced imposition of the personal guarantees, the "65%" number did not feature anywhere in the Loan Documents.

346.   The FBI affidavits are yet another demonstration of the level of influence that collusion between Wallace, Pratt, and Lowell Five had upon the FBI.

347.   More troubling yet was the extent to which the United States Attorney and FBI received and relied upon the false and intentionally deceptive information provided by Lowell Five, Wallace, and Pratt on matters involving the constitutional rights of United States citizens.

348.   Copying almost verbatim from the Pratt Affidavit ("Over the course of the Loan, Boston East was late with its payments at least 35 times, and beginning in May 2018, **was late every single month, stopping payments altogether in early-to-mid 2019**"), the FBI affidavit states, definitively, that "beginning in May 2018, **DAS was late every single month and by early to mid-2019, stopped paying altogether**." (emphasis added).

349.   The FBI statement ignored the fact that Beej Das had no personal payment obligation to Lowell Five for which he could have been late.

350.   Through constant repetition, Lowell Five's propensity to fudge facts and provide perjured testimony had been amplified and found its way as a central fact in the criminal investigation and subsequent prosecution by the FBI and United States Attorney.

*Two Paths: Truth vs. Lowell Five*

351.    During its pendency but completely unaware of the existence of the Lowell Five Investigation at the time, Beej Das reached out to the FBI through counsel.

352.    Beej Das met with FBI agents in February 2021 to discuss information that he had regarding Reault and Lowell Five (the "Das-FBI Meeting").

353.    During the Das-FBI meeting, Beej Das detailed (a) a pattern of corruption within the Town of Tyngsborough, namely through Reault and Lowell Five's influence, (b) Reault and Lowell Five's coordinated efforts to violate due process and the automatic stay provisions of the Bankruptcy Code to deny renewal of the Hotel's liquor license, and (c) Lowell Five's business and personal relationships with Reault and its proclivity to support racism.

354.    At the end of the Das-FBI Meeting, Beej Das advised the FBI that he "would be willing to speak with Agents again should they require any additional information regarding the above-referenced matters," as shown in the FBI record of the meeting.

355.    The Das-FBI Meeting included credible evidence and information which discredited Lowell Five, the FBI's star witness in its multi-year Lowell Five Investigation.

356.    Though Beej Das's counsel, shortly after the meeting, was told that there appeared interest to further investigate the matters discussed.

357.    Approximately one month later, Beej Das's counsel was informed that the lead agent present at the Das-FBI Meeting had been reassigned and would no longer be handling the matter.

358.    During the extensive Lowell Five Investigation, the FBI went so far as to investigate repairmen who worked on an anchor of a yacht owned by a company affiliated with

the Plaintiffs and the records pertaining to a safe deposit box of the parents of Beej Das's ex-girlfriend.

359.    Yet, surprisingly, in its effort to gather evidence and ultimately prove an intent crime, the FBI declined an open offer by Beej Das, the prime subject of its clandestine, Bank-inspired investigation, who voluntarily made himself available for further interviews with the FBI and offered complete transparency – to speak to discuss the claims Lowell Five had cultivated and fostered.

360.    Understanding the dynamic of that refusal offers true insight into the workings of the Lowell Five Investigation.

361.    When a financial institution approaches federal or state regulators, authorities and tribunals seeking to investigate a customer, there is an expectation that the financial institution comes with clean hands to the investigation. That is strengthened when a financial institution is represented and aided by a prominent Boston law firm such as Nutter McClennen & Fish LLP.

362.    The Lowell Five Investigation, at its very foundation, was premised on a perjured affidavit by Pratt that federal and state authorities had no reason to believe was corrupted. The investigation was buttressed, along the way, by the willing cooperation and testimony of biased and unsavory characters such as Pratt, Reault and Belanger.

363.    Doubts that Lowell Five's manipulative and strategic use of criminal charges as a weapon in its civil litigation against Plaintiffs and the Hotel Company's CEO, Beej Das are further dispelled by (a) Lowell Five's pleadings in the State Court Action and (b) Lee's email to counsel for Beej Das seeking to advise the court in the State Court Action of Beej Das's conviction — a

conviction stemming from charges that Lowell Five helped fabricate using underhanded methods and falsified records. *See* Mem. in Supp. of Mot. for Summ. J. at 12 attached as <u>Exhibit AA25</u>.[20]

364.    Lowell Five's move, aimed at undermining Plaintiffs' credibility, was strategically timed and irrelevant to the central issue of the Bank's own fraudulent behavior and its fraud upon the court. Lee's email is just the latest example, in a long string of such behavior, of Defendants' willingness to misuse the legal system to gain unfair advantage in its dispute against civil adversaries aggrieved by the Bank's conduct.

365.    To many, the Lowell Five Investigation appeared to be a clear case of an incompetent and shifty hotel operator and lawyer who misused campaign funds to prop up a failing business.

366.    The reality and truth – was that the Das Family, with two individuals in their late-70s/early-80s and their son, summoned every bit of financial wherewithal to support a small business aimed at bolstering diversity in a community they cared about, only to be stomped on upon and destroyed by Lowell Five, a local bank run by politically motivated, racially discriminatory power brokers seeking to wield their power.

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(RICO Violation)**
**All Plaintiffs v. All Defendants**

367.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count I.

368.    Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

---

[20] Page number references in the citations refer to the internal page numbers within the exhibits, not the original page numbers of the pleadings.

369.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

370.    Troca Holdings is an enterprise engaged in and affecting interstate commerce by virtue of purchases of supplies from out-of-state suppliers, as a provider of services to interstate travelers, and performance of construction activities on buildings sold and leased in interstate commerce.

ENTERPRISE

371.    Lowell Five is an enterprise engaged in and whose activities affect interstate commerce. Count I Defendants include the enterprise itself, Lowell Five, and those employed by or associated with the enterprise, whom, along with the enterprise, formed an association in fact, and include (1) the officers of Lowell Five – Wallace and Pratt; (2) the employees of Lowell Five – Tzilotzioras, LaBonte, Marchand, Eath and Firth; (3) a director of Lowell Five – Belanger, (4) attorneys of Lowell Five – Lee and Brake; and (5) associates of Wallace and/or Lowell Five in the municipal government of Tyngsborough, namely Reault.

