# Exhibit 1

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**

**SUPERIOR COURT DEPARTMENT**
**CIVIL ACTION NO.** 19-3481

---

BOSTON EAST TYNGSBORO HOLDINGS
LLC, MUKTI DAS, MITRA DAS and
ABHIJIT DAS

        Plaintiffs,

v.

THE LOWELL FIVE CENT SAVINGS
BANK

        Defendant.

**VERIFIED COMPLAINT**
**AND JURY DEMAND**

> FILED
> IN THE OFFICE OF THE
> CLERK OF COURTS
> FOR THE COUNTY OF MIDDLESEX
>
> **NOV 2 6 2019**
>
> *[signature]*
> CLERK

## INTRODUCTION

Defendant The Lowell Five Cent Savings Bank actively sought and solicited Plaintiff Boston East Tyngsboro Holdings LLC ("Boston East" or "Borrower") to borrow $ 3,850,000 (the "Loan"). This is an action brought by Plaintiffs Mukti Das, Mitra Das, and Abhijit Das (collectively "Guarantors") and Borrower (each a "Plaintiff" and collectively "Plaintiffs") against Defendant for damages and injunctive relief alleging breach of contract, unjust enrichment, breach of covenant of good faith and fair dealing, tortious interference with contract, and violations of G.L. c.93A arising out of and in connection with the Loan.

## PARTIES

1.     Defendant The Lowell Five Cent Savings Bank ("Lowell Five" or the "Bank") is a Massachusetts Savings Bank with its registered address at One Merrimack Plaza, Lowell,

Massachusetts 01852. Upon information and belief, Defendant's principal place of business is 30 International Place, Tewksbury, MA 01876.

2.      Plaintiff Boston East Tyngsboro Holdings LLC ("Boston East" or "Borrower") is a Massachusetts Limited Liability Company which owns the real estate and has its its principal place of business at 160 Pawtucket Blvd, Tyngsboro, MA 01879.

3.      Plaintiff Mukti Das is an individual and resident of North Andover, Massachusetts.

4.      Plaintiff Mitra Das is an individual and resident of North Andover, Massachusetts.

5.      Plaintiff Abhijit Das an individual and resident of North Andover, Massachusetts.

## FACTS

6.      In late May 2014, Plaintiff Boston East was introduced by email to Donald A. Bedard, Executive Vice President and Chief Lending Officer for Lowell Five ("Bedard") by a mutual contact in the commercial real estate industry.  Plaintiff was seeking financing to purchase a hotel in Tyngsboro, Massachusetts (the "Hotel") and Lowell Five was actively targeting borrowers seeking to acquire hotels.

7.      Borrower met with Bedard and Thomas N. Boucher, Vice President – Commercial Lending for Lowell Five ("Boucher") for their first in-person meeting on Friday, May 30, 2014. Following Plaintiff's meeting with Bedard and Boucher, Plaintiff was invited to meet with Lowell Five's President, David E. Wallace ("Wallace") on June 10, 2014. During his meeting, Wallace advised Plaintiff that Lowell Five had a keen interest in taking over a loan that had historically been with Enterprise Bank ("Enterprise"), a local competitor of Defendant. He told Plaintiff that he would personally ensure the Loan's commercial terms would be attractive and that Lowell Five would do more than Enterprise to assist Borrower after the Loan had closed. Wallace was

aware that Enterprise regularly held events at the Hotel and pledged to support Borrower and the Hotel in a more substantial way than Enterprise had in the past.

8.       In another material inducement to conduct business with the Defendant in connection with the Loan, Wallace also offered to pave the way for members at Vesper, an exclusive country club near the Hotel of which he was a member, to spend money in their country club accounts at the Hotel, a radical departure from the practices of the past.  Borrower's attempts to arrange a meeting with Wallace to discuss the Vesper opportunity after the Loan had already been signed would fall on completely deaf ears.

9.       Following Borrower's meeting with Bedard, Boucher and Wallace, Lowell Five offered several written proposals for the Loan, each with different options for amount, interest rate, and duration. The one constant between all the proposals, prominently displayed on the second line of each proposal, read, "Guarantor: None."

10.      On June 24, 2014, Lowell Five issued its final proposal for the Loan, in which it offered to lend Borrower up to $3,850,000 with no personal guarantee, no origination fee, an interest rate of 4.85% for 25 years and interest only payments during the first year of the Loan (the "Term Sheet"). *Attached as Exhibit A.*

11.      The Term Sheet contained a 3% prepayment penalty "if refinanced with another financial institution" during the first 60 months (the "Prepayment Penalty").  Throughout the nearly entire term of the Loan to date Lowell Five has had the benefit of a provision that would require the Borrower to pay Defendant a penalty of approximately $100,000 to refinance with another lender.  Borrower agreed to the Prepayment Penalty because it had no reason to believe the Bank would not honor the $3,850,000 it had promised to lend pursuant to the Note. The 60 month period for the Prepayment Penalty ended on July 31, 2019.

12.     On July 11, 2014, Lowell Five advised Borrower that the Bank had completed its review of the Borrower and Loan application, that the Loan had been approved and that the "feedback has been very positive thus far." On July 15, 2014, Lowell Five advised Borrower that the Loan amount of $3,850,000 would be split between $2,925,000 for acquisition financing and $925,000 for capital investments in the property and business, to be disbursed "as work is completed and/or expenses incurred."

13.     On August 1, 2014 (the "Closing Date"), Borrower completed its acquisition of the Hotel and executed financing documents (the "Closing Documents") including a Commercial Promissory Note for $3,850,000 (the "Note") which stated that the Bank and Borrower agree that "Borrower may borrow up to the maximum amount of principal only one time." *Note attached as Exhibit B.* As part of the acquisition, the Bank provided $3,200,000 of acquisition financing; the Note specified that another $650,000 would be available for disbursement in the future. Neither the Note, the Closing Documents, nor any other documents signed by the Borrower contained personal recourse or personal guarantees of any kind.

14.     Unbeknownst to the Borrower on the Closing Date, the Hotel had an appraised value of between $5,100,000 "as is" and $6,450,000 "as completed" ("2014 Appraisal"), yielding a loan to value ratio ("LTV") of 62.7% on an "as is" basis for the $3,200,000 that the Bank provided in acquisition financing for the Hotel. The 2014 Appraisal states that "it is the appraiser's understanding that the subject will be undergoing updates, consisting of approximately $1,500,000 of modernization and updates... it [is] easy to assume that the value of the subject "as-is" would be at the mid-low range of the comparables, but the value "as-completed" with new updates and $1,500,000 of modernization would result in a higher value at the upper range of the comparables utilized." *Relevant portion of 2014 Appraisal attached as Exhibit C.*

15.     The 2014 Appraisal and the valuation it contained was provided to the Borrower only weeks after the Closing Date. Unlike the Borrower, on the Closing Date, Defendant was already aware that it would use the 2014 Appraisal and the value contained therein to prevent Borrower from accessing a portion of the Loan that Defendant knew had motivated Borrower to choose the Defendant as a lender. Defendant has consistently used the 2014 Appraisal and Defendant's own convoluted reasoning as a basis for denying access to funds that the 2014 Appraisal itself contemplates would significantly increase the valuation of the Hotel. The plain language of the 2014 Appraisal contradicts the position Defendant has consistently taken regarding funding of the Loan.

16.     In other words, according to the appraiser who researched and produced the 2014 Appraisal, $1,500,000 of modernization and updates would push the Hotel's valuation significantly higher, yielding a nearly 1:1 gain per dollar spent in upgrades. The "as-is" valuation under the 2014 Appraisal shows a value of $170,000 per room, times 30 rooms, yielding a valuation of $5,100,000. According to the appraiser, a $1,500,000 modernization would "easily" result in a value of $215,000 per room, times 30 rooms, yielding a valuation of $6,450,000.

17.     In late 2014 and early 2015, Lowell Five advanced an additional $115,000 to Borrower to support upgrades and renovations that were being made at the time. However, on January 30, 2015, despite the Bank's lending obligations of $3,850,000 contained in the Note and Closing Documents and ignoring the plain language of the 2014 Appraisal which provides an "as-completed" valuation of $6,450,000, Lowell Five advised Borrower that it could not extend further advances because of a "65% maximum L/V ratio limitation." In so doing, Defendant directly violated its commitment to lend amounts up to a total of $3,850,000 which was to be disbursed "as work is completed and/or expenses incurred."

18.     Defendant has never offered any explanation as to how Borrower was to utilize or access the development and construction financing Defendant had committed to provide. The Borrower was left to presume that such funding was solely dependent on receipt of some future appraisal of the project once completed. Yet, the 2014 Appraisal already contained an "as completed" valuation of $6,450,000 which was more than adequate a basis upon which Defendant could have funded the Loan to the amount of the Note if it had acted in good faith during the entire term of the Loan.

19.     Lowell Five's business practices in securing and thereafter servicing the Loan can best be described as akin to the Strange Case of Dr. Jekyll and Mr. Hyde. On the one hand, Lowell Five aggressively fought to win Plaintiff's business for the acquisition of the Hotel by offering terms that were very attractive and by making promises that were highly motivating. Indeed, Defendant had offered higher loan amounts and no personal recourse compared to other lenders and promised to host events regularly at the Hotel to support Borrower's business. Yet, on the other hand, Lowell Five from the very beginning has simply not performed on its promises, which is demonstrative of an intent all along to have never done so. While it promised to lend $3,850,000, including $925,000 which was to be disbursed "as work is completed and/or expenses incurred," it lent only the $3,200,000 on the Closing Date and an additional $115,000 a few months thereafter. When Borrower tried to access more than $3,315,000, Defendant refused to honor its commitment to lend. Similarly, while it promised to eclipse Enterprise's stellar record of support for the Hotel, in the five years since the inception of the Loan, Lowell Five has held only two events at the Hotel (despite offering effusive praise of each event held there.)

20.     After the especially challenging winter of 2015 in the Merrimack Valley area, Plaintiff sought to resume the development and upgrades to the Hotel that had been envisioned

when the property was acquired. At that time, Borrower still had some reason to be optimistic about its relationship with the Defendant. Defendant had again approached Borrower to help further Defendant's business objectives to attract more business to Lowell Five. Defendant proposed that it feature Plaintiff and the Hotel in an ad campaign that featured Lowell Five bankers as "dedicated partners in growing your business." Weeks after the campaign was announced and launched, Plaintiff approached Lowell Five to honor its commitments under the Note, fund development plans for the Hotel and lend more than the $3,315,000 it had already advanced. *One ad from the ad campaign attached as Exhibit D.*

21.     On June 5, 2015, despite (i) Lowell Five's commitment in the Note and Closing Documents to lend $3,850,000 with no personal guarantees, (ii) an as-completed valuation of $6,450,000 in the 2014 Appraisal that supported such funding and (iii) its most recent ad campaign featuring the Borrower that "Lowell Five stands with your business every step of the way," Defendant refused, without providing any reason, to disburse additional funds. Instead, the Bank completely changed the agreement it had with Borrower and offered to lend an additional $300,000 to the Borrower if Guarantors agreed to execute personal guarantees as part of a loan modification agreement it proposed ("First Loan Modification"). *Attached as Exhibit E.*

22.     Faced with the immediate need to move the Hotel development forward and handcuffed by the Prepayment Penalty, Guarantors executed the First Loan Modification, which contained the following material terms, "to advance $300,000 subject to borrower raising an additional $300,000 in capital within 60 days of this modification. Borrower shall provide unlimited guarantees of the entire indebtedness from Mukti Das, Mitra Das, Abhijit Das. Upon the achievement of a loan-to-value ratio of 65% or less, the guarantees shall be removed."