372.    Commencing prior to the late summer or early fall of 2018,  Defendants Lowell Five, already an enterprise, along with its employees and associates, Wallace, Pratt, Lee, Brake, and Reault, formed an association in fact for the common purpose as described herein, which constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4), to engage in a continuing pattern of racketeering activity. The members of the enterprise of Lowell Five functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

SCHEME

373.   Defendants formed an association in fact for the purpose of accomplishing two schemes. The first was to (1) acquire undue money, assets, and security interests from Plaintiffs, for Defendants' own ill begotten gain, which they achieved by denying funds due to Plaintiffs in order to compel default and ultimately foreclose upon their assets, namely the Hotel; and the second was to (2) disgrace and expel the Das Family, persons of color, within and from their community, which Defendants achieved by depriving Beej Das, Mukti Das, and Mitra Das fair and equal opportunity based on their race, color, national origin, and political aspiration. Defendants engaged in a pattern of racketeering to facilitate and accomplish their schemes, going so far as to doctor appraisals submitted to a state court, recharacterize and falsely record bank transactions performed by Beej Das without his knowledge or consent, entice witnesses to produce false testimony in exchange for pecuniary benefit, recruit and corrupt municipal government officials to assist and engage in their conspiracy and scheme, intentionally withhold funds due to Plaintiffs to compel default in breach of the loan agreements, conceal information concerning the receipt of funds from Plaintiffs' insurer and falsely incriminate Beej Das to federal authorities suggesting criminal activity, while omitting exculpatory evidence, in order to subject Beej Das to criminal investigation in the hopes that federal authorities physically expel Beej Das from society through incarceration.

374.   Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs, acquiring Plaintiffs' assets, depriving Plaintiffs of their equal rights under the law on the basis of race, color, national origin, and political ambition. Defendants

conspired to and succeeded in expelling the Plaintiffs from their community and Plaintiffs' own property on the basis of their race and national origin.

375.    Each Defendant conspired to and succeeded in depriving Beej Das, Mitra Das, and Mukti Das of their fair and equal opportunity on the basis of their race and national origin through a pattern of racketeering activity and pervasive control and utilized the FBI to pursue criminal charges against Beej Das to falsely imprison him and threaten to deprive him of his freedom.

376.    The enterprise was not limited to the predicate acts and extended beyond the racketeering activity. Rather, the enterprise existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of financing and banking. Defendants have had, and do have, upon information and belief, legitimate business plans outside the pattern of racketeering activity.

PATTERN OF RACKETEERING ACTIVITY

377.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

378.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately late summer or early fall of 2018 and continuing to the present, and there is a continued threat of repetition of such conduct.

379.    Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18

U.S.C. §1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had specific intent to engage in the substantive RICO violations herein alleged. Pursuant to and in furtherance of their scheme, Defendants committed multiple related acts of mail fraud (18 U.S.C. §1341), wire fraud (18 U.S.C. §1343), extortion (18 U.S.C. §1951), and corruption through bribery and falsifying evidence (18. U.S.C. §§1510 and 1512).

380.    Plaintiffs specifically further allege that Defendants participated in the operation and management of the association in fact enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

*Mail and Wire Fraud*

381.    Defendants committed acts constituting indictable offenses under 18 U.S.C. §§1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs and obtain and retain undue money, assets, and security interest from Plaintiffs by means of false or fraudulent pretenses, representations, or promises.

382.    Furthermore, Defendants committed said fraudulent acts to deprive Plaintiffs fair and equal opportunity based on race, and harm Plaintiffs, and succeeded in compelling and utilizing the U.S mail and wires to falsely report to the FBI in order to bring criminal charges against Beej Das, with the purpose of depriving Beej Das his freedom. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and items by U.S. Mail and by private or commercial interstate carriers. Defendant also transmitted or caused to be transmitted by means of wire communications, in interstate commerce, various writings, signs, and signals.

383.     The acts of Defendants set forth herein were done with the knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

384.     In furtherance of their scheme, Lowell Five, through Wallace and other agents, on June 5, 2014, used wire and/or U.S. mail to fraudulently induce Plaintiffs to execute the loan agreements, with no intention of providing Plaintiffs with the Renovation Financing funds as promised in the inducement.

385.     Lowell Five, through its Vice-President Commercial Lending, Thomas N. Boucher ("Boucher"), on July 11, 2014, and at other times, used wire and/or U.S. mail to fraudulently induce Plaintiffs to execute the loan agreement for their purchase and renovation of the Hotel, with the intent to maximize payments received from the Plaintiffs, while at the same time forcing Plaintiffs into default by withholding the Renovation financing necessary to generate the revenue to sustain the payment obligations under the loan. In furtherance of their scheme to acquire Plaintiffs assets and expel them from their property and the community, while withholding funds due to Plaintiffs.

386.     On January 30, 2015, Lowell Five, through Boucher, used wire and/or U.S. mail to intentionally misrepresent the terms of the loan agreement by stating to the Plaintiffs that the loan to value ratio was material to the loan agreement after closing, when it in fact was not.

387.     On June 4, 2015, Lowell Five, through Boucher, used wire and/or U.S. mail to induce Plaintiffs to execute a personal guarantee by intentionally withholding the funds due to Plaintiffs, whereby Defendants intentionally misrepresented the Renovation financing funds were being withheld due to a loan to value ratio cap, which was false.

388.     Lowell Five, through Boucher, on September 5, 2017, used wire and/or U.S. mail to misrepresent that Lowell Five has the right to and authority to withhold the Renovation Financing funds which were agreed upon, contracted for, and due to Plaintiffs.

389.     Lowell Five, through its Collections Officer, Normand A. Zarella ("Zarella"), used wire and/or U.S. mail on March 15, 2019 to mislead, confuse and otherwise intentionally misrepresent both the status of the Loan and of the Guarantors to Mitra Das by addressing Mitra Das as the Manager of the Borrower, not as a Guarantor, as Defendants purported.