23.     After the execution of the First Loan Modification, Lowell Five provided $300,000 of funding, bringing its funding total to $3,615,000, an "as-is" LTV of 66.9% under the methodology outlined in the 2014 Appraisal. From June 5, 2015 onward, personal guarantees from Guarantors would be in effect until "the achievement of a loan-to-value ratio of 65% or less" at which time the guarantees were to be removed automatically.

24.     On February 16, 2016, a main sprinkler pipe burst at the Hotel, sending thousands of gallons of water through the property.  The Hotel was closed for extensive repairs and renovation from February 16, 2016 to September 1, 2016. Despite having no revenue flowing and delayed insurance proceeds, Borrowers continued to pay the salaries of all staff members through the period the Hotel was shut down.

25.     Borrower and Guarantors executed two additional loan modifications, one allowing for six months of interest only payments in 2016 to accommodate for the loss of revenues due to the flood ("Second Loan Modification") and the other allowing for three months of interest only payments in 2017 ("Third Loan Modification").

26.     Throughout 2016, in addition to deploying insurance proceeds to return the Hotel to its pre-flood condition, Borrowers invested over $1,500,000 to modernize the Hotel, add amenities and proprietary design elements and make long deferred capital improvements. As a result of these investments, by December 1, 2016, the Loan had a less than 55% LTV, which triggered the automatic removal of the personal guarantees of the Guarantors under the terms of the First Loan Modification (the "Guarantee Removal").

27.     In December 2016, Borrower again requested that funds from Loan be dispersed for capital improvement projects. Again, Defendant denied Borrower's request for funding. Forced by the Prepayment Penalty to continue under the Loan, Borrower obtained $150,000 of

funding from On Deck Capital, Inc. ("On Deck"), at a 48% APR for a six month term. Borrower renewed its loan with On Deck in March 2017, again at a high rate of interest.

28.     Borrower made additional significant capital investments throughout 2017 which further enhanced the valuation of the Hotel. In August 2017, Lowell Five commissioned a new appraisal (the "2017 Appraisal"). Lowell Five assured the Borrower that the appraisal would factor into the valuation of the Hotel the millions of dollars of renovations and repairs that Borrowers had added to the Hotel in 2016 and 2017. To this day and despite multiple requests to do so by the Borrower and Guarantors, Lowell Five has refused to release the 2017 Appraisal to Borrower and/or Guarantors. Plaintiff has reason to believe that the appraisal is notably higher than the "as completed" 2014 Valuation of $6,450,000. *Email confirming 2017 Appraisal attached as Exhibit F.*

29.     The Hotel was built in 1987 as an iconic and unique hospitality destination north of Boston. Borrower's renovations and improvements to the property were highly researched and planned, with capital budgets set well before the Closing Date. The implementation of the upgrades was based on the highly proprietary branding, design, hospitality, and operations experience of a team affiliated with the Borrower. Defendant requested and received confidential and proprietary design and branding documents in connection with the Loan, including capital and operations budgets showing the critical need for the $3,850,000 that Defendant had approved in connection with the Loan.

30.     As of August 2017 and the date of the 2017 Appraisal, the LTV of the outstanding indebtedness under the Loan, utilizing the valuation and methodology from the 2014 Appraisal, had dropped well under the 65% threshold triggering the Guarantee Removal. Despite the clear

and unambiguous terms of the First Loan Modification, Lowell Five has steadfastly refused to acknowledge this fact.

31.     On March 5, 2019, an intense microburst of wind hit the Hotel and adjacent grounds and severely damaged the roof, chimney and exterior electricals, causing extensive damage (the "Microburst Damage"). While the actual damage to the Hotel was extensive, the cosmetic damage was also quite significant, affecting the Hotel's business and event revenue drastically.

32.     Additionally, a third-party vendor to which Borrower had outsourced the management of its restaurant and bar at the Hotel in March 2019 defaulted on its obligations to collect and remit sales and meals tax to the Commonwealth of Massachusetts. As a result, despite not having collected a bulk of the tax owed, Borrower made a one-time payment to the Commonwealth of Massachusetts of $134,944 on August 28, 2019 to clear tax obligations that it had not itself incurred.

33.     The state of the Hotel's business, including the restaurant management arrangement and Microburst Damage was discussed in detail with Lowell Five during a meeting between Borrower, Boucher and John Pratt, Chief Credit Officer and Senior Vice President for Lowell Five ("Pratt") on May 15, 2019. At that meeting, which was not acrimonious and best described as congenial and productive, Borrower against asked Defendant about the current LTV under the loan, why the Bank was unwilling to honor its commitment to lend under the Note and a release of personal guarantees from Guarantors. Borrower did not receive fulfilling answers to the questions raised but had received assurances that Defendant would work with Borrower in light of the circumstances Borrower had presented to Defendant.

34.     Despite Defendant's meeting with Borrower a mere five days prior, in which the pending insurance claim, a plan for returning the Borrower and Hotel to normal operating

condition, and a schedule to resume payments due under the Note were all discussed and agreed to, Lowell Five issued a Final Demand Notice on May 20, 2019 as if its meeting with Borrowers never took place.

35.     Exactly thirty days prior to the expiration of the Prepayment Penalty that Defendants had used as a hammer to block the feasibility of a refinance by Plaintiff, on July 1, 2019, Defendant issued a Notice of Acceleration of Note ("Acceleration Notice") to Plaintiffs, asserting that both Borrower and Guarantors were in default under the Note.  The Acceleration Notice states that "you have the right to reinstate your mortgage by paying all sums and expenses including, but not limited to, reasonable attorney's fees, due under Mortgage and Note as if no acceleration had occurred and by curing any default of any other covenant or agreement in connection with your loan. Your right to acceleration remains in effect even after acceleration, and you have the further right, including the right to assert the non-existence of a default or any other defenses to the acceleration and sale." ("Reinstatement Right") *Attached as Exhibit G.*

36.     Borrower made several attempts to make payments under the Loan in July 2019, which Lowell Five rejected.  Defendant's issuance of the Acceleration Notice made it clear to the Plaintiffs that Lowell Five had never intended to honor its commitments and obligations under the Closing Documents. Not only had Lowell Five breached its obligations to lend funds required under the Note, it used its breach of the Loan documents to extract additional security from Plaintiffs in the form of personal guarantees from Guarantors.

37.     On July 18, 2019, in response to Lowell Five's repeated failures to (a) lend up to the approved amount under the Loan, and (b) timely release the Guarantors from their guarantees, in reliance upon which Borrowers had invested in the Hotel and executed the Closing Documents and First Loan Modification, Borrower and Guarantors issued a demand letter pursuant to

Massachusetts Consumer Protection Act, G.L.c. 93A demanding that Lowell Five honor its obligations under the Loan, or, in the alternative, maintain a safe and unobstructed path for Borrower to refinance its Loan. *Attached as Exhibit H.*

38.     On August 15, 2019, Defendant, through its counsel, responded to Plaintiffs demand and specifically denied the applicability of Massachusetts Consumer Protection Act, G.L.c. 93A and asserted that the clear language of the First Loan Modification and the Guarantee Removal were somehow later nullified by Lowell Five's subsequent claim that Borrower was now in breach of its obligations under the Note.

39.     On August 26, 2019, consistent with Borrower's previously stated commitment to "working with Lowell Five in a cooperative manner," and the Reinstatement Right clearly specified in the Acceleration Notice, Borrower delivered to Lowell Five a check for $86,888.08, representing payments on the Loan from May 2019 through August 2019, effectively bringing the Loan current ("August Payment"). Along with the check, Plaintiffs also requested a meeting with Lowell Five to determine whether a settlement of the demands being made by all parties could be achieved "short of litigation." *Attached as Exhibit I.*

40.     Defendant refused to deposit the August Payment that would have brought the Loan current, thereby refusing to honor the Reinstatement Right in its own Acceleration Notice. Defendant did agree to meet with Borrower and its counsel. On September 26, 2019, representatives of Plaintiffs and Defendant met at Borrower's counsel's offices in Boston for settlement discussions (the "Settlement Meeting"). At the outset of the Settlement Meeting, the parties agreed, with counsel present, that the meeting was for "settlement purposes only." During the Settlement Meeting, Plaintiff shared with Defendant sensitive information about its business, the status of discussions with its insurance carrier regarding the Microburst Damage, Borrower's

ongoing and successful discussions with lenders regarding a refinance of the Loan, and the treatment of the August Payment.

41.     The parties at the Settlement Meeting agreed to continue discussions to resolve the dispute between them. Defendant advised borrower that it would propose terms under which it would accept the August Payment to bring the account current and would allow Borrower the opportunity to accept those terms before depositing the August Payment. It was understood that this would allow Plaintiffs time to finalize a refinance plan. At the conclusion of the Settlement Meeting, it was understood by both parties that (i) Plaintiff would remove the funds from the account on which the August Payment had been issued pending an agreement between Lowell Five and Borrower regarding the payment's treatment and (ii) that Plaintiff would wait to hear from Defendant as to what the Defendant would be looking for while Plaintiff finalized its plan to refinance the Loan and remove Defendant.

42.     Despite its agreement to the terms of the Settlement Meeting and the stipulation that all discussions during the Settlement Meeting were for settlement purposes only, Defendant sent a letter to Borrower on October 9, 2019 providing what it claimed was a summary of the Settlement Meeting incorporated into a "notice in an attempt to collect a debt." Defendant also sought a significant list of documents "required" under the Loan to assess the "viability of the business going forward." Defendant violated the terms of the Settlement Meeting knowing that so doing would stall any progress to amicably resolve all business matters between the parties. *Attached as Exhibit J.*

43.     In another dramatic violation of the terms agreed to between the parties at the Settlement Meeting, on October 21, 2019, Defendant sent a letter to Borrower's insurance carrier and broker improperly exploiting the information Defendant obtained during the Settlement

Meeting and maliciously suggesting that Borrower's insurance carrier had adversely affected Lowell Five's position by cooperating with Borrower. Defendant's improper disregard of its commitments regarding the purpose and use of the Settlement Meeting was a continuation of Defendant's pattern of behavior throughout the servicing of the Loan in which Lowell Five made agreements and commitments that it never intended to honor to suit only its best interests. *Attached as Exhibit K.*

44.    On October 21, 2019, Defendant also sent a letter to Borrower (i) seeking specific information regarding the insurance claim filed in connection with the Microburst Damage, (ii) seeking to enter the Hotel to inspect it in connection with the Microburst Damage and advising Borrower that it would be in contact to arrange such an inspection, (iii) advising Borrower that Lowell Five had ordered an updated appraisal of the property and would provide Borrower's contact information to the appraiser, and (iv) advising Borrower that despite Defendant's understanding and acknowledgement that it was not to deposit the August Payment unless it agreed such payment fulfilled the Reinstatement Notice or until a settlement plan had been worked out, it nonetheless attempted to deposit the check. *Attached as Exhibit L.*

45.    Defendant's attempt to deposit the August Payment is especially perplexing. It was clear, as a result of the Settlement Meeting, that the August Payment was offered by Plaintiffs as a good faith gesture to bring the loan current and avail of the Reinstatement Notice in the Acceleration Notice while a refinancing of the Hotel would be arranged by the Borrower. It was also clear that Plaintiff had not offered the August Payment as a contribution toward the Acceleration Notice, but rather as an attempt to avail the Reinstatement Right. Only an attempt to posture can explain Defendant's behavior.