390.     Lowell Five, through Zarella, used wire and/or U.S. mail on March 15, 2019 to mislead, confuse and otherwise intentionally misrepresent both the status of the Loan and of the Guarantors to Mukti Das by addressing Mukti Das as the Manager of the Borrower, not as a Guarantor, as Defendants purported.

391.     Lowell Five used wire and/or U.S. mail on April 9, 2019 to mislead and otherwise intentionally misrepresent the bank records provided to various federal agencies by submitting records that it had falsified regarding Beej Das's loan repayments from his Das for Congress campaign.

392.     Lowell Five and Pratt, used wire and/or U.S. mail on June 27, 2019 to wrongfully dun Borrower for late payments ostensibly due, and declare a default on Borrower, knowing that Lowell Five had itself caused the default by failing to provide the Renovation Financing.

393.     Lowell Five, through Lee, used wire and/or U.S. mail on February 19, 2020 to intentionally misrepresent the 2017 appraisal, which Defendant doctored to hide the true value of the Hotel prior to submitting to the state court and to others through the U.S mail and/or wire for circulation and misrepresentation. Defendants did so to unlawfully support its contention that the Guarantors were liable under the guarantees.

394.    On or about February 19, 2020, Lowell Five and Lee used wire and/or U.S. mail to intentionally and fraudulently represent that the results of the 2017 appraisal determined the LTV was greater than it was, and that this LTV granted Defendants personal recourse over Guarantors.

395.    On February 19, 2020, Lee used wire and/or U.S mail to commit fraud upon the Middlesex Superior Court of Massachusetts, by fraudulently doctoring the appraised value of the Hotel in order to circumvent liability and defraud the Guarantors under the Loan Documents.

396.    In June 2020, Hosey used wire and/or U.S mail to commit fraud upon the FBI, by fraudulently misrepresenting Lowell Five's transaction records pertaining to Beej Das in order to utilize the FBI to pursue criminal charges against Beej Das to strip his personal freedom and liberties away.

397.    From 2018 until 2021, Defendants at various times used wire and/or U.S mail to fraudulently incriminate Beej Das to the FBI, in order to compel and utilize the FBI to unlawfully expel Beej Das and Plaintiffs from their community based upon their race and color, deprive Beej Das the opportunities and fair reporting they afforded to Lowell Five's "VIP Customers", with the ultimate goal of utilizing the FBI to effectively pursue criminal charges against Beej Das to strip his personal freedom and liberties away.

398.    Upon information and belief, Defendants also communicated by wire and /or U.S. mail or private or commercial carriers to facilitate the payment of bribes and offer of improper and illegal pecuniary benefits to one or more government officials, namely, Reault.

399.    Upon information and belief, throughout their dealings with Plaintiffs, Defendants also communicated by wire and/or U.S. mail or private or commercial carriers to conspire with one another to facilitate the specific frauds perpetrated against the Plaintiffs as stated herein.

*Extortion under Hobbs Act (18 U.S.C. §1951)*

400.   Defendants unlawfully withheld the Renovation Financing, depriving the Plaintiffs of their lawfully entitled funds under the official color of light.

401.   Defendants' threats of withholding the funds which Plaintiffs were lawfully entitled; then extorting Guarantors into executing personal guarantees and depositing additional funds into their accounts at Lowell Five amounts to extortion in violation of 18 U.S.C. §1951, because without the Renovation Financing, essential renovations could not occur, revenues and profitability could not be increased, and the sustainability of the Hotel would be in jeopardy.

402.   Defendants' threats of acceleration and collection upon the Loan Documents compelled Guarantors to invest additional funds to improve the Hotel and tender payments to the Defendants in excess of their legal obligations, in order to "burn off" the personal guarantees upon achieving the 65% LTV. Defendants received the benefits of these funds and the improvements to the Hotel, triggered by forcing Plaintiffs to default under the Loan Documents, while never releasing the Guarantors as promised and agreed, as Defendants had orchestrated and schemed all along.

403.   Lowell Five threatened Zurich and Plaintiffs from working together to resolve a claim that Plaintiffs have filed with Zurich.

404.   Utilizing the fear Lowell Five had created to obstruct Plaintiffs, Lowell Five demanded and thereafter collected $253,628.24 of proceeds from Plaintiffs' insurer, which would have otherwise been paid to Plaintiffs.

*Corruption & Fraudulently Falsifying Evidence*

405.    Lowell Five and Lee committed fraud upon the Superior Court of Massachusetts by omitting the 2017 Appraisal, then misleading Plaintiffs and the court as to its determinations. Lowell Five and Lee then altered and doctored the 2017 Appraisal before finally submitting it to the court and Plaintiffs, in order to conceal its determination that the LTV was below 65%, and did so with the intent to impair the 2017 Appraisal's integrity and the availability of its findings to the Plaintiffs and the court in the state court proceedings, in clear violation of 18 U.S.C § 1512.

406.    Upon information and belief, Reault revoked Borrower's liquor license without legal right, "under color of authority" in furtherance of the enterprise's goal to deprive Plaintiff of income needed to pay under the Loan Documents, in furtherance of Defendants' goal to acquire the Hotel and expel Plaintiffs from their community.

407.    Upon information and belief, Belanger acted as an agent of Lowell Five in furtherance of its schemes throughout her involvement with Plaintiffs until the present date. Belanger assisted Lowell Five in delivering its false narratives to the FBI and actively assisted Lowell Five in expelling Beej Das, Mitra Das, and Mukti Das from their community. As a reward for her covert acts, Lowell Five rewarded Belanger with a seat on its Board of Directors.

408.    Upon information and belief, Lowell Five, through Wallace and/or Pratt bribed and/or otherwise facilitated the payment of bribes and offer of improper and illegal pecuniary benefits to Reault and possibly other government officials with proceeds from the pattern of racketeering activity facilitated by their unlawful enterprise.