46.     As Plaintiffs had demonstrated and the Defendant knew well on October 21, 2019 from (a) access to Borrower's bank accounts, (b) Defendant's own numerous appraisals, and (c) the LTV of the property, including evidence of millions of dollars in renovations, repairs and upgrades, refinancing the Hotel would not be difficult and Plaintiff was engaged and underway in that process.  It therefore came as a disappointing surprise when Plaintiff learned on social media only a few days after the Defendant had requested information to assess the viability of a continuing relationship with Borrower, that Defendant had listed the Hotel for auction. While, in hindsight, Lowell Five's pattern of bad faith behavior does not make it a surprise, the fact that Defendant would not officially alert Borrower or Guarantors until more than a week after it had made the announcement on Facebook is revealing.

47.     Defendant's decision to accelerate the Note and auction the Hotel (i) while engaged in settlement discussions, (ii) while seeking information about Borrower's business, (iii) after interfering with Borrower's resolution of an important insurance claim, (iv) while refusing to deposit a check that would make it whole, (v) with knowledge of Borrower's advanced refinancing plans with a willing and engaged banking partner, (vi) only shortly after the Prepayment Penalty period expiration strongly suggests Defendant's actions were motivated by a desire not to lose control of a prized local asset that had undergone a multi-million dollar complete facelift.

48.     Faced with credible accusations that it had violated the terms of the Note and with the knowledge that the Hotel and Borrower would soon be refinanced with another financial institution, Defendant sought to inflict the maximum financial damage it could upon Borrower and the Hotel business by choosing December, which Defendant knew to be the single strongest

revenue and cash flow month for the Hotel, as the month to promote a sudden auction. The timing is evidence of the vindictive nature of the Defendant and its senior leadership team.

49.     The fact that a prospective bidder for the Hotel at the auction Lowell Five has arranged is a former Lowell Five employee, who is himself closely aligned with a member of the Tyngsborough Board of Selectmen who has privately spread damaging rumors about Borrower and its management and ownership, introduces a particularly ugly element to this case and provides significant insight into why Defendant Lowell Five, which had received a payment that would have made it whole and knew that a refinancing was imminent that would allow Borrower to move on with a prized asset it had spent five years rehabilitating through difficult conditions, would nonetheless seek to destroy the Borrower's goodwill in the community, its reputation, and the valuation of its asset.

**COUNT I**
**BREACH OF CONTRACT**

50.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count I.

51.     Borrower and Defendant entered into a valid and binding contract on or about August 1, 2014 by signing of the Closing Documents.

52.     Guarantors and Defendant entered into a valid and binding contract on or about June 4, 2015 by signing of the First Loan Modification.

53.     Borrower was performing as required by the terms of the contract and sought funds that were committed to it by Defendant under the terms of the Loan.

54.     Defendant breached the terms of the agreement between the parties by (i) failing to initially advance funds against an available $535,000, (ii) requiring Plaintiff to add Guarantors to the Loan and modify the terms of the Loan to receive a $300,000 advance, (iii) refusing to advance

an additional $235,000 even after Guarantors had been added to the Loan, and (iv) refusing to release Guarantors from their personal guarantees despite the clear language and automatic operation of the guarantee removal provisions of the First Loan Modification.

55.     Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT II**
**UNJUST ENRICHMENT**

56.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count II.

57.     Borrower alleges that Defendant has been unjustly enriched by accepting payments and interest from the Borrower without performing fully under the terms of the Loan by lending the amount it was required to lend to Borrower.

58.     Guarantors allege that Defendant has been unjustly enriched by exacting personal guarantees and changing the security interest of a contract where no such guarantees and security were required under the terms of the Closing Documents.

59.     Plaintiffs have suffered damages in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

60.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count III.

61.     In addition to the express contractual provisions set forth in the Closing Documents, First Loan Modification and other related agreements, there is an implied covenant that the parties shall act in good faith, deal fairly with one another and not undertake efforts that would deprive the other of the benefits of the Closing Documents, First Loan Modification and other related agreements.

62.     At all times, Plaintiffs acted in good faith and dealt fairly with Defendant in connection with its rights and obligations pursuant to Closing Documents, First Loan Modification and other related agreements.

63.     As set forth above, Defendant has failed to act in good faith and deal fairly with Plaintiffs. As a result of their bad faith and unfair dealing, Defendant has deprived Plaintiffs of the benefits they were entitled to receive under the Closing Documents, First Loan Modification and other related agreements Defendants.

64.     As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages, including but not limited to: loss of the full loan amount of $3,850,000 and the benefits attendant thereto and the continuing threat by Defendant to enforce a security interest that should long since have been extinguished.

## COUNT IV
## INTERFERENCE WITH CONTRACTUAL RELATIONS

65.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count IV.

66.     Defendant has contacted Borrower's insurer in an effort to pressure Plaintiffs to make contractual concessions that are not due and to abandon Plaintiffs' claims against Defendant.

67.     Defendant has interfered with Borrower's contract with its insurance company.

68.     Said interference by Defendant was intentional, malicious, and without lawful justification.

69.     As a direct result thereof, Defendant has hampered Borrower's ability to negotiate with its insurer and recover amounts due under its policies, causing damages to Plaintiffs in an amount to be determined at trial.

## COUNT V
## VIOLATION OF MASS. GEN. LAWS CH. 93A

70.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth in this Count V.

71.    At all relevant times hereto, Defendant was engaged in trade or commerce as defined under Mass. Gen. Laws ch. 93A, § 1(b).

72.    The above-described actions of Defendant, including but not limited to (i) Defendant's repeated refusal to honor its contractual obligations, (ii) bad faith interference with Borrower's negotiations with its insurer, (iii) failure to release Guarantors from their personal guarantees and (iv) predatory and collusive practices constitute "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 2, and are therefore unlawful.

73.    At all relevant times, Borrower was engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 1(b), including its ownership of the Hotel, and has suffered a loss of money and property in an amount to be determined at trial as a result of Defendant's violation of Mass. Gen. Laws ch. 93A, § 2.

74.    Defendant's violations of Mass. Gen. Laws ch. 93A, § 2 was willful and/or knowing violations of said statute. Defendant is therefore liable, under Mass. Gen. Laws ch. 93A, § § 2 and 11, to Plaintiffs in an amount equal to not less than twice and up to three times Plaintiffs' damages by reason of its violations of Mass. Gen. Laws ch. 93A, § 2.

75.    Plaintiffs are also entitled to an award of reasonable attorneys' fees and costs incurred in this action as a result of Defendant's violations of Mass. Gen. Laws ch. 93A, § 2.

## <u>REQUESTS FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Grant Plaintiffs preliminary injunctive relief that

    a.   precludes Defendant from selling the Hotel at a foreclosure sale on December 5, 2019;

    b.   releases Guarantors from the personal guarantees, as required under the terms of the First Loan Modification; and

    c.   forces Defendant to honor the Reinstatement Right.

2.    Enter judgment for Plaintiffs on all Counts of its Verified Complaint;

3.    Grant Plaintiffs permanent injunctive relief as set forth above;

4.    Award Plaintiffs damages as determined at trial, plus interest and costs as provided by law;

5.    Award Plaintiffs multiple damages and attorney fees on account of the Defendant's willful violation of G.L. c. 93A;

6.    Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

BOSTON EAST TYNGSBORO HOLDINGS LLC

By its counsel,


Kevin J. O'Connor, BBO # 555250
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109

Tel:    617-345-9000
Email: koconnor@hinckleyallen.com



MUKTI DAS, MITRA DAS and ABHIJIT DAS

By their counsel,


Mark D. Johnson, BBO # 629805
LAW OFFICES OF MARK D. JOHNSON
15 Chestnut Street
Andover, MA 01810

Tel:    978-470-1411
Email: johnsonlawoffices@comcast.net

Dated: 11/2/19

## **VERIFICATION**

I, Abhijit Das, Managing Member of Boston East Tyngsboro Holdings LLC, do hereby declare that I have read the foregoing Verified Complaint and know the contents thereof. The same is true to my knowledge except to those matters that are alleged on information and belief; as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 2(rH day of November, 2019 in Middlesex County, Massachusetts.

_____

Abhijit Das, Managing Member
Boston East Tyngsboro Holdings LLC

# Exhibit A



The Lowell Five Cent Savings Bank
One Merrimack Plaza
Lowell, MA 01852

June 24, 2014

Beej Das, President & CEO
Boston East India Hotels
21 High St.
North Andover, MA 01845

Dear Beej:

On behalf of The Lowell Five, I am pleased to offer you the following financing proposal for your consideration:

**BORROWER:** Boston East Tyngsboro Holdings, LLC

**GUARANTOR:** None.

**AMOUNT:** Up to $3,850,000.

**PURPOSE:** Real property acquisition, business acquisition and building improvements of the Stonehedge Inn, located at 160 Pawtucket Blvd., Tyngsboro, MA.

**RATE:**

**Option 1:**
4.85% for the first <u>Ten</u> years, then adjusting at The Federal Home Loan Bank's Five-year Classic Advance Rate plus 2.25% every five years thereafter. Interest is calculated on the basis of an actual/360 day banking year.

**Option 2:**
4.35% for the first <u>Five</u> years, then adjusting at The Federal Home Loan Bank's Five-year Classic Advance Rate plus 2.25% every five years thereafter. Interest is calculated on the basis of an actual/360 day banking year.

*During the first 60 months, the loan will be subject to a 3% prepayment penalty if refinanced with another financial institution.*

**TERM:** 25 years.

**PAYMENT:** Interest only will be due and payable monthly for the first year of the note. Thereafter, the monthly installment of principal and interest will be based

on a 24-year amortization.

**ORIGINATION FEE:**    None.

**COLLATERAL:**    (A) A valid 1ˢᵗ mortgage and assignment of leases & rents on land and buildings located at 160 Pawtucket Blvd., Tyngsboro, MA;

(B) A valid first blanket security interest in all business assets.

**APPRAISAL:**    An appraisal, satisfactory to Bank in scope and form, of the collateral shall evidence a loan-to-value ratio no greater than 65%, based on the lower of cost or appraised value.

**ENVIRONMENTAL COMPLIANCE:**    An Environmental Study, satisfactory to Bank in scope and form, on the collateral shall evidence no environmental risk or concerns.

**INSURANCE:**    Borrower shall purchase and maintain insurance in such amounts and for such coverage as is satisfactory to Bank.  Said insurance is to be maintained for the life of the loan, and all policies shall designate *The Lowell Five.* as Mortgagee/Loss Payee.

**TITLE INSURANCE:**    Lender's Title Insurance shall be provided on the collateral in the principal amount of the loan, ensuring that Borrower has good and marketable title to the property.  Such policy shall have all of the standard exceptions deleted, shall be subject only to such special exceptions as are acceptable to Bank's counsel, and shall provide such affirmative insurance as is requested by Bank's counsel.