409.    Upon information and belief, Lowell Five and its officers notified Reault, Belanger, and potentially others of their scheme, including their false reporting to the FBI, the existence of

the federal investigation of Beej Das Lowell Five fostered, and the existence of the grand jury subpoena issued to Lowell Five, in violation of 18 U.S.C § 1510.

410.    Lowell Five and its officers falsely and intentionally recharacterized Loan Repayments and Corporate Loans as L5 Direct Transfers without Plaintiffs' knowledge or consent, overriding instructions they were given and replacing them with the Bank's own instructions, creating false records and "suspicious activity" that they then reported to FinCEN, in clear and repeated violation of 18 U.S.C § 1512.

411.    Defendants violated 18 U.S.C § 1512 by corruptly persuading others to diminish and obstruct the questionable acts of Lori Trahan, their preferred candidate, and instead encouraged, stoked, and promoted the investigation into Beej Das.

*RICO Summary*

412.    As set forth herein, in furtherance of Defendants' scheme to defraud Plaintiffs, Defendants utilized the United States mails and the wires in violation of 18 U.S.C. §§1341, 1343. In addition, as set forth in paragraph 74, Defendants induced Plaintiffs to execute a security agreement from Plaintiffs, in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 1961(1)(A).

413.    The Defendants used or invested, directly or indirectly, part or all of such income, or the proceeds of such income, in the establishment or operation of the enterprise and association in fact to further the enterprise's scheme to defraud Plaintiffs of all valuable assets and property, in violation of §1962(a).

414.    The acts set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

415. The activities of this association in fact affect interstate or foreign commerce in that the properties involved are marketed in interstate commerce and the businesses and enterprises involved are engaged in interstate commerce.

416. The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

417. As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they are entitled judgment for the following damages caused by Defendants:

a. Lowell Five acquired Plaintiffs' Hotel;

b. Plaintiffs lost all of their investment;

c. Plaintiffs' brand and reputation were significantly diminished;

d. Guarantors' liquid assets were unlawfully frozen and seized on multiple occasions and remain frozen to present date, causing an escalating pattern of financial distress and ruin for Plaintiffs;

e. Beej Das was subject to false imprisonment and his home was ransacked by federal agents; and

f. Beej Das was subject to a trial replete with false testimony and perjured evidence orchestrated by Defendants.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(RICO Violation)**
**All Plaintiffs v. All Defendants**

418.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count II.

419.    In violation of 18 U.S.C. § 1962(d), Defendants, all persons as defined in RICO, commencing prior to late summer or early fall of 2018, conspired to violate 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c), to obtain or attempt to obtain, directly or indirectly, control over Plaintiffs' assets, receive financial benefits from the enterprise's pattern of racketeering activity to defraud Plaintiffs, and dishonor and expel Plaintiffs in and from their community on the basis of race, national origin, and political beliefs, which Defendants conspired to accomplish through a pattern of racketeering.

420.    Troca Holdings is an enterprise engaged in and affecting interstate commerce by virtue of purchases of supplies from out-of-state suppliers, as a provider of services to interstate travelers, and performance of construction activities on buildings sold and leased in interstate commerce.

421.    Defendant, which is FDIC insured, is an enterprise engaged in and affecting interstate commerce by virtue of its business activities in interstate commerce, through servicing clients across state lines, loaning funds in multiple states in interstate commerce, and its branch locations in Massachusetts and New Hampshire.

422.    The conspiracy to obtain or attempt to obtain control was carried out through a pattern of racketeering activity. As set forth above in paragraphs 85, 90-2, 94-5, 100, 103, 106-7, 122-3, 138, 146, 149, 152, 156-9, 165-9, 170-2, 178, 193, 196, 197, 200-1, 208, 210, 213, 218, 220, 221-3, 227, 233-8, 240-1, 264-5, 268-70, 273, 275-80, 294, 321-3, 326, 335, and 360 in furtherance of Defendants' scheme to acquire control over Plaintiffs' assets, prey upon and defraud Plaintiffs, and dishonor and expel Plaintiffs in and from their community on the basis of race,

national origin, and political beliefs and aspirations, Defendants conspired to and utilized the United States mails and the wires in violation of 18 U.S.C. §§ 1341 and 1343. In addition, as set forth in paragraph 74, Defendants extorted a valuable security agreement from Plaintiffs in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 1961(1)(A), and as set forth in paragraphs 219-222 above, Defendants obtained hundreds of thousands from Plaintiff and $253,628.24 from Plaintiff's insurer, Zurich, by extortion in violation of 18 U.S.C. § 1951. These mailings, use of the telephone, and acts of extortion constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(1), (5).

423.    Defendants conspired to control or to attempt to control Plaintiffs' assets, including but not limited to the Hotel, for financial gain, and to strip it and its owners of all valuable assets and for purposes of circumventing their obligations under the Loan Documents, of which Defendants were in breach by defrauding Plaintiffs of funds due thereunder. Instead of granting Renovation Financing and loan proceeds, Lowell Five forced Guarantors into executing personal guarantees through economic duress and extortion, by withholding the additional funds which Plaintiffs were entitled, essentially forcing them sign the personal guarantees or lose their entire investment in the Hotel. Defendants conspired to and succeeded in defrauding Plaintiffs of funds due, which then caused Borrower to default, and ultimately file for bankruptcy protection.

424.    Defendants conspired to entice and promote the FBI's criminal investigation and prosecution of Beej Das while at the same time protecting from and preventing any such inquiry into Lori Trahan, believing that such criminal inquiry would ruin and expel Beej Das from their community, render him incapable of taking legal action against Defendants, and ultimately lead to incarceration, depriving Beej Das of his actual freedom and liberty. Defendants at all times acted upon their prejudice against Beej Das's race, culture, and political beliefs and aspirations,

conspiring to "kill two birds with one stone" – thwarting the investigation into Lori Trahan, their preferred candidate who is white, while harnessing the reigns of federal power to harm their adversary, Beej Das, a person of color.