**FLOOD INSURANCE:**    Flood insurance shall be provided if at any time during the life of the loan the Borrower's location falls within the boundaries of a special flood hazard area (as designated by the Federal Insurance Administration) and flood insurance becomes available. The amount of flood insurance purchased shall be the lesser of: (1) the maximum amount of flood insurance available; (2) the amount of the subject loan; or (3) the insurable value of the property to be insured.  The flood insurance policy shall designate *The Lowell Five.* as Mortgagee/Loss Payee.

**CAPITAL RESERVE:**    The Lowell Five. Will collect three percent (3%) of the prior year's annual gross income monthly. Proceeds shall be applied to future capital improvements.

**FINANCIAL REPORTING:**    During the term of the loan, Borrower will submit to Bank the following financial information:
- Annual Reviewed Financial Statement and Corporate Tax Return, prepared by April 30 of each year;

2

- Quarterly Internally Prepared Financial Statement and STAR report by April 30, July 31, October 31 and January 31 of each year.

**DEPOSIT ACCOUNTS:** Borrower shall establish and maintain its primary deposit accounts at The Lowell Five during the life of the loan. In addition, Borrower shall maintain a 30-day operating cash-on-hand balance.

This proposal is provided for discussion purposes only and does not constitute an offer, agreement or commitment to lend. The actual terms and conditions upon which Bank might provide credit to Borrower are subject to satisfactory completion of due diligence and review of documentation, credit approval, and such other terms and conditions as determined by Bank.

Beej, should you have any questions or concerns with this proposal, please do not hesitate to contact me at 978-441-6499.

Thank you for giving us the opportunity to earn your business.

Sincerely,

Thomas N. Boucher
Vice President

3

# Exhibit B

**COMMERCIAL PROMISSORY NOTE**

**The Lowell Five Cent Savings Bank**
One Merrimack Plaza
Lowell, Massachusetts 01852
(978)452-1300
www.lowellfive.com

| LOAN NUMBER | NOTE DATE | PRINCIPAL AMOUNT | LOAN TERM | MATURITY DATE |
|---|---|---|---|---|
| To Be Assigned | August 1, 2014 | $3,850,000.00 | 300 months | August 1, 2039 |

**LOAN PURPOSE:** Construction Permanent

**BORROWER INFORMATION**

Boston East Tyngsboro Holdings, LLC
21 High Street, Suite 300
North Andover, MA 01845

**NOTE.** This Commercial Promissory Note will be referred to in this document as the "Note."

**CONSTRUCTION LOAN AGREEMENT.** "Construction Loan Agreement" means the Construction Loan Agreement between Lender and Borrower entered into on August 1, 2014.

**LENDER.** "Lender" means The Lowell Five Cent Savings Bank whose address is One Merrimack Plaza, Lowell, Massachusetts 01852 , its successors and assigns.

**BORROWER.** "Borrower" means each person or legal entity who signs this Note.

**PROMISE TO PAY.** For value received, receipt of which is hereby acknowledged, on or before the Maturity Date, the Borrower promises to pay the principal amount of **Three Million Eight Hundred Fifty Thousand and 00/100 Dollars ($3,850,000.00)** or such lesser amount as shall have been advanced by Lender, from time to time, to or on behalf of Borrower under the terms of this Note, and all interest on the outstanding principal balance and any other charges, including service charges, to the order of Lender at its office at the address noted above or at such other place as Lender may designate in writing. The Borrower will make all payments in lawful money of the United States of America.

**PAYMENT SCHEDULE.** This Note will be paid according to the following schedule: 12 consecutive payments of interest only beginning on **September 1, 2014** and continuing on the same day of each month thereafter. This will be followed by 287 consecutive payments of principal and interest beginning on September 1, 2015 and continuing on the same day of each month thereafter. This will be followed by 1 payment of principal and interest on August 1, 2039. The unpaid principal balance of this Note, together with all accrued interest and charges owing in connection therewith, shall be due and payable on the Maturity Date. All payments received by the Lender from the Borrower for application to this Note may be applied to the Borrower's obligations under this Note in such order as determined by the Lender.

**INTEREST RATE AND SCHEDULED PAYMENT CHANGES.** The interest will begin to accrue on the **Funding Date.** The initial variable interest rate on this Note will be 4.850% per annum. This interest rate may change on August 1, 2024, and every 60 months thereafter. Each date on which the interest rate may change is called the "Change Date." Beginning with the first Change Date, Lender will calculate the new interest rate based on 5yr FHLB Reg Classic Advance Rate in effect on the Change Date (the "Index") plus 2.250 percentage points (the "Margin"). The sum of the Index and Margin will be rounded to the nearest 0.12500. If the Index is not available at that time, Lender will choose a new Index which is based on comparable information. The Index is used solely to establish a base from which the actual rate of interest payable under this Note will be calculated, and is not a reference to any actual rate of interest charged by any lender to any particular borrower. The interest rate will never be less than 4.850%.

Nothing contained herein shall be construed as to require the Borrower to pay interest at a greater rate than the maximum allowed by law. If, however, from any circumstances, Borrower pays interest at a greater rate than the maximum allowed by law, the obligation to be fulfilled will be reduced to an amount computed at the highest rate of interest permissible under applicable law and if, for any reason whatsoever, Lender ever receives interest in an amount which would be deemed unlawful under applicable law, such interest shall be automatically applied to amounts owed, in Lender's sole discretion, or as otherwise allowed by applicable law. An increase in the interest rates will result in a higher payment amount. Interest on this Note is calculated on an Actual/360 day basis. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note. The unpaid balance of this loan shall, while any Event of Default exists under this Note or any other agreement related to the loan, be subject to a Default Rate of interest equal to 18.000% per annum, and after Maturity, whether by acceleration or otherwise, shall be subject to a post-maturity rate of interest equal to 18.000% per annum.

**LATE PAYMENT CHARGE.** If any required payment is more than 15 days late, then at Lender's option, Lender will assess a late payment charge of 5% of the amount of the regularly scheduled payment then past due.

**PREPAYMENT PENALTY.** This Note is subject to a prepayment penalty. Payment of all unpaid principal, accrued and unpaid interest and all other fees then outstanding prior to the Maturity Date will result in a penalty that shall be equal to: **Please reference Addendum for the Note dated August 1, 2014.**

**ADVANCES.** The Borrower and Lender agree that the Borrower may borrow up to the maximum amount of principal only one time. Principal advances will not be made to the Borrower if any of the following conditions exist:

- The maximum amount on this Note has been reached or is outstanding.

- Borrower has breached any of the terms, provisions, representations, requirements or promises contained in this Note or any other agreement.
- Borrower makes a request for an advance after the Completion Date (as defined in the Construction Loan Agreement).
- The Note or any other agreement relating to the extension of credit is in default.
- The Lender has deemed itself insecure or there has been a material adverse change of conditions.
- The Lender is precluded by law from making the advance.

Advances under this Note may only be requested in writing by the Borrower or by an authorized person.

The total of any advance requested and unpaid principal cannot exceed the available principal amount. The available principal amount refers to the principal amount minus the aggregate amount of outstanding advances.

All advances will be charged to a loan account in Borrower's name on Lender's books, and the Lender shall debit in such account the amount of each advance made to, and credit to such account the amount of each repayment made by Borrower.

**SECURITY TO NOTE.** Security (the "Collateral") for this Note is granted pursuant to the following security document(s):

- Assignment of Leases and Rents dated August 1, 2014, executed by **Boston East Tyngsboro Holdings, LLC**, evidencing an assignment of leases and rents on the property located at **160 & 170 Pawtucket Blvd. Tyngsboro MA 01879.**
- Security Agreement dated August 1, 2014, executed by **Boston East Tyngsboro Holdings, LLC**, evidencing security interest in **All personal property of Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired, including without limitation, the following categories of property as defined in Revised Article 9 of the Uniform Commercial Code: goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all records of, accessions to and products and proceeds of the foregoing. Any term used herein which is defined in either (i) Article 9 of the Uniform Commercial Code as in effect in the jurisdiction in which this financing statement was signed or authenticated by the Debtor at the time it was so signed or authenticated or (ii) Article 9 of the Uniform Commercial Code as in effect at any relevant time in the jurisdiction in which this financing statement is filed, has the meaning to be ascribed thereto with respect to any particular item of property under the more encompassing of the two definitions. This financing statement covers, and is intended to cover, all personal property of the Debtor.**
- Security Instrument (Mortgage/Deed of Trust/Security Deed) in the amount of **$3,850,000.00, dated August 1, 2014, executed by Boston East Tyngsboro Holdings, LLC**, evidencing a lien on the property located at **160 & 170 Pawtucket Blvd. Tyngsboro MA 01879.**

**RIGHT OF SET-OFF.** To the extent permitted by law, Borrower agrees that Lender has the right to set-off any amount due and payable under this Note, whether matured or unmatured, against any amount owing by Lender to Borrower including any or all of Borrower's accounts with Lender. This shall include all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. Such right of set-off may be exercised by Lender against Borrower or against any assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower or such assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off has not been exercised by Lender prior to the making, filing or issuance or service upon Lender of, or of notice of, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena or order or warrant. Lender will not be liable for the dishonor of any check when the dishonor occurs because Lender set-off a debt against Borrower's account. Borrower agrees to hold Lender harmless from any claim arising as a result of Lender exercising Lender's right to set-off.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, security agreements, mortgages, deeds of trust, deeds to secure debt, business loan agreements, construction loan agreements, resolutions, guaranties, environmental agreements, subordination agreements, assignments and any other documents or agreements executed in connection with this Note whether now or hereafter existing, including any modifications, extensions, substitutions or renewals of any of the foregoing. The Related Documents are hereby made a part of this Note by reference thereto, with the same force and effect as if fully set forth herein.

**DEFAULT.** Upon the occurrence of any one of the following events (each, an "Event of Default" or "default" or "event of default"), Lender's obligations, if any, to make any advances will, at Lender's option, immediately terminate and Lender, at its option, may declare all indebtedness of Borrower to Lender under this Note immediately due and payable without further notice of any kind notwithstanding anything to the contrary in this Note or any other agreement: (a) Borrower's failure to make any payment on time or in the amount due; (b) any default by Borrower under the terms of this Note or any other Related Documents executed in connection with this Note; (c) any default by Borrower under the terms of any Related Documents in favor of Lender; (d) the death, dissolution, or termination of existence of Borrower or any guarantor; (e) Borrower is not paying Borrower's debts as such debts become due; (f) the commencement of any proceeding under bankruptcy or insolvency laws by or against Borrower or any guarantor or the appointment of a receiver; (g) any default under the terms of any other indebtedness of Borrower to any other creditor; (h) any writ of attachment, garnishment, execution, tax lien or similar instrument is issued against any collateral securing the loan, if any, or any of Borrower's property or any judgment is entered against Borrower or any guarantor; (i) any part of Borrower's business is sold to or merged with any other business, individual, or entity; (j) any representation or warranty made by Borrower to Lender in any of the Related Documents or any financial statement delivered to Lender proves to have been false in any material respect as of the time when made or given; (k) if any guarantor, or any other party to any Related Documents in favor of Lender entered into or delivered in connection with this Note terminates, attempts to terminate or defaults under any such Related Documents; (l) Lender has deemed itself insecure or there has been a material adverse change of condition of the financial prospects of Borrower or any collateral securing the obligations owing to Lender by

Borrower. Upon the occurrence of an event of default, Lender may pursue any remedy available under any Related Document, at law or in equity.