425.    Defendants conspired to use their pervasive control, causing Plaintiffs' Hotel investment despite Defendants' pre-existing scheme to arbitrarily act against Plaintiffs' contractual rights and foreclose upon the Hotel, which was among the enterprise's goals. Defendants (a) denied Plaintiffs the Renovation Financing, at all times essential to increasing revenue; increasing asset value; and serving the Loan and (b) conspired to foreclose upon the Hotel and Plaintiffs' assets by forcing default under the Loan. Defendants knew withholding the Renovation Financing would render it impossible for the Hotel to succeed. Having grown dissatisfied with Plaintiffs' inconvenient assertion of their rights, Defendants acted in an arbitrary and capricious manner in order to wrest control of the Hotel after compelling Plaintiffs to make significant investments thereon. Defendants acquired such pervasive control over Plaintiffs and conspired to, and did extort them, by compelling Guarantors to execute personal guarantees under economic duress. Using a myriad of deceptive and illegal practices, Defendants perpetrated these harms on the Plaintiffs while intending to fulfill a goal of their conspiracy, to foreclose and acquire the Hotel after extorting the maximum amount of Plaintiffs' funds possible, which they accomplished.

426.    Defendants conspired to commit the RICO violations as stated herein and did commit the RICO violations in furtherance of their unlawful schemes. As a result of Defendants conspiracy, in violation of 18 U.S.C. § 1962(d), Plaintiffs have suffered significant damages in an amount to be determined at trial.

### COUNT III
### CIVIL RIGHTS VIOLATION (42 U.S.C. § 1981)
### (Equal Rights under the Law)
### Beej Das, Mukti Das, and Mitra Das v. Lowell Five, Wallace, and Pratt.

427.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count III.

428.    Plaintiffs, Mukti Das and Mitra Das, are naturalized citizens of the United States of America, and reside in the town of North Andover, in the County of Essex, in the Commonwealth of Massachusetts.

429.    Mukti Das and Mitra Das were born in the Republic of India.

430.    Mitra Das and Mukti Das maintain citizenships of the United States of America.

431.    Beej Das is the only child of Mitra Das and Mukti Das. Beej Das, Mitra Das and Mukti Das are all individuals of color, and ethnically Indian.

432.    Plaintiffs Mukti, Mitra and Abhijit Das have the right to make and enforce contracts in the United States and are entitled to the full and equal benefits of the law.

433.    Defendant David Wallace is a white American, who was born in the United States of America.

434.    Defendant Pratt is a white American, who was born in the United States of America.

435.    Defendant Lowell Five has no minorities or individuals of foreign origin on its executive committee. Defendant Lowell Five's executive committee consists of white American born individuals exclusively. Indeed, Lowell Five's 18-member Board of Directors has only one person of color.

436.    Defendants Lowell Five, Wallace, and Pratt have deprived Plaintiffs Beej Das, Mukti Das, and Mitra Das of their right to make and enforce contracts and to the full and equal benefit of Lowell Five's regulations and all laws and proceedings for funds contracted and entitled to Plaintiffs, because of Plaintiffs' race and national origin in violation of 42 U.S.C. § 1981.

437.     Defendants Lowell Five, Wallace, and Pratt have deprived Plaintiffs of such rights for the purpose of expelling Plaintiffs from their community based upon Defendants Lowell Five, Wallace, and Pratt's animus toward Plaintiffs' race and national origin.

438.     Plaintiffs have been damaged by virtue of Defendants Lowell Five, Wallace, and Pratt's conduct alleged in the foregoing paragraphs in the same manner as alleged in paragraphs above, which is incorporated herein by reference, and entitles Plaintiffs to recover these damages from the Defendants Lowell Five, Wallace, and Pratt.

439.     Defendants Lowell Five, Wallace, and Pratt conspired to and did engage in discrimination against the individual Plaintiffs, based upon their race, color and national origin, whereby Plaintiffs were deprived of their federal Constitutional rights to make and enforce contracts, and not to be victimized by the Defendants Lowell Five, Wallace, and Pratt's fraud, misrepresentation, defamation and breach, which Defendants Lowell Five, Wallace, and Pratt pursued to deprive and infringe on Plaintiffs' right to contract and enforce the terms thereof, on the basis of Plaintiffs' race, all as proscribed by and in violation of 42 USC Section 1981 et seq.

440.     Defendants Lowell Five, Wallace, and Pratt conspired to and did engage in discrimination against the individual Plaintiffs, based upon their race, color and national origin, in their disparate treatment of Beej Das compared to Lori Trahan.

441.     Defendants Lowell Five, Wallace, and Pratt have a history of discriminatory practice adversely impacting minorities, including Hispanics and Black Americans which Defendants brazenly attempt to conceal by suggesting their focus is commercial lending, thus evading the conventional metrics by which discriminatory lending practices are detected and monitored.

442.    As a proximate result of such wrongful activities referred to above conducted by Defendant Lowell Five and the individual Defendants Wallace, and Pratt on behalf of Lowell Five, the Plaintiffs came to lose their entire investment in the Stonehedge Hotel and Spa and all profits from the hotel, to their pecuniary loss and damage, as well as the funds contained in their individual bank accounts that were seized by Lowell Five as part of its collection efforts.

**COUNT IV**
**CIVIL RIGHTS VIOLATION (42 U.S.C. § 1982)**
**(Equal Right to Hold Real and Personal Property)**
**Beej Das, Mukti Das, Mitra Das v. Lowell Five, Wallace, Pratt**

443.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count IV.

444.    The provisions of 42 U.S.C. § 1982 afford "all citizens of the United States . . . the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

445.    Plaintiffs Beej Das, Mukti Das, and Mitra Das are non-white citizens of color of the United States, who invested to hold real property in the Stonehedge Hotel and Spa.

446.    Plaintiffs Mitra Das, and Mukti Das are of Indian ethnicity and national origin.

447.    Defendants Lowell Five, Wallace, and Pratt sought to deprive Plaintiffs of their property, expel them from their own property and community, and take possession and control over Plaintiffs' property and assets on the basis of their race, color and national origin, and did so.

448.    As the direct result of the Defendants Lowell Five, Wallace, and Pratt's unlawful acts, Plaintiffs were deprived of their right to keep their property, to which they were lawfully entitled.