**GENERAL WAIVERS.** To the extent permitted by law, the Borrower severally waives any required notice of presentment, demand, acceleration, intent to accelerate, protest and any other notice and defense due to extensions of time or other indulgence by Lender or to any substitution or release of collateral. No failure or delay on the part of Lender, and no course of dealing between Borrower and Lender, shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

**JOINT AND SEVERAL LIABILITY.** If permitted by law, each Borrower executing this Note is jointly and severally bound.

**SEVERABILITY.** If a court of competent jurisdiction determines any term or provision of this Note is invalid or prohibited by applicable law, that term or provision will be ineffective to the extent required. Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Note without invalidating the remainder of either the affected provision or this Note.

**SURVIVAL.** The rights and privileges of the Lender hereunder shall inure to the benefits of its successors and assigns, and this Note shall be binding on all heirs, executors, administrators, assigns and successors of Borrower.

**ASSIGNABILITY.** Lender may assign, pledge or otherwise transfer this Note or any of its rights and powers under this Note without notice, with all or any of the obligations owing to Lender by Borrower, and in such event the assignee shall have the same rights as if originally named herein in place of Lender. Borrower may not assign this Note or any benefit accruing to it hereunder without the express written consent of the Lender.

**ORAL AGREEMENTS DISCLAIMER.** This Note represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**GOVERNING LAW.** This Note is governed by the laws of the state of Massachusetts except to the extent that federal law controls.

**HEADING AND GENDER.** The headings preceding text in this Note are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading. All words used in this Note shall be construed to be of such gender or number as the circumstances require.

**ATTORNEYS' FEES AND OTHER COSTS.** If legal proceedings are instituted to enforce the terms of this Note, Borrower agrees to pay all costs of the Lender in connection therewith, including reasonable attorneys' fees, to the extent permitted by law.

**WAIVER OF JURY TRIAL. All parties to this Note hereby knowingly and voluntarily waive, to the fullest extent permitted by law, any right to trial by jury of any dispute, whether in contract, tort, or otherwise, arising out of, in connection with, related to, or incidental to the relationship established between them in this Note or any other instrument, document or agreement executed or delivered in connection with this Note or the Related Documents.**

By signing this Note, Borrower acknowledges reading, understanding, and agreeing to all its provisions and receipt hereof.

Boston East Tyngsboro Holdings, LLC

By: Boston East/India Hotels, LLC, Manager

_____    8/1/14

By: Abhijit Das                      Date
Its: Manager

**Addendum to Promissory Note Dated August 01, 2014**
**Between Boston East Tyngsboro Holdings, LLC and The Lowell Five Cent Savings Bank**
**in the Amount of $3,850,000.00**

This Note may be prepaid in whole or in part upon thirty (30) days prior written notice to the Bank. In the event of any prepayment of this Note , whether by voluntary prepayment, acceleration or otherwise, the Borrower shall, at the option of the Bank, pay a "fixed rate prepayment charge" equal to the product of: (a) the principal amount prepaid and (b) the percentage set forth in the table below for any prepayment made during the indicated period.

| Period | Percentage |
|--------|-----------|
| Year 1 | 3% |
| Year 2 | 3% |
| Year 3 | 3% |
| Year 4 | 3% |
| Year 5 | 3% |

After the last period indicated in the above table this Note may be prepaid in whole or in part without any prepayment charge.

Acknowledged and Accepted:

Boston East Tyngsboro Holdings, LLC

By: _____
       Abhijit Das, Manager

# Exhibit C

# APPRAISAL

*of*

## *160 Pawtucket Boulevard*
## *Tyngsborough, MA 01879*

**Applicant/Borrower: Boston East Tyngsboro Holdings, LLC**

**RE:  STONEHEDGE Inn & Spa**

**Prepared For**

**The Lowell Five Cent Savings Bank**
**Appraisal Review Department**
**C/O John Pratt, Jr., Vice President**
**34 John Street**
**Lowell, MA 01852**

**By:**

Michael V. Correia
MA Certified General #75425

## A-Zabbo Associates
Village Crossing Condominium
Unit 12 - 404 Middlesex Road
Tyngsboro, Massachusetts 01879
**(978) 649-3808**

160 Pawtucket Boulevard, Tyngsborough, MA

## Valuation Techniques

This section of the report briefly explains the recognized appraisal methods, the applicability of the various methods, and sets forth those appraisal methods deemed appropriate for valuing the subject property.

### The Cost Approach

In this approach, the cost to replace the improvements new today is estimated. A deduction is then made from cost new for depreciation, if any, and the result is then added to the estimated value of the underlying land. As implied, the indication of value via this approach is a process of summation of the various property components contributing to total property value. The approach is especially useful in estimating insurable value and/or in valuing special purpose properties, which, because of their design and single-use nature, have a limited market and cannot better be valued by another approach. The approach is not applicable to unimproved land or obsolete improvements, and in the case of the subject was deemed a fairly reliable indicator of Market Value, but considered less reliable than the other approaches and therefore will not be developed for this report.

### The Sales Comparison Approach

This approach compares the subject property with other similar properties offered, or having recently been sold, at known price levels. This approach varies directly with the quantity and quality of available market data.

### The Income Approach

This approach analyzes the property's capacity to generate rental income and converts this capacity into an indication of market value using one of the numerous techniques for converting a stream of expected earnings into a capital sum of equal value. This approach is suitable for properties having obvious earning power and investment appeal but is inappropriate for properties that have no readily discernible income potential.

26

*A-Zabbo Associates, Inc.*

160 Pawtucket Boulevard, Tyngsborough, MA

**Valuation Techniques** (con't)

After considering the physical features of the subject property and the availability of reliable data, all three approaches were considered, but only the Sales Comparison and Income Approaches were developed as part of the Scope of Work for this assignment per Engagement Letter. Where the subject property is considered a special-use property and similar properties do not change hands often and inventory of similar properties is virtually unavailable in the immediate area, the cost approach is considered a reliable indicator for similar properties when recent sales are unavailable, but where the appraiser was able to obtain several recent sales of similar properties recently sold due to a fairly robust hospitality investment market, the cost approach was considered less reliable and therefore omitted for this particular assignment.

The Sales Comparison Approach will be developed as noted.  In the Sales Comparison Approach to Value, the subject property is compared with other similar properties offered or having been sold at known price levels.  Adjustments are made to accommodate for the differences in the properties, in order to arrive to a credible value conclusion.  In employing the Sales Comparison Approach, the process of comparison can be made on the basis of some common denominator or unit of comparison, such as price per unit, price per room or price per square foot of Gross Building Area to include land. For the purpose of this appraisal, the Final Value Opinion via the Sales Comparison Approach will be derived utilizing a price per room, where the market indicates that market participants and typical buyers and investors assess properties on a price per room basis and was therefore deemed to be the most credible value indicator for similar properties within the subject market.

The Income Approach to Value was also developed and given consideration in this instance.  In the Income Approach, the net income is capitalized with a rate commensurate with local market conditions and prevailing interest rates, i.e. Overall Cap Rate, in order to arrive at a Final Value Opinion. The Income Approach is also considered a credible indicator of value for properties like the subject as they are typically pursued for their income producing capabilities.

*A-Zabbo Associates, Inc.*

## Direct Sales Comparison Approach

The objective in the Direct Sales Comparison Approach is to predict the most probable selling price of the subject property.  The rational of the Direct Sales Comparison Approach is that a purchaser will usually not pay more for a property than he would be required to pay for a comparable alternative property (principle of substitution).  Furthermore, a seller will not take less than he can obtain elsewhere in the market.  The method of the Direct Sales Comparison Approach is an empirical investigation in which the prediction of the most probable selling price is based on actual sales of comparable properties.

The disciplines most relevant to the Direct Sales Comparison Approach are economics and statistics.  Appraisal is an economic problem, and the Direct Sales Comparison Approach is empirical, customarily informal statistical method of solution.  The appraiser must collect, classify, analyze and interpret a body of market data.

Although there are many ways to articulate the steps in the Direct Sales Comparison Approach to Value, the following are suitable.

1. Identify the sources of value in the subject property.

2. Find comparable sales and confirm the price and terms.

3. Compare the subject property and sold properties, adjusting for differences.

4. Reach the value conclusion.

The subject property falls under the full-service hotel sector of the hotel investment market. The subject property is further classified in the Luxury and Boutique property category. Given its "niche" market this sector tends to outperform not only the limited-service facilities, but also other full-service facilities that may not capture a niche or market such as the luxury and boutique properties do.

Given this, the comparables chosen represent similar Inn-style properties that are considered boutique, luxury and/or historic full-service hotel properties.

It is the appraiser's understanding that the subject will be undergoing updates, consisting of approximately $1,500,000 of modernization and updates. Rather than individual adjustments that may be speculative it easy to assume that the value of the subject "as-is" would be at the mid-low range of the comparables, but the value "as-completed" with new updates and $1,500,000 of modernization would result in a higher value at the upper range of the comparables utilized.

*A-Zabbo Associates, Inc.*

160 Pawtucket Boulevard, Tyngsborough, MA

## Summary of the Direct Sales Comparison Approach

As noted throughout the report, similar properties are very unique to the subject's immediate area and there is no other property that is similar, let alone a similar property that has recently been sold or transferred. Given this, the appraiser has to mimic the actions of market participants, namely buyers and users of similar properties within the marketplace and it was evident that similar properties are purchased on a regional basis, and even competing with national and international buyers. Large companies that operate similar facilities typically search to obtain a presence within a particular market and when inventory in a certain sector such as the luxury or boutique style brand the search expands to secondary markets such as the subject.

Most emphasis was placed on comparables #1, #2, #3 and #4 which are the most recent sales of similar Inn properties in the region. In particular, comparables #1 and #2 were selected given the size with 18 rooms in each facility. Although the location of these properties may be considered superior coastal or Cape Cod locations, all of the comparables are on significantly smaller parcels, less than one acre while the subject consists of approximately 10+/- acres and the improvements are significantly older (although this is given less consideration, as these properties tend to be regularly updated with modern features and amenities). Additionally, the locations of the comparables suffer from substantial seasonal fluctuations with several properties not even open year round in these areas.

Comparables #1 - #4 are the most recent sales and Comparables #1 and #2 considered the most similar of the recent sales consisting of 18-Room facilities. Most emphasis was placed on Comparables #1 - #4, with primary emphasis on Comparables #1 and #2 for the value of subject. Comparable #3 is considered a more similar location, but is a significantly smaller facility. Comparable #4 is also a very recent sale, but a smaller property. Comparable #5 is an older sale and the location is also considered less similar than the subject location. Comparable #6 is also considered a very similar facility with sixteen rooms and although an older sale given some consideration. Primary emphasis was placed on Comparables #1-#6 as noted.

After considering these differences; the seasonality of the comparables as well as the parcel sizes and utility of the sites for things such as buffers from externalities and privacy, as well as the potential for future development or redevelopment, the comparables chosen are considered equal to the subject overall. Sale prices of the comparables ranged from $153,846 per room to $225,000 per room. The opinion of value of the subject "as-is" is $170,000 per Room, at the low range of the comparables, and "as-completed" is $215,000 per Room at the upper range of the comparables.