## COUNT V
## CIVIL RIGHTS VIOLATION (42 U.S.C. § 1983)
### (Equal Protection Violation Under The Fourteenth Amendment )
### Beej Das, Mitra Das, and Mukti Das v. Reault

449.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count V.

450.    Defendant Reault, while member of the Tyngsborough, Massachusetts Select Board deprived Plaintiffs of their right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution by intentionally basing his decisions to an impermissible extent on Plaintiff's race, color and national origin.

451.    Defendant Reault exhibited none of the animosity, bias, or racism against white, non-foreign borrowers in similar circumstances. Neither did Defendant Reault perpetrate the fraud and other unlawful acts herein described against white American citizens.

452.    Defendant Reault was highly motivated to expel Plaintiffs from their community, their political affiliations, their social circles, and would go at any length to fulfill these racist goals.

## COUNT VI
## CIVIL RIGHTS VIOLATION (42 U.S.C. §  1985)
### (Conspiracy to Interfere with Civil Rights)
### All Plaintiffs v. All Defendants

453.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count VI.

454.    Defendants have conspired for the purpose of depriving Plaintiffs the equal protection of the laws and of equal privileges and immunities under the laws by conspiring to ruin and eject Plaintiffs in and from their community and deprive Plaintiffs of their property based upon Plaintiff's race and national origin, by personal malice against the Plaintiffs, and by improper

consideration of Plaintiffs predicated upon racial bias and disdain for Plaintiffs' race and national origin.

455.     In furtherance of the object of this conspiracy to deprive Plaintiffs of the equal protection of the laws and his equal privileges and immunities under the laws, Defendants have done or caused to be done the acts set forth in this complaint which resulted in Plaintiffs being ejected from the community, the denial of remedial rights, deprivation of property, and violated their civil rights and liberties.

456.     Plaintiffs have been injured in their person and property and deprived of exercising their rights and privileges as a citizen by virtue of the conduct of the conspiring Defendants.

**COUNT VII**
**VIOLATIONS OF 15 U.S.C. ¶ 1691**
**(Equal Credit Opportunity)**
**All Plaintiffs v. Lowell Five**

457.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count VII.

458.     Plaintiffs Mitra Das and Mukti Das non-white individuals of color; both are naturalized citizens of the United States, of the Indian race, and lawfully married to one another.

459.     Defendant Lowell Five did discriminate against Plaintiffs on the basis of their race, color, and national origin by depriving them of the Renovation Financing, to which Plaintiffs were entitled under the terms of the Loan Documents; Defendants did not, and would not, perpetrate these same harms upon a white individual born in the United States of the same background, appearance, and culture as the Defendant Lowell Five, in the same position as the Plaintiffs.

460.     Defendant Lowell Five did discriminate against Plaintiffs on the basis of their marital status, by withholding funds due to Plaintiffs, in order to deprive Plaintiffs of funds agreed

to and promised, and compelled Plaintiffs Mukti and Mitra Das, husband and wife, to both execute personal guarantees.

461.    Defendant Lowell Five discriminated against Plaintiffs on the basis of race, color, and national origin by inducing them to execute the Loan Documents, then subsequently withholding funds due under Loan Documents on the basis of their race, color, and national origin, then leveraging their pervasive control, acquired through their racketeering acts as stated herein to compel Mitra Das and her spouse Mukti Das, along with their son Beej Das, to execute personal guarantees under economic duress; which Defendant Lowell Five has not done to other white individuals.

**PENDANT STATE CLAIMS**

**COUNT VIII**
**BREACH OF CONTRACT**
**All Plaintiffs v. Lowell Five**

462.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count VIII.

463.    Borrower and Defendant Lowell Five entered into a valid and binding contract on or about August 1, 2014 by signing the Loan Documents.

464.    Guarantors executed the First Loan Modification on July 4, 2015 under economic duress, because of Defendant Lowell Five's breach of the Loan Documents in withholding funds due to Plaintiffs for Renovation Financing. However, even assuming the First Loan Modification is a valid and binding contract, then Defendant Lowell Five also breached this contract by failing to extinguish the personal guarantees upon the loan to value ratio reaching 65% or less. and Defendant Lowell Five entered into a valid and binding contract on or about June 4, 2015 by signing of the First Loan Modification.

465.     Borrower was performing as required by the terms of the contracts and sought funds that were committed to it by Defendant Lowell Five under the terms of the loan.

466.     Defendant Lowell Five breached the terms of the agreement between the parties by (i) failing to initially advance funds against an available $535,000, (ii) requiring Plaintiff to add Guarantors to the Loan and modify the terms of the Loan to receive a $300,000 advance which Plaintiff BETH was already due, (iii) refusing to advance an additional $235,000 even after Guarantors had been added to the Loan, (iv) refusing to release Guarantors from their personal guarantees despite the clear language and automatic operation of the guarantee removal provision in the First Loan Modification, (v) enforcing personal guarantees against Guarantors to the present day despite clear evidence and knowledge that such guarantees are no longer in force, (vi) holding Plaintiffs' assets against Plaintiffs' will in the servicing of the Loan Documents and loan.

467.     Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT IX
## UNJUST ENRICHMENT
### All Plaintiffs v. Lowell Five

468.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count IX.

469.     Borrower alleges that Defendant Lowell Five has been unjustly enriched by accepting payments and interest from the Borrower without performing fully under the terms of the Loan by lending the amount it was required to lend to Borrower.

470.     Guarantors allege that Defendant Lowell Five has been unjustly enriched by exacting personal guarantees and changing the security interest of a contract where no such guarantees and security were required under the terms of the Closing Documents.

471.     Plaintiffs receipt of the Renovation Financing, which both parties agreed would be provided to Plaintiffs after the Closing, was material to the terms of the loan agreement as the projected increase in revenue after renovation to the Hotel was a primary consideration with regards to the feasibility of Plaintiffs adhering to the payment schedule under the loan agreements. Defendant Lowell Five s' scheme to intentionally withhold the Renovation Financing funds caused the Plaintiffs' default under the loan, which led to the pervasive control Defendant Lowell Five sought to exert over the Plaintiffs. Defendant Lowell Five's acts caused Plaintiffs' default, forced Beej Das, Mukti Das, and Mitra Das to execute the personal guarantee, and compelled Plaintiffs to invest additional funds into the value of the Hotel in order to extinguish said personal guarantee, which Defendant Lowell Five later proclaimed was "unlimited" and never extinguished.