Based on the comparable sales data utilized as noted, value of the subject as proposed, via the Direct Sales Comparison Approach would be as follows:

**30 Rooms at $170,000 per Room 'AS-IS"…………...……………….....….…. $5,100,000.00**

### *"Five-Million One-Hundred Thousand Dollars"*

### *AND*

**30 Rooms at $215,000 per Room "AS-COMPLETED"……………....….….. $6,450,000.00**

### *"Six-Million Two-Hundred Fifty-Thousand Dollars"*

160 Pawtucket Boulevard, Tyngsborough, MA

**Reconciliation and Final Value Opinion**

Value Indicated by Cost Approach ............................................................................ Not Developed
Value Indicated by Income Approach............................................................................$ 4,500,000.00
Value Indicated by Sales Comparison Approach "AS-IS"............................................$ 5,100,000.00
Value Indicated by Sales Comparison Approach "AS-COMPLETED"........................$ 6,450,000.00

As previously mentioned, the intended use of this appraisal is to provide an opinion of market value for the subject, in order to assist in Mortgage/Financing proceedings regarding a purchase of the subject property. The intended user is The Lowell Five Cent Savings Bank.

The final step in providing an Opinion of Market Value of the subject is a correlation of value from each approach utilized. As noted earlier, all (3) traditional approaches to value were considered, but only the Sales Comparison and Income Approaches were developed as part of the Scope of Work, to be included in this report.

The Cost Approach was considered, but not developed as previously noted. The Cost Approach is considered a credible and reliable indicator of value for the subject property and therefore considered, but was not developed as the other approaches were considered more reliable than the cost approach for this particular market.

The Income Approach was developed for this report. The subject tis a full-service hotel that currently generates substantial income and the Income Approach is considered a reliavle indicator of value for the subject, but in this instance given less consideration where the income approach does not reflect the potential for future cash flows that may significantly exceed the previous years' cash flows or revenue. The income approach is considered less reliable than the Sales Comparison Approaches. Therefore, less emphasis was given to the income approach, due to fluctuations that can occur in occupancy, operating expenses and overall income, and where if the subject property's use as a full-service hotel facility is discontinued or changed, the income could change significantly and therefore less emphasis was given to the income approach in this particular instance as noted.

The Direct Sales Comparison Approach was also developed. The appraiser was able to locate recent sales of several properties throughout the area that would be considered substitute or competing properties that offer similar appeal to market participants. Significant consideration was given to Sales Comparison Approach where not only does the Sales Comparison Approach reflect the actions of participants within the marketplace, but is also directly related to property's income earning capabilities. Given this, most emphasis was placed on the Sales Comparison Approach was given to the Income Approach.

All three approaches were considered, but only the Sales Comparison and Income Approaches were developed as part of the Scope of Work for this report and only the two approaches developed were given any weight in developing an opinion of market value for the subject property as proposed. All three approaches are considered reliable indicators of value for the subject property, but for reasons as noted, some of the approaches are considered more reliable in certain circumstances and although all three approaches are considered acceptable and credible indicators of value for a property like the subject, some approaches are considered more reliable than others for reasons noted. As noted, all three approaches were considered reliable indicators of value for the subject and given the purpose of the appraisal and the subject property's current use; some weight was placed on both the Sales Comparison and Income approaches, where the price paid in the Sales Comparison Approach directly reflects a properties income earning potential. As noted, both the Sales Comparison

*A-Zabbo Associates, Inc.*

160 Pawtucket Boulevard, Tyngsborough, MA

Approach and Income Approach were deemed good indicators of the current market for similar full-service hotel properties and where occupancy, income and operating expenses for properties like the subject can fluctuate from year to year as noted most weight has been placed on the Sales Comparison, with the Income Approach included only as informational support.

Based on the analysis of the real estate market data within the market area of the subject property and after considering the reliability of the individual approaches to value and the intended use of this appraisal, it is the Appraisers opinion that the current Market Value of 160 Pawtucket Boulevard, Tyngsborough, Massachusetts described within, as of *July 18, 2014, is "Five-Million One-Hundred Thousand Dollars" or $5,100,000.00 "As-Is" and "six-Million Four-Hundred Fifty-Thousand or $6,450,000.00 "as-Completed"*

I, the undersigned, do hereby certify that I have no interest, present or contemplated, in the subject property.

**Michael V. Correia**
**MA Certified General #75425**

*A-Zabbo Associates, Inc.*

160 Pawtucket Boulevard, Tyngsborough, MA

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title of it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. (Assessors Property Card)

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser in not a surveyor, he or she makes no guarantees, expressed or implied, regard this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, deprecation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more of less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, expressed or implied regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes then to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer, consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia: except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraisers prior written consent. The appraiser's written consent and approval must be obtained before the appraisal can be conveyed by anyone to the public through advertising, public retaliations, news, sales, or other media.

*A-Zabbo Associates, Inc.*

**Exhibit D**

# DEDICATED PARTNERS IN GROWING YOUR BUSINESS









**Michael Sheahan,**
*Assistant Vice President, Branch Manager*

**Rob Parsons,**
*Franchisee, Popeyes*

**Mark Katimy,**
*Vice President Commercial Lending*

**Don MacLaren, Sr.**
*Owner, Wamesit Lanes, LLC*

**Tom Boucher**
*Vice President Commercial Lending*

**Abhijit "Beej" Das**
*President and CEO,*
*Boston East India Hotels*

**Gary W. Croft,**
*Vice President Commercial Lending*

**Daniel C. O'Neil**
*President and CEO, O'Neil Cinemas*

## A few of our successful partnerships









Every business has unique needs. Our experienced business banking team is here to meet those needs with you. Offering a full array of business lending, cash management and banking solutions plus local decision-making and individualized support, Lowell Five stands with your business every step of the way.

**Look to Lowell Five for all of your business banking needs, call TBD**

# Exhibit E

# CHANGE IN TERMS AGREEMENT

**The Lowell Five Cent Savings Bank**
**One Merrimack Plaza**
**Lowell, Massachusetts 01852**
**(978)452-1300**
**www.lowellfive.com**

| LOAN NUMBER | ORIGINAL PRINCIPAL BALANCE | CURRENT PRINCIPAL BALANCE | ORIGINAL AGREEMENT DATE | AGREEMENT CHANGE DATE |
|---|---|---|---|---|
| 4170899 | $3,850,000.00 | $3,315,000.00 | August 1, 2014 | June 4, 2015 |

| DESCRIPTION OF THE EXISTING DEBT ("Existing Debt") |
|---|
| $3,850,000 Mortgage Loan secured by a first mortgage on real property located at: 160 & 170 Pawtucket Blvd. Tyngsboro, MA 01879 |

## BORROWER INFORMATION

Boston East Tyngsboro Holdings, LLC
21 High Street, Suite 300
North Andover, MA 01845

## GUARANTOR INFORMATION

Abhijit Das
148 Main Street, Unit O-401
North Andover, MA 01845

Mitra Das
North Andover, MA 01845

Mukti Das
North Andover, MA 01845

**AGREEMENT.** This Change in Terms Agreement will be referred to as the "Agreement."

**PARTIES.** "Parties" means all Borrowers, Guarantors, Hypothecators and Cosigners signing this Agreement.

**PARTY.** "Party" means any Borrower, Guarantor, Hypothecator or Cosigner signing this Agreement.

**EXISTING DEBT.** "Existing Debt" refers to an instrument executed on **August 1, 2014** in the original principal amount of **$3,850,000.00** with a remaining balance due of **$3,315,000.00** and a maturity date of **08/01/2039**.

**LENDER.** The term "Lender" means **The Lowell Five Cent Savings Bank** whose address is **One Merrimack Plaza, Lowell,** Massachusetts **01852** , its successors and assigns.

**SECURITY TO AGREEMENT.** Security (the "Collateral") for the Agreement is granted pursuant to the following security document(s):

- Assignment of Leases and Rents dated **August 1, 2014** evidencing an assignment of leases and rents on the property located at **160 & 170 Pawtucket Blvd. Tyngsboro MA 01879.**
- Security Agreement dated **August 1, 2014** evidencing security interest in **All personal property of Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired, including without limitation, the following categories of property as defined in Revised Article 9 of the Uniform Commercial Code: goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all records of, accessions to and products and proceeds of the foregoing. Any term used herein which is defined in either (i) Article 9 of the Uniform Commercial Code as in effect in the jurisdiction in which this financing statement was signed or authenticated by the Debtor at the time it was so signed or authenticated or (ii) Article 9 of the Uniform Commercial Code as in effect at any relevant time in the jurisdiction in which this financing statement is filed, has the meaning to be ascribed thereto with respect to any particular item of property under the more encompassing of the two definitions. This financing statement covers, and is intended to cover, all personal property of the Debtor.**
- Security Instrument (Mortgage/Deed of Trust/Security Deed) in the amount of **$3,850,000.00.** dated **August 1, 2014** evidencing a lien on the property located at **160 & 170 Pawtucket Blvd. Tyngsboro MA 01879.**

**TERMS AND PROVISIONS.** In consideration of the terms and provisions contained in this Agreement and in the instruments evidencing the Existing Debt, and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the undersigned, the Parties agree to the following provisions: To advance $300,000.00 subject to borrower raising an additional $300,000.00 in capital within 60 days of this modification. Borrower shall provide unlimited guarantees of the entire indebtedness from Mukti Das, Mitra Das, Abhijit Das. Upon the achievement of a loan-to-value ratio of 65% or less, the guarantees shall be removed.

**RATIFICATION AND CONTINUED VALIDITY.** Except for the terms expressly modified by this Agreement, the undersigned Parties hereby acknowledge they are still bound by the terms of the instruments and prior modifications, extensions, and supplements evidencing the

Existing Debt as if they were fully set forth and repeated in this Agreement and that those terms will continue to bind the Parties as provided in this Agreement and those instruments. Consent to this Agreement does not waive the right to strictly enforce any rights under this Agreement or the instruments evidencing the Existing Debt. Consent to this Agreement does not require the Parties to enter into another agreement like this one in the future. The Parties and Lender agree that this Agreement shall not be construed as a novation or extinguishment of the Existing Debt, but a restatement of the Existing Debt with modifications.

**OTHER RESPONSIBLE PARTIES.** Any Parties liable for the Existing Debt, including without limitation, cosigners, guarantors, and hypothecators, are not relieved of any obligation except as expressly relieved in this Agreement or any other writing. The liability of any Party who signed the instruments evidencing the Existing Debt, whether primary or secondary, continues in full force and effect, even if that Party does not sign this Agreement.