472.     Defendant Lowell Five have been unjustly enriched due to its unlawful acts, whereby it withheld funds due to Plaintiffs, then compelled Plaintiffs to execute personal guarantees, which allowed the Defendant Lowell Five to then seize Plaintiffs' assets, then foreclose upon the Hotel, which Plaintiffs spent significant investment toward in order to extinguish the personal guarantees.

473.     Defendant Lowell Five was unjustly enriched by receiving a payment from Plaintiffs' insurer for nearly a quarter million dollars and thereafter concealing that fact in bankruptcy proceedings, to the courts and to Plaintiffs themselves.

474.     Defendant Lowell Five was unjustly enriched by receiving payments from Plaintiffs when they intended foreclosure from the onset of their dealings, and by receiving the Hotel in much better condition than at the Closing, and by receiving Plaintiffs' monies and assets through its scheme to compel foreclosure and bind the personal guarantors.

## COUNT X
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### All Plaintiffs v. Lowell Five

475.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count X.

476.     In addition to the express contractual provisions set forth in the Closing Documents, First Loan Modification and other related agreements, there is an implied covenant that the parties shall act in good faith, deal fairly with one another, and not undertake efforts that would deprive the other of the benefits of the Closing Documents, First Loan Modification and other related agreements.

477.     At all times, Plaintiffs acted in good faith and dealt fairly with Defendant Lowell Five in connection with its rights and obligations pursuant to Closing Documents, First Loan Modification and other related agreements.

478.     As set forth above, Defendant Lowell Five has failed to act in good faith and deal fairly with Plaintiffs. As a result of their bad faith and unfair dealing, Defendant Lowell Five has deprived Plaintiffs of the benefits they were entitled to receive under the Closing Documents, First Loan Modification and other related agreements Defendants.

479.     As a direct and proximate result of Defendant Lowell Five's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages, including but not limited to: loss of the full loan amount of $3,850,000 and the benefits attendant thereto and the continuing threat by Defendant Lowell Five to enforce a security interest that should long since have been extinguished.

## COUNT XI
## INTERFERENCE WITH CONTRACTUAL RELATIONS
### Troca Holdings v. Lowell Five

480.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count XI.

481.    Defendant Lowell Five has contacted Borrower's insurer to pressure Plaintiffs to make contractual concessions that are not due and to abandon Plaintiffs' claims against Defendant.

482.    Defendant Lowell Five's secret negotiations with Plaintiffs' insurer and receipt of a $253,628.24 payment without Plaintiffs' knowledge or consent adversely affected Plaintiff's claims under its insurance policy with Zurich.

483.    Defendant Lowell Five has interfered with Borrower's contract with its insurance company.

484.    Said interference by Defendant Lowell Five was intentional, malicious, and without lawful justification.

485.    As a direct result thereof, Defendant Lowell Five has hampered Borrower's ability to negotiate with its insurer and recover amounts due under its policies, causing damages to Plaintiffs in an amount exceeding $3,000,000.

486.    Defendant Lowell Five's actions caused Plaintiffs to receive significantly less in insurance proceeds than they were entitled and, ultimately, resulted in the loss of an asset with a valuation of at least $5,500,000.

## COUNT XII
## VIOLATION OF MASS. GEN. LAWS CH. 93A
### All Plaintiffs v. All Defendants

487.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count XII.

488.    At all relevant times hereto, Defendants were engaged in trade or commerce as defined under Mass. Gen. Laws ch. 93A, § 1(b).

489.    The above-described actions of Defendants, including but not limited to (i) Defendants' repeated refusal to honor contractual obligations, (ii) bad faith interference with Borrower's negotiations with its insurer, (iii) failure to release Guarantors from their personal guarantees and (iv) predatory and collusive practices constitute "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 2, and are therefore unlawful.

490.    At all relevant times, Borrower was engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 1(b), including its ownership of the Hotel, and has suffered a loss of money and property worth a minimum of $8,500,000 as a result of Defendants' violation of Mass. Gen. Laws ch. 93A, § 2.

491.    Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 were a willful and/or knowing violations of said statute. Defendants are therefore liable, under Mass. Gen. Laws ch. 93A, § § 2 and 11, to Plaintiffs in an amount equal to not less than twice and up to three times Plaintiffs' damages by reason of its violations of Mass. Gen. Laws ch. 93A, § 2.

492.    Plaintiffs are also entitled to an award of reasonable attorneys' fees and costs incurred in this action as a result of Defendants' violations of Mass. Gen. Laws ch. 93A, § 2 for the reasons stated herein, for fraudulently and wrongfully failing to extend to the Plaintiffs the promised loan benefits, for the fraudulent misrepresentation of material elements of the proposed loan package, and for then extorting personal guarantees from the individual Plaintiffs; Lowell Five and all individual Defendants are in violation of Massachusetts GL chapter 93A, the Massachusetts Consumer Protection Statute, all to the Plaintiffs' loss and entitling them to statutory damages.

493.     By the conduct and activities described above, the Bank and individual Defendants are in material breach of their contract with the Plaintiffs and the provisions of the loan documents executed by both parties August 1, 2014, to the Plaintiffs' loss and damage.

494.     By the conduct and activities described above, the Bank and individual Defendants have stolen and converted Plaintiffs' property to their own use by way of garnishing and then seizing the individual bank accounts and retirement accounts of the individual Plaintiffs, as part of the Bank's collection efforts, all to the Plaintiffs' loss and damage.

**COUNT XIII**
**DEFAMATION**
**Beej Das v. Lowell Five and Pratt**

495.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count XIII.