**PARAGRAPH HEADINGS; SINGULAR AND PLURAL TERMS.** Paragraph headings of this Agreement are solely for the convenience of the Parties and shall not be used to interpret this Agreement. Whenever used, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**By signing this Agreement, each Borrower and Guarantor acknowledges reading, understanding, and agreeing to all its provisions, and receiving a copy.**

Boston East Tyngsboro Holdings, LLC

By: Boston East India Hotels, LLC, Manager

_____   6/4/15

By: Abhijit Das                  Date
Its: Manager

_____   6/4/15          _____   6/4/15

**Abhijit Das**            Date              **Mitra Das**            Date
Individually                                 Individually

_____

**Mukti Das**              Date
Individually

**By signing this Agreement, Lender acknowledges reading, understanding, and agreeing to all its provisions.**

The Lowell Five Cent Savings Bank

_____   6/4/15

By: Thomas Boucher        Date
Its: Vice President

Existing Debt as if they were fully set forth and repeated in this Agreement and that those terms will continue to bind the Parties as provided in this Agreement and those instruments. Consent to this Agreement does not waive the right to strictly enforce any rights under this Agreement or the instruments evidencing the Existing Debt. Consent to this Agreement does not require the Parties to enter into another agreement like this one in the future. The Parties and Lender agree that this Agreement shall not be construed as a novation or extinguishment of the Existing Debt, but a restatement of the Existing Debt with modifications.

**OTHER RESPONSIBLE PARTIES.** Any Parties liable for the Existing Debt, including without limitation, cosigners, guarantors, and hypothecators, are not relieved of any obligation except as expressly relieved in this Agreement or any other writing. The liability of any Party who signed the instruments evidencing the Existing Debt, whether primary or secondary, continues in full force and effect, even if that Party does not sign this Agreement.

**PARAGRAPH HEADINGS; SINGULAR AND PLURAL TERMS.** Paragraph headings of this Agreement are solely for the convenience of the Parties and shall not be used to interpret this Agreement. Whenever used, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders.

**ORAL AGREEMENTS DISCLAIMER.** This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

By signing this Agreement, each Borrower and Guarantor acknowledges reading, understanding, and agreeing to all its provisions, and receiving a copy.

Boston East Tyngsboro Holdings, LLC

By: Boston East India Hotels, LLC, Manager

By: Abhijit Das                Date: 3/4/15
Its: Manager

Abhijit Das                    Date: 6/4/15
Individually

Mitra Das                      Date: 6/4/15
Individually

Mukti Das                      Date: 6/4/15
Individually

By signing this Agreement, Lender acknowledges reading, understanding, and agreeing to all its provisions.

The Lowell Five Cent Savings Bank

By: Thomas Boucher             Date
Its: Vice President

# Exhibit F

Troca Hotels Mail - Boston East Tyngsboro



# TROCA HOTELS

---

## Boston East Tyngsboro

John Pratt <JPratt@lowellfive.com>                                      Fri, May 12, 2017 at 3:14 PM
To: "Abhijit \"Beej\" Das"
Cc: Tom Boucher <TBoucher@lowellfive.com>

Beej,

I understand that delaying the report was part of our initial discussion; however, the Bank has decided to move forward with the new appraisal now.  This updated report is important for our relationship review as well as our updated valuations.  The appraiser can provide a prospective value based upon the pending claims and projected work to be completed.

Sorry for the inconvenience.  Your help with providing the correct information relevant to all ongoing and upcoming renovations is important to this process.  Thanks in advance for your cooperation!

**John Pratt, Jr.** | *Senior Vice President, Credit & Collections*

**The Lowell Five Cent Savings Bank** | 34 John Street | Lowell, MA 01852

t: 978.441.6446 | f: 978.934.0921 | www.lowellfive.com (http://www.lowellfive.com/)



The Relationship Bank

[Quoted text hidden]

# Exhibit G



July 1, 2019

Boston.East Tyngsboro Holdings LLC
160 Pawtucket Blvd
Tyngsboro, MA  01879

# NOTICE OF ACCELERATION OF NOTE

Re: Commercial Mortgage # 4170899
Property: 160 – 170 Pawtucket Blvd, Tyngsboro, MA  01879

Your having failed to bring your loan indebtedness current, pursuant to a Final Demand Notice sent to you on <u>May 20, 2019</u> the Bank is hereby accelerating your loan and hereby demands full payment of the amount due within thirty (30) days from the date hereof.

You are required to pay the entire amount as of <u>**July 1, 2019**</u>, which is <u>**$3,408,982.20.**</u> The breakdown is as follows:

| | |
|---|---|
| Note Balance | $3,346,207.41 |
| Note Interest | $41,155.49 |
| Appraisal Fee | $7,500.00 |
| Late Charges | $14,119.30 |

As of <u>**July 31, 2019**</u>, which is thirty (30) days from the date hereof, you will owe full payment of <u>**$3,423,592.56.**</u>  The breakdown is as follows:

| | |
|---|---|
| Note Balance | $3,346,207.41 |
| Note Interest | $54,679.75 |
| Appraisal Fee | $7,500.00 |
| Late Charges | $15,205.40 |

Your Failure to make payment within thirty (30) days may result in election by the Bank to undertake all remedies permitted by law, including, but not limited to the filing of a lawsuit against you and foreclosure proceedings; and you will be liable for further fees & expenses, including attorney's fees and costs as set forth in your loan documentation.

Unless you notify the Bank within thirty (30) days from the date of this notice that you dispute the validity of this debt, or any portion thereof, the Bank will assume that you agree that the debt is valid. If, within the thirty (30) day period, you notify the Bank in writing that the debt, or any portion thereof, is disputed, we will obtain verification of the debt and mail a copy of such verification to you. If you request the Bank in writing within thirty (30) days of receiving this notice, the Bank will provide you with the name and address of the original creditor if different from the original creditor.

That you have thirty (30) days to notify the Bank as a dispute to the validity of all or any portion of the debt; it may not prevent the Bank from filing a lawsuit within such time.

You have the right to reinstate your mortgage by paying all sums and expenses including, but not limited to, reasonable attorney's fees, due under the Mortgage and Note as if no acceleration had occurred and by curing any default of any other covenant or agreement in connection with your loan. Your right to reinstate remains in effect even after acceleration, and you have the further right, including the right to assert the non-existence of a default or any other defense to the acceleration and sale.

**THIS IS AN ATTEMPT TO COLLECT A DEBT; AND ANY INFORMATION OBTAINED WILL BE USED PURSUANT TO SAID PURPOSE.**

Sincerely,

Normand A. Zarella
Collections Officer

**CERTIFIED/rrr**

cc: Abhijit Das
    Mukti Das
    Mitra Das
    Tom Boucher

# Exhibit H



**TROCA HOTELS**

Abhijit "Beej" Das
President & CEO

Troca Hotels Management LLC

160 Pawtucket Boulevard
Tyngsboro, Massachusetts 01879
United States of America

+1 617-231-6550 main

July 17, 2019

<u>VIA EMAIL AND CERTIFIED MAIL</u>

Mr. Normand A. Zarella
Mr. Donald A. Bedard
Mr. John Pratt, Jr.

Lowell Five Savings Bank ("Lowell Five")
30 International Place
Tewksbury, MA 01876

RE:     Commercial Mortgage Loan # 4170899 ("L5 Loan")
        Property Address: 160-170 Pawtucket Blvd, Tyngsboro MA 01879 ("Property")

Dear Messrs. Zarella, Bedard and Pratt:

This letter is sent on behalf of Boston East Tyngsboro Holdings LLC ("BETH" or "Borrower"); and Mukti L. Das, Mitra Das, and Abhijit Das (collectively the "Gurantors" or "Investors" and each individually a "Gurantor" or "Investor")  regarding the L5 Loan. As described more fully below, and while it is hoped that amicable arrangements can be established to address any issues pertaining to the L5 Loan, **please be advised that this is a demand for relief pursuant to the Massachusetts Consumer Protection Act, G.L. c. 93A** ("Chapter 93A").

The L5 Loan resulted from an introduction to the Lowell Five Savings Bank on May 27, 2014. At the time, the principals and promoters of the entity that subsequently became BETH were seeking debt financing to acquire the Stonehedge Inn & Spa in Tyngsboro ("Stonehedge"). On June 5, 2014, Lowell Five presented a proposal to lend BETH $3,575,000 for the purchase and renovation of Stonehedge with no recourse or guarantor. On June 24, 2014, Lowell Five revised its proposal to an amount of up to $3,850,000 ("Approved Amount") again with no recourse or guarantor. The L5 Loan was approved on July 15, 2014. As per the L5 Loan approval terms, $925,000 of the approved loan amount was to be "held back and distributed as work is completed and/or expenses incurred." The transaction which initiated the L5 Loan closed on August 1, 2014 ("Closing Date") secured by a mortgage on the Property in an amount equal to the Approved Amount.

Despite its commitment to lend up to the Approved Amount and despite its confirmation that $925,000 would be "distributed as work is completed and/or expenses incurred" Lowell Five advised BETH on January 30, 2015, that it would not advance additional funds, having advanced less than $3,400,000 of the $3,850,000 that had been approved.  In June 2015, in exchange for personal gurantees from the Guarantors, Lowell Five agreed to advance an additional $300,000 to BETH. Lowell Five, in effect, renegotiated its deal to extract personal gurantees while still lending BETH significantly less than the Approved Amount. On or about June 5, 2015, Lowell Five asked BETH and the Gurantors to execute a Change in Terms Agreement ("Change Agreement") evidencing the personal guarantees of the Guarantors.



**TROCA HOTELS**

Under the terms of the Change Agreement, "upon achievement of a loan-to-value ratio of 65% or less, the guarantees of Mukti Das and Mitra Das shall be removed." Despite the fact that the loan to value ratio is now significantly less than the threshold set in the Change Agreement, a fact that Lowell Five is well aware of, the guarantees of the Guarantors has yet to be removed. **Guarantors therefore demand that Lowell Five immediately remove the gurantees of the Gurantors from the L5 Loan in accordance with the Change Agreement.**

Furthermore, between the Closing Date and the date of this letter, BETH has invested over $2,500,000 in capital improvements to Stonehedge and the Property. Because of BETH's investments and despite Lowell Five continued and continuing failure to lend up to the Approved Amount on the L5 Loan, the value of the property is significantly higher than it was on the Closing Date. BETH made its decision to acquire Stonehedge and borrow from Lowell Five on the basis of Lowell Five's commitment to lend the Approved Amount and other material commitments made by Lowell Five.

Despite the investment made by BETH in the Stonehedge and despite Lowell Five's commitment to lend the Approved Amount on the L5 Loan, Lowell Five has failed to honor its lending commitments under the L5 Loan. BETH relied upon Lowell Five's many commitments in making its investment and capital deployment decisions. Lowell Five's failure to lend and uphold its commitments has adversely affected and harmed BETH and the Guarantors.

**The Borrower and Investors therefore demand (1) Lowell Five advance funds up to the Approved Amount, as required under the L5 Loan documents and (2) six months of time to complete a refinancing and financial restructuring of the L5 Loan.**

The Borrower and Guarantors are committed to working with Lowell Five in a cooperative manner to ensure the Property's success as an important community oriented business. Further, the Borrower and Guarantors are hopeful that Lowell Five will honor its commitments under the L5 Loan and Change Agreement and that the relationship between Lowell Five and the Bowrrower can move forward in a cooperative and amicable manner.  However, with the continuing threats of possible legal action by Lowell Five, it is prudent for the Borrower and Guarantors to seek appropriate protection under the law.

Please be advised that Chapter 93A provides for an award of actual damage, attorney fees and costs for a prevailing party. Since your conduct was willful and knowing, it constitutes a violation of Chapter 93A which allows the Borrower to claim treble damages.  Under Chapter 93A, Lowell Five has 30 days to make a reasonable offer of settlement to resolve this matter. Should you fail to do so, the Borrower and Guarantors reserve the right to institute suit seeking necessary relief, together with damages representing diminution in the value of the Property, expenses and legal fees.