496.     Defendant Lowell Five has made utterances and published materials that defamed the Plaintiffs by falsely depicting them and casting them in a false light as financial delinquents, knowing that to be untrue and knowing that it was the Bank's own actions that caused any delinquency on the part of the Plaintiffs, all to the Plaintiffs' loss and damage.

497.     Defendant Lowell Five utilized its contacts and connections with the Lowell Sun to publish false and misleading articles, intended to harm the reputation of Beej Das within the community.

498.     Defendant Lowell Five, through its now Board member and agent Deborah Belanger, published false and racist statements about Beej Das in the Lowell Sun- with the intent to defame him, and harm his reputation and insult his ethnicity.

499.     As a result of the harm caused to Beej Das as a direct result of Defendant Lowell

Five's smear campaign against him, Beej Das has suffered significant damage to his credibility,

name, and reputation in an amount not less than $20,000,000.

**COUNT XIV**
**FRAUD**
**All Plaintiffs v. All Defendants**

500.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in

this Count XIV.

501.     At all relevant times herein mentioned, Defendant Lowell Five Cent made several

representations to Plaintiff(s) about the terms of the proposed loan, including but not limited to:

no requirement for personal guarantees, an interest rate of 4.85% for 25 years, and the availability

of $650,000 for renovations and improvements upon request.

502.     Contrary to the representations made, Defendants, after closing the loan, refused to

provide the agreed-upon renovation financing citing a "65% maximum L/V ratio limitation" that

had previously been satisfied as a condition precedent to closing the loan.

503.     Furthermore, in a deliberate and deceitful act designed to manipulate the legal

process and the rights of Plaintiff(s), Defendants, specifically through actions coordinated by

Lowell Five and its representatives, altered critical documents related to the loan agreement.

Notably, Defendants doctored the 2017 Appraisal of the Stonehedge Inn and Spa to omit the

"Value Conclusion" section that crucially valued the property at $5,500,000, a fact that would have

demonstrated the loan-to-value ratio fell below the 65% threshold, thereby satisfying the "Burn-

off Provision" and negating the requirement for personal guarantees from Plaintiffs.

504.     Defendants' act of altering the appraisal and submitting this doctored document to

the court constituted a fraudulent misrepresentation of material facts. This act was intended to and

did mislead the courts and other relevant parties about the true value of the property and the status of the loan-to-value ratio, directly affecting the legal and financial obligations of Plaintiffs.

505.    Defendants' conduct in falsifying the appraisal document and concealing the true property valuation was willful, deliberate, and intended to deprive Plaintiffs of their rightful claims and to enforce unfounded claims against them. This conduct further demonstrates Defendants' fraudulent intent and their willingness to engage in deceptive practices to achieve their objectives, at the expense of Plaintiffs' rights and interests.

506.    In an additional fraudulent scheme to manipulate Plaintiffs' financial and legal standing, Defendants, specifically through Lowell Five and its agents, intentionally altered banking transaction records related to lawful withdrawals made by Plaintiffs. These alterations were designed to misrepresent the nature and purpose of the transactions, thereby creating a false narrative of financial impropriety.

507.    Specifically, Defendants altered transaction records for withdrawals made by Plaintiffs from the Das for Congress campaign account, which were legitimate Campaign Loan Repayments. Defendants deceitfully recharacterized these transactions in the bank's records to appear as direct transfers to business accounts managed by the Hotel Company, without Plaintiffs' knowledge or consent. This deliberate mischaracterization was contrary to the explicit instructions provided by Plaintiffs and the lawful financial practices they intended to follow.

508.    Lowell Five's actions of altering the transaction records were part of a calculated effort to falsely implicate Beej Das in improper financial conduct, thereby undermining his credibility and legal standing. This conduct was particularly egregious as it involved the exploitation of regulatory reporting mechanisms to create an appearance of regulatory violations where none existed.

509. By engaging in these fraudulent acts, Defendants sought to leverage the regulatory framework, the scrutiny of financial transactions and the power of federal agencies for their own advantage, aiming to exert undue pressure on Plaintiffs and to achieve unwarranted concessions in their ongoing financial and legal disputes.

510. As a direct and proximate result of Defendants' fraudulent doctoring of the appraisal and alteration of transaction records, Plaintiffs suffered financial losses stemming from the wrongful enforcement of personal guarantees, unnecessary legal expenses in contesting these actions, loss of Plaintiffs' asset in the Bankruptcy Proceeding, reputational harm, and were subjected to unwarranted regulatory scrutiny, damage to their personal and professional reputations, significant financial and legal expenditures to address the false implications created by Defendants, and severe emotional distress, in an amount not less than $19,000,000.

511. The conduct of Defendants, including the intentional falsification of banking records and the malicious use of such falsified records to instigate regulatory actions against Plaintiffs, warrants not only compensatory damages for the harm inflicted but also punitive damages. Such punitive damages are necessary to punish Defendants for their fraudulent and malicious conduct and to deter similar conduct in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Pray this Honorable Court Award Plaintiffs:

1. Entry of judgment against all Defendants, jointly and severally, for under Counts I, II, IV, VI, VIII, IX, XII, and XIV.

2. Entry of judgment against Lowell Five, Wallace and Pratt, jointly and severally, for Counts III and IV.

3. Entry of judgment against Reault for Count V.

4.      Entry of judgment against Lowell Five for Counts VII, X, and XI.

5.      Entry of judgment against Lowell Five and Pratt, jointly and severally, for Count XIII.

6.      Actual damages in an amount to be determined but believed to be at least $53,000,000.

7.      Treble Statutory Damages under RICO and M.G.L. c. 93A claims.

8.      Attorney's Fees and Costs under RICO and M.G.L. c. 93A claims.

9.      In all Counts, such other and further relief as the Court considers proper and appropriate under the circumstances.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated:  April 9, 2024

ABHIJIT DAS, MITRA DAS,
MUKTI L. DAS, and TROCA HOLDINGS LLC,

By their attorneys,


/s/
Michael J. Duffy, BBO #652621
**TYMANN, DAVIS & DUFFY, LLP**
45 Bromfield Street, 6th Floor
Boston, MA  02108
617.933.9490
mduffy@tddlegal.com