Sincerely,

BOSTON EAST TYNGSBORO HOLDINGS LLC,
     by its Manager, TROCA HOTELS MANAGEMENT LLC,
     by its Manager, ABHIJIT DAS

# Exhibit I



**T R O C A   H O T E L S**

Abhijit "Beej" Das
President & CEO

Troca Hotels Management LLC

160 Pawtucket Boulevard
Tyngsboro, Massachusetts 01879
United States of America

+1 617-231-6550 main

August 26, 2019

**VIA EMAIL AND FEDERAL EXPRESS**

Mr. Normand A. Zarella
Mr. Donald A. Bedard
Mr. John Pratt, Jr.

Lowell Five Savings Bank ("Lowell Five")
30 International Place
Tewksbury, MA 01876

RE:     Commercial Mortgage Loan # 4170899 ("L5 Loan")
        Property Address: 160-170 Pawtucket Blvd, Tyngsboro MA 01879 ("Property")

Dear Messrs. Zarella, Bedard and Pratt:

This letter is sent on behalf of Boston East Tyngsboro Holdings LLC ("BETH" or "Borrower"); and Mukti L. Das, Mitra Das, and Abhijit Das (collectively the "Guarantors" or "Investors" and each individually a "Guarantor" or "Investor") regarding the L5 Loan. We are in receipt of a letter from Attorney Stephen J. Brake of Nutter McLennen & Fish LLP sent to BETH on behalf of The Lowell Five Cent Savings Bank ("Lowell Five") dated August 15, 2019. This letter is not intended as a response to that letter. BETH, the Guarantors and their collective counsel are reviewing its contents and explicitly reserve their rights with respect to the response thereto.

In line with our letter to you dated July 18, 2019, in which we stated that "the Borrower and Guarantors are committed to working with Lowell Five in a cooperative manner," a check for $86,888.08 is attached to this letter, representing payments on the L5 Loan from May through August, 2019. While Borrower previously attempted to make payments under the L5 Loan, those attempts were not accepted. This payment is made towards the amounts that were due or became due under the L5 Loan as of the date of my previous letter and the amount that became due on August 1, 2019. This payment is made while the demands made by the Guarantors in my letter of July 18, 2019 remain pending. The Guarantors and Borrowers request a meeting with Lowell Five to determine whether a resolution of the demands made by the Guarantors and Borrowers and Lowell Five can be achieved short of litigation.

Sincerely,

BOSTON EAST TYNGSBORO HOLDINGS LLC,
        by its Manager, TROCA HOTELS MANAGEMENT LLC,
        by its Manager, ABHIJIT DAS

cc.     Stephen J. Brake, Esq.

4441

**Troca Tyngsboro Hotel LLC**
160 Pawtucket Blvd
Tyngsboro, MA 01879
978-649-4400

Lowell Five
53-7133/2113

08/26/2019

PAY TO THE
ORDER OF   Lowell Five Cent Savings Bank                                    $   **86,888.08

Eighty-six thousand eight hundred eighty-eight and 08/100*************************************************** DOLLARS

Lowell Five Cent Savings Bank
Lowell Five Cent Savings Bank
55 Technology Drive
Lowell, MA  01851

MEMO

AUTHORIZED SIGNATURE

MP

---

Troca Tyngsboro Hotel LLC                                                            4441

**08/26/2019**        **Lowell Five Cent Savings Bank**

| Date | Type | Reference | Original Amount | Balance Due | Payment |
|------|------|-----------|-----------------|-------------|---------|
| 05/01/2019 | Bill | Due May | 21,722.02 | 21,722.02 | 21,722.02 |
| 06/01/2019 | Bill | Due June | 21,722.02 | 21,722.02 | 21,722.02 |
| 07/01/2019 | Bill | Due July | 21,722.02 | 21,722.02 | 21,722.02 |
| 08/01/2019 | Bill | Due August | 21,722.02 | 21,722.02 | 21,722.02 |
|  |  | Check Amount |  |  | 86,888.08 |

86,888.08

# Exhibit J



October 9, 2019

<u>**VIA EMAIL AND FIRST CLASS MAIL**</u>

Boston East Tyngsboro Holdings, LLC
Troca Hotels Management, LLC
Attn: Abhijit Das
160 Pawtucket Boulevard
Tyngsboro, Massachusetts   01879

Dear Mr. Das:

     This letter provides a summary of our September 26 meeting. This letter also represents formal request of all financial information due to the Bank under the terms of the loan documents. Finally, this letter outlines the Bank's plan to collect on the outstanding monies due as the account is now 160 days delinquent.

     In summary, the Bank understands that damage occurred to the property in March or April 2019, that the revenue and financial condition of the borrower have been materially impacted by the damage sustained resulting in a change in the financial condition of the borrower, that the restaurant lease presented in May 2019 has been terminated and that the borrower is operating the restaurant, that an initial emergency payment was provided to the borrower through Troca Holdings, and that additional insurance proceeds are expected. The Bank recognizes your desire to refinance the outstanding debt with another institution.

     As previously requested and as required by your loan documents, the Bank requires complete financial update for the borrower and guarantors for review to determine potential for continued operations and demonstration of debt service capacity of the borrower. The following financial information and additional documents are requested for the Bank to make a decision on the viability of the business going forward:

- Federal income tax returns for the borrower for the period ending 12/31/2018
- Management prepared quarterly financial statements for the quarters ending March, June, September, and December 2018
- Management prepared quarterly financial statements for the quarters ending March, June, September 2019 to be supported by quarterly account payable agings
- Management quarterly financial projections for the period ending December 2019, March 2020, and June 2020
- Quarterly STR report data for the borrower detailing including occupancy, total monthly room nights and ADR
- Complete debt schedule for the borrower including principal balance outstanding, monthly payment, and collateral pledged to secure the debt



- 2018 federal income tax returns for the guarantors as well as updated personal financial statements for the guarantors
- Details of the insurance claim submitted for the wind damage along with evidence of work completed to repair the damage and estimates for the remaining work to be completed to complete restoration of the chimneys and roof
- Business plan as prepared for your financing request(s) for new lenders

The Bank requests this financial information be presented in a complete and timely manner. The Bank will continue with its collections efforts in an attempt to satisfy the outstanding Final Demand and Acceleration letters provided.

This Notice is an attempt to collect a debt, and any information obtained will be used toward that purpose.

Sincerely,

John Pratt, Jr.
Senior Vice President

Cc: Stephen Brake, Esq.

# Exhibit K



October 21, 2019

**VIA EMAIL AND FIRST CLASS MAIL**

Cross Insurance
Anastasia Bean, Claims Manager
2331 Congress Street
Portland, ME 04102

Re: The Stonehedge Hotel & Spa
160-170 Pawtucket Boulevard, Tyngsboro, MA

Dear Ms. Bean,

The Bank is contacting you based upon our discussion of the insurance on the subject property. As discussed, The Bank is the mortgagee and loss payee for the property located at 160-170 Pawtucket Boulevard, Tyngsboro, MA. The insured was provided an emergency payment of $500,000 in August 2019 for wind damage and for business interruption. Finally, this initial check issued to the insured by Zurich Insurance did not include the Bank as a joint payee as it should have been.

At this time, The Bank will forbear from filing civil action to exercise its rights to insurance proceeds for the property and will instead rely upon the representations by you and Cross Insurance that future payments will be issued to the insured and the Bank as joint payees. If these representations cannot be met, The Bank requests notification forthwith in order to protect its position and preserve the condition of the property.

Additionally, the Bank requests copies of the insurance claim submitted and in process and any report from your adjuster detailing the damage which occurred to the property.

Respectfully,

John Pratt, Jr.
Senior Vice President

cc:     Steven Brake, Esq.
        Abhijit Das, Boston East Tyngsboro Holdings
        Zurich Insurance

30 International Place Tewksbury, MA 01876  |  lowellfive.com  |  978.452.1300

# Exhibit L



October 21, 2019

**<u>VIA EMAIL AND FIRST CLASS MAIL</u>**

Boston East Tyngsboro Holdings, LLC
Troca Hotels Management, LLC
Abhijit Das
160 Pawtucket Boulevard
Tyngsboro, Massachusetts 01879

Re: The Stonehedge Hotel & Spa
160-170 Pawtucket Boulevard, Tyngsboro, MA

Dear Mr. Das,

     This letter is sent you, as Manager of Boston East Tyngsboro Holdings, LLC, (the "Borrower") regarding the property owned and operated at 160-170 Pawtucket Boulevard, Tyngsboro, MA (the "Property"), which is secured by, among other things, a Mortgage covering the above-referenced Property (the "Mortgage") dated August 1, 2004.

     At our meeting September 28, you indicated that the Property sustained wind damage on or about March or April 2019, the Bank's Mortgage provides warranties with regard to Condition of the Property, Insurance, and Lender's Right to Enter. Additionally, the Mortgagor promises at all times to preserve and maintain the property. The Bank requests a copy of the insurance claim submitted to Zurich Insurance, a report of repairs completed to date and estimates of the remaining work to be completed including costs spent to date and anticipated costs. The Bank would also like to inspect the property and will contact you and Eric Kfoury to schedule a time to perform this inspection. The Bank has also ordered an updated appraisal of the property and will provide your contact information to the appraiser.

     Additionally, please find enclosed payment presented to the Bank on August 28. This check is returned for insufficient funds as you stated in our meeting of September 28 that you would not fund this check without an agreement with regard to a workout plan to provide time for refinance. As this payment is returned and no payments have been made, the Bank asserts that you remain in default and the Bank reserves all rights to collect all monies due and to protect its collateral.

Respectfully,

John Pratt, Jr.
Senior Vice President

cc:    Steven Brake, Esq.

**Troca Tyngsboro Hotel LLC**
160 Pawtucket Blvd
Tyngsboro, MA 01879
978-649-4400

4441

Lowell Five
53-7133/2113

08/26/2019

PAY TO THE
ORDER OF   Lowell Five Cent Savings Bank

$ **86,888.08

Eighty-six thousand eight hundred eighty-eight and 08/100************************************************************ DOLLARS

Lowell Five Cent Savings Bank
Lowell Five Cent Savings Bank
55 Technology Drive
Lowell, MA  01851

AUTHORIZED SIGNATURE                                 MP

MEMO

Acc # ▓▓▓▓▓

---

Troca Tyngsboro Hotel LLC                                                                 4441

**08/26/2019**      **Lowell Five Cent Savings Bank**

| Date | Type | Reference | Original Amount | Balance Due | Payment |
|------|------|-----------|-----------------|-------------|---------|
| 05/01/2019 | Bill | Due May | 21,722.02 | 21,722.02 | 21,722.02 |
| 06/01/2019 | Bill | Due June | 21,722.02 | 21,722.02 | 21,722.02 |
| 07/01/2019 | Bill | Due July | 21,722.02 | 21,722.02 | 21,722.02 |
| 08/01/2019 | Bill | Due August | 21,722.02 | 21,722.02 | 21,722.02 |
| | | | Check Amount | | 86,888.08 |

**10248 CHK:L5 - TTH** Acc ▓▓▓▓▓                                              86,888.08