**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                      )
MITRA DAS, MUKTI L. DAS, and TROCA    )
HOLDINGS LLC, for themselves, and     )
as assignees of BOSTON EAST           )
TYNGSBORO HOLDINGS LLC,               )
                                      )
                    Plaintiffs,       )
                                      )         Civil Action
v.                                    )         No. 24-cv-10931-PBS
                                      )
THE LOWELL FIVE CENT SAVINGS          )
BANK, DAVID WALLACE, and JOHN         )
PRATT JR.,                            )
                                      )
                    Defendants.       )
_____)

**MEMORANDUM AND ORDER**

September 26, 2025

Saris, J.

**INTRODUCTION**

This action concerns a loan taken out by Plaintiffs Mitra Das and Mukti Das (the "Das Plaintiffs"), through their company Plaintiff Troca Holdings LLC ("Troca Holdings"), for the acquisition and renovation of a hotel in Tyngsborough, Massachusetts. Beginning in 2015, the lender -- Defendant Lowell Five Cent Savings Bank ("Lowell Five") -- stopped providing renovation financing, citing Troca Holdings' default on the loan. Lowell Five also sought recourse from the Das Plaintiffs as personal guarantors of the loan. Ultimately, Troca Holdings filed for bankruptcy, and Lowell Five foreclosed on the hotel.

1

In an unsuccessful lawsuit in state court, the Massachusetts Superior Court concluded that Lowell Five had complied with its loan obligations and the Das Plaintiffs had breached theirs. See Bos. E. Tyngsboro Holdings, LLC v. Lowell Five Cent Sav. Bank, No. 1981CV03481 (Mass. Super. Ct. Oct. 11, 2024), Dkt. 59. Plaintiffs now sue Lowell Five and two of its officers in federal court. They allege, among other things, that Lowell Five, its CEO (Defendant David Wallace), and its Chief Credit Officer (Defendant John Pratt Jr.) failed to provide renovation financing and release the Das Plaintiffs from their personal guarantees due to the Das Plaintiffs' being Indian American, in violation of two federal antidiscrimination statutes. In support of these allegations, the Das Plaintiffs primarily point to an investigation by Lowell Five into their son's banking activity during his failed congressional candidacy, asserting that Lowell Five did not conduct a similar investigation into allegedly fraudulent actions by a white candidate. The son was convicted by a federal jury on various campaign-related offenses on October 13, 2023.

Defendants now move to dismiss Plaintiffs' amended complaint under Federal Rule of Procedure 12(b)(6). Because the Court concludes that Plaintiffs' federal claims are barred by statutes of limitations and that the allegations regarding the son do not plausibly reset the clock, the Court dismisses those claims and declines to exercise supplemental jurisdiction over Plaintiffs'

state-law claims. Defendants' motion to dismiss (Dkt. 39) is **<u>ALLOWED</u>**.

**<u>BACKGROUND</u>**

In adjudicating a motion to dismiss for failure to state a claim, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the [plaintiffs'] favor." <u>Back Beach Neighbors Comm. v. Town of Rockport</u>, 63 F.4th 126, 128 (1st Cir. 2023) (quoting <u>Legal Sea Foods, LLC v. Strathmore Ins. Co.</u>, 36 F.4th 29, 34 (1st Cir. 2022)). The Court may also consider "'documents attached to or fairly incorporated into the complaint,' 'facts susceptible to judicial notice,' and 'concessions in plaintiff[s'] response to the motion to dismiss.'" <u>Cheng v. Neumann</u>, 51 F.4th 438, 441 (1st Cir. 2022) (alteration in original) (quoting <u>Lemelson v. Bloomberg L.P.</u>, 903 F.3d 19, 21 (1st Cir. 2018)).

**I.    <u>The Loan Agreement</u>**

In or around early 2014, the Das Plaintiffs began evaluating the purchase of the Stonehedge Inn and Spa (the "Hotel"), an inn located in Tyngsborough, Massachusetts. Because the Hotel "was dilapidated and required significant capital investment for critical repairs," Dkt. 30 ¶ 52, the Das Plaintiffs required financing for both the acquisition and the renovation of the Hotel. They soon found a willing lender in Lowell Five. In or around June

2014, the Das Plaintiffs met with Wallace to discuss the terms of a potential loan.

Among other discussions, Wallace promised that in addition to favorable loan terms, Lowell Five would offer the Das Plaintiffs access to the Vesper Country Club, a nearby country club that "gained notoriety in 1991 because at the time it had not had a black member in its 116-year history and relegated women to associate membership." Dkt. 30 ¶ 56 (quotation marks omitted). Wallace's father served on the country club's executive committee, and Wallace promised to use his influence there to link club members' accounts to the Hotel.

The Das Plaintiffs filed a loan application with Lowell Five, which was approved in July 2014. As a pre-closing condition, Lowell Five required a property appraisal evidencing a loan-to-value ("LTV") ratio not exceeding 65%. Lowell Five received an appraisal satisfying this condition on July 28, 2014. On August 1, 2014, the Das Plaintiffs completed their purchase of the Hotel, executing (through their company, Troca Holdings) various documents collectively referred to herein as the "Loan Agreement."[1] Under the Loan Agreement, Lowell Five agreed to lend Troca Holdings

---

[1] To be more precise, the Loan Agreement was entered into between Lowell Five and Boston East Tyngsboro Holdings LLC. Troca Holdings later took over the rights and obligations of Boston East Tyngsboro Holdings LLC under the Loan Agreement by way of assignment. For ease of reference, the Court refers to Troca Holdings as the borrowing entity.

$3,200,000 in acquisition financing on the closing date and up to an additional $650,000 in renovation financing upon request.

Soon after the closing date, the Das Plaintiffs began improving the Hotel, and Lowell Five advanced renovation financing to support those efforts. But beginning on January 30, 2015, Lowell Five refused to convey additional funds. Lowell Five claimed that that Troca Holdings was no longer entitled to renovation financing because the property had exceeded the 65% LTV ratio, which the Das Plaintiffs believed was no longer a requirement after the credit transaction had closed.

The Loan Agreement originally contained no provisions requiring the Das Plaintiffs to serve as personal guarantors for Troca Holdings' debt. After Lowell Five stopped providing renovation financing, however, the Das Plaintiffs agreed to become guarantors in exchange for the additional funds they needed to continue maintaining and updating the Hotel. In a June 2015 amendment to the Loan Agreement, Lowell Five agreed to a "Burn-Off Provision" under which the Das Plaintiffs' personal guarantees would be removed upon the achievement of an LTV ratio of 65% or less.

From 2015 to 2017, the Das Plaintiffs continued renovating the Hotel. Among other changes, the Das Plaintiffs "repositioned" the Hotel "from catering to the wealthy and largely white guests to consumers and guests who increasingly reflected the cultural

5

and ethnic diversity of the region." Id. ¶ 89. For example, the Das Plaintiffs "added Indian, Chinese and South American items" to the Hotel's food menu, which was previously "geared to a nearly completely European palette." Id. The Hotel also began hosting "[l]ive music performances from an eclectic and racially diverse group of performers" in lieu of previous classical music performances. Id. By the end of 2018, the Hotel "had gained a new reputation welcoming a diverse set of individuals of all backgrounds and ethnicities," in contrast "to the exclusive, segregated enclave" of the adjacent Vesper Country Club. Id. ¶ 107. Wallace, who was a member of Lowell Five's Executive Committee -- which consisted of only white individuals as of 2017, according to a photo on Lowell Five's website -- allegedly "expressed dissatisfaction" with these changes and told colleagues that he "missed the old days and clientele" at the Hotel. Id. ¶¶ 88-90. Wallace also "spoke openly about the need to find the [Hotel] new ownership and management." Id. ¶ 91.

In June 2017, Lowell Five commissioned a new appraisal (the "2017 Appraisal"), which Lowell Five assured the Das Plaintiffs would account for the capital improvements to the Hotel. The 2017 Appraisal concluded that the value of the Hotel was $5,500,000, consisting of $5,200,000 in real property value and $300,000 in personal property value. At that time, the outstanding loan balance was $3,491,864.56, meaning that the Burn-Off Provision would be

6

triggered if the LTV ratio was determined by reference to the total value of the Hotel (i.e., $5,500,000), but not if it was determined by reference to the value of only the real property (i.e., $5,200,000). Lowell Five did not provide the 2017 Appraisal to the Das Plaintiffs and did not remove their personal guarantees. Instead, because Lowell Five deemed Troca Holdings to have continued to default on the loan, Lowell Five pursued recourse through the Das Plaintiffs as guarantors.

For the remainder of 2017 and 2018, the relationship between Lowell Five and the Das Plaintiffs became "increasingly contentious." Id. ¶ 105. Lowell Five continued withholding renovation financing and seeking to hold the Das Plaintiffs financially responsible as guarantors. Unable to satisfy the loan and other financial obligations, Troca Holdings ultimately filed for bankruptcy. Lowell Five subsequently foreclosed on the Hotel, and the Das Plaintiffs lost both their investment in the Hotel and personal funds taken by Lowell Five pursuant to the guarantee provisions.

## II.  **The State Court Action**

On November 26, 2019 -- after several attempts to convince Lowell Five that they remained entitled to renovation financing under the Loan Agreement -- the Das Plaintiffs sued Lowell Five in state court, alleging that Lowell Five had breached the Loan Agreement (and committed other state-law violations) by failing to

7

extend renovation financing and refusing to release the Das Plaintiffs from their personal guarantees. In support of their argument that the guarantees should have been removed, the Das Plaintiffs alleged that they had "reason to believe" that the 2017 Appraisal -- which the Das Plaintiffs had still not received -- evidenced a property value sufficiently high that the LTV ratio "had dropped well under the 65% threshold [necessary to] trigger[] the" Burn-Off Provision. Dkt. 40-3 ¶¶ 28, 30.

In response to this argument, on February 20, 2020, Lowell Five submitted a copy of the 2017 Appraisal to the state court and the Das Plaintiffs, along with a cover letter explaining Lowell Five's view that the LTV ratio never decreased below 65% because the relevant property value was that of the real property, not of the entire Hotel. In an omission that Lowell Five claimed was caused by an accidental redaction, but that the Das Plaintiffs allege was fraudulent, the cover page of the copy of the 2017 Appraisal sent by Lowell Five did not include the values of the Hotel (i.e., $5,500,000), the real property (i.e., $5,200,000), and the personal property (i.e., $300,000). However, those values were included elsewhere in the document, and Lowell Five's explanation for using the $5,200,000 real property value in calculating the LTV ratio was described in the accompanying cover letter. Lowell Five produced the unaltered version of the 2017 Appraisal in June 2020.

The state court ultimately granted summary judgment to Lowell Five on all of the Das Plaintiffs' claims, concluding that Lowell Five complied with its funding obligations and was not required to release the Das Plaintiffs from their personal guarantees. The state court also held that the Das Plaintiffs had breached their contractual obligations under the Loan Agreement.

### III. __The Criminal Action__

While the Das Plaintiffs were running the Hotel, their son Abhijit "Beej" Das was running for Congress. Beej announced his candidacy in September 2017 for the Democratic primary election. Beej's candidacy allegedly angered Wallace and other Lowell Five officers, who supported a white candidate named Lori Trahan.[2] When Beej solicited campaign contributions from Wallace, Wallace told Beej that Trahan's husband and the incumbent congressmember, whom the amended complaint describes as "powerful and established white patrons of Lowell Five," would "destroy" Wallace and Lowell Five if Wallace contributed to Beej's campaign. Dkt. 30 ¶¶ 10, 101.

Beej's campaign was largely self-funded, including through credit transactions. Beginning in January 2018, Beej started to "repay himself" the loans he had made to his congressional campaign

---

[2] Trahan ultimately won the election and currently holds congressional office. Beej placed seventh in the Democratic primary. See Massachusetts' 3rd Congressional District Election, 2018, Ballotpedia, https://ballotpedia.org/Massachusetts%27_3rd_Congressional_District_election,_2018 (last visited Sep. 25, 2025).

account, which was held at Lowell Five. Dkt. 30 ¶ 111. To do so, he made several withdrawals from his campaign account and then deposited the withdrawn funds into the accounts of business entities he owned. Although Beej instructed Lowell Five's bank tellers to perform these steps as separate transactions, the tellers recorded the transactions as direct internal transfers from Beej's campaign account to his business accounts on at least twelve occasions from February 2018 through May 2018. Lowell Five then filed Suspicious Activity Reports ("SARs") regarding the transactions.

In or around September 2019, federal law enforcement began investigating Beej's banking activity for violations of election laws. Lowell Five supported the investigation by providing information regarding Beej's transactions. But that information, according to the amended complaint, was "largely a fabrication," id. ¶ 139, and Lowell Five officers (including Wallace and Pratt) allegedly directed bank tellers to "go along with a narrative" in interviews with law enforcement that Beej had requested direct internal transfers rather than separate transactions, id. ¶ 148. Meanwhile, Trahan was allegedly subject to accusations of campaign finance violations of her own, but Lowell Five did not submit any SARs regarding her banking activity.

Beej was indicted in 2021 for multiple campaign finance violations. See United States v. Das, No. 21-cr-10200 (D. Mass.

June 28, 2021), Dkt. 1. The criminal action proceeded to trial in October 2023. At the trial, several Lowell Five employees allegedly testified that Beej Das had instructed Lowell Five to process his campaign account withdrawals and subsequent deposits as separate transactions. Nevertheless, Beej was convicted and sentenced to twenty-one months of incarceration and one year of supervised release. See id., Dkt. 188.

## IV.  **The Federal Lawsuit**

On April 10, 2024, the Das Plaintiffs and Troca Holdings filed the instant lawsuit against Lowell Five, Wallace, and Pratt.[3] In their operative amended complaint, Plaintiffs allege that Defendants violated two federal antidiscrimination statutes: 42 U.S.C. § 1981 and the Equal Credit Opportunity Act ("ECOA"). With respect to the § 1981 claim, the Das Plaintiffs allege that Defendants discriminatorily deprived the Das Plaintiffs "of their right to make and enforce contracts and to the full and equal benefit of . . . all laws and proceedings" by failing to comply with the Loan Agreement and the Burn-Off Provision, resulting in the Das Plaintiffs "los[ing] their entire investment in the [Hotel] . . . as well as the funds contained in their individual bank accounts that were seized by Lowell Five as part of its collection

---

[3] Plaintiffs' original complaint also included Beej as a plaintiff and three other individuals as defendants. These four individuals are no longer parties under the operative amended complaint.

efforts." Dkt. 30 ¶¶ 325, 331. With respect to the ECOA claim, Plaintiffs allege that Lowell Five violated 15 U.S.C. § 1691 by discriminatorily "depriving them of . . . [r]enovation [f]inancing" and "compel[ling] [the Das Plaintiffs] . . . to execute personal guarantees under economic duress." Id. ¶¶ 334, 336. Plaintiffs also assert three state-law claims based primarily on allegations that Lowell Five improperly received a payment from Plaintiffs' insurer during Troca Holdings' bankruptcy proceeding. See id. ¶¶ 338-40, 342-47, 350.

Plaintiffs do not bring independent claims related to Lowell Five's alleged actions during the criminal investigation into Beej's campaign finance transactions. Rather, the Das Plaintiffs allege as part of their § 1981 claim that Defendants "engage[d] in discrimination against the [Das] Plaintiffs, based upon their race, color and national origin, in [Defendants'] disparate treatment of Beej Das compared to Lori Trahan." Id. ¶ 329.

Defendants now move to dismiss the amended complaint, arguing, among other things, that Plaintiffs' federal claims are barred by the applicable statutes of limitations.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (cleaned up). This standard requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The court must then determine whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Defendants' argument that Plaintiffs' claims are barred by statutes of limitations is an affirmative defense that may be raised in a motion to dismiss. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). A court may grant a motion to dismiss based on a statute of limitations defense where "the facts establishing the defense" (1) are "definitively ascertainable from the complaint and other allowable sources of information" and (2) "suffice to establish the affirmative defense with certitude." Gray v. Evercore Restructuring, LLC, 544 F.3d 320, 324 (1st Cir. 2008) (quoting Nisselson v. Lernout, 469 F.3d

143, 150 (1st Cir. 2006)). In other words, "[w]here the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate." Trans-Spec Truck Serv., 524 F.3d at 320 (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 510 (1st Cir. 1998)).

## **DISCUSSION**

### I.   **Federal Claims**

Defendants posit several grounds for dismissal of Plaintiffs' § 1981 and ECOA claims. The Court need resolve only one: Defendants' argument that these federal claims are barred by their respective statutes of limitations. The Court agrees and dismisses these two claims.[4]

---

[4] The Court has doubts about whether Plaintiffs have plausibly alleged racial discrimination with respect to the credit transactions at issue, as is necessary to plead both of their federal claims. See, e.g., Garrett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002); Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992). Defendants did not fully brief an argument along these lines, instead contending narrowly that the Bank Secrecy Act immunizes Lowell Five for filing SARs against Beej and that "there are no facts to support [the federal claims] outside of Lowell Five's protected activity in reporting suspicious activity." Dkt. 40 at 7. At hearing, counsel for Defendants more thoroughly explained his view that Plaintiffs have not plausibly alleged discrimination, even if the allegations regarding SARs are considered. The Court need not resolve the issue because the federal claims are barred by the statute of limitations. See Abdallah v. Bain Cap. LLC, 752 F.3d 114, 121 (1st Cir. 2014)

### A.    Section 1981 Claim

Section 1981 provides, in relevant part, that persons of all races have an equal right "to make and enforce contracts." 42 U.S.C. § 1981(a); see Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006).[5] "To state a claim under § 1981, a plaintiff must show that (1) she is a member of a racial minority; (2) the defendant discriminated against her on the basis of her race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts." Hammond v. Kmart Corp., 733 F.3d 360, 362 (1st Cir. 2013). A plaintiff may obtain relief not only "when racial discrimination blocks the creation of a contractual relationship, [but also] when racial discrimination impairs an existing

---

("Whether [plaintiff] now actually would have a claim against [defendant] but for the expiration of the limitations period we need not decide.").

[5] Section 1981 also protects certain other enumerated activities, including by providing that all persons are entitled "to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a); see Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 348 (1st Cir. 1995) (discussing this "equal benefit" clause). Although the amended complaint refers to the equal benefit clause in passing, see Dkt. 30 ¶ 325, Plaintiffs do not appear to make any claim for relief under that clause independent of their allegations regarding the parties' contractual relationship. Because the parties have not discussed the equal benefit clause in their briefing and because the Court's statute of limitations analysis would likely remain the same in applying that clause to a contractual relationship, the Court does not separately analyze Plaintiffs' claims under that clause.

contractual relationship." <u>Domino's Pizza</u>, 546 U.S. at 476; <u>see</u> 42 U.S.C. § 1981(b) (defining "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship").

A four-year statute of limitations applies to those species of § 1981 claims that "aris[e] under" the 1991 amendment to the statute. 28 U.S.C. § 1658(a); <u>see</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 382-83 (2004); <u>see also</u> <u>Garmon v. Nat'l R.R. Passenger Corp.</u>, 844 F.3d 307, 318 n.8 (1st Cir. 2016) ("Section 1981 discrimination claims are subject to a four-year statute of limitations."). Defendants contend that a four-year statute of limitations applies here, and Plaintiffs do not argue otherwise.[6]

The four-year statute of limitations for § 1981 claims begins when "the cause of action accrues." 28 U.S.C. § 1658(a). A § 1981 claim "accrue[s] 'when the alleged unlawful act "has a crystallized and tangible effect on [the plaintiff] and [the plaintiff] has notice of both the act and its invidious etiology."'" <u>Garmon</u>, 844

---

[6] The Court notes that if Plaintiffs' claim arises under the pre-1991 version of § 1981, the statute of limitations would likely be three years. <u>See</u> <u>Johnson v. Rodriguez</u>, 943 F.2d 104, 107 (1st Cir. 1991); <u>Alston v. Town of Brookline</u>, No. 15-cv-13987, 2020 WL 1615408, at *4 (D. Mass. Apr. 2, 2020), <u>aff'd sub nom.</u> <u>Alston v. Int'l Ass'n of Firefighters, Loc. 950</u>, 998 F.3d 11 (1st Cir. 2021). In any event, the Court need not determine which of these limitations periods applies because the Court concludes that Plaintiffs do not satisfy even the longer four-year statute of limitations.

F.3d at 318 n.8 (quoting <u>Buntin v. City of Boston</u>, 813 F.3d 401, 405 (1st Cir. 2015)). The Das Plaintiffs' § 1981 claim therefore is barred by the statute of limitations if the Das Plaintiffs had notice by April 10, 2020, of both the alleged unlawful acts -- <u>i.e.,</u> Defendants' failure to provide renovation financing and to release the Das Plaintiffs from their personal guarantees -- and the alleged discriminatory animus underlying those acts. The Court concludes that the Das Plaintiffs had notice of both.

   *1. Notice of the Alleged Acts*

  By April 10, 2020, the Das Plaintiffs had ample notice of the allegedly wrongful acts by Defendants related to the Loan Agreement, and those acts had had "a crystallized and tangible effect" on the Das Plaintiffs. <u>Id.</u> (quoting <u>Buntin</u>, 813 F.3d at 405). Lowell Five ceased providing renovation financing to Troca Holdings beginning in January 2015. Throughout the next several years, Lowell Five continued to withhold renovation financing and to hold the Das Plaintiffs personally responsible under the Loan Agreement as guarantors. And in November 2019, the Das Plaintiffs alleged in a state court action that Lowell Five had wrongly failed to extend financing and refused to release them from their guarantees. These events make clear that the Das Plaintiffs knew well before April 2020 of the acts underlying their claim that Defendants violated § 1981 by not performing their contractual obligations under the Loan Agreement.

Even if the statute of limitations did not begin to run until the Das Plaintiffs knew that their personal guarantees allegedly should have been removed under the Burn-Off Provision, they still gained that knowledge before April 2020. A copy of the 2017 Appraisal -- which Plaintiffs allege revealed that the Hotel's LTV ratio had decreased below 65% -- was provided to the Das Plaintiffs in February 2020. Although the cover page of that copy did not include the value of the Hotel, that value was included elsewhere in the copy, and the value of the associated real estate was included in the accompanying cover letter, along with Lowell Five's explanation that the real estate value was the relevant factor in determining whether the Burn-Off Provision had been triggered. Cf. Abdallah v. Bain Cap. LLC, 752 F.3d 114, 121 (1st Cir. 2014) ("[A] statute of limitations is not tolled due to fraudulent concealment if the plaintiff has actual knowledge of the facts giving rise to his cause of action." (cleaned up) (quoting Stark v. Advanced Magnetics, Inc., 736 N.E.2d 434, 442 (Mass. App. Ct. 2000))). And in any event, the Das Plaintiffs' November 2019 state court complaint alleged that the 2017 Appraisal evidenced an LTV ratio below 65%, demonstrating that the Das Plaintiffs were on notice of (and, indeed, had already brought) that portion of their claim. See id. at 119 (noting that courts may look to both the complaint and "other properly considered records" in adjudicating a statute of limitations defense on a motion to dismiss).

18

The fact that the amended complaint discusses certain incidents postdating April 10, 2020, does not alter this conclusion. For example, the May 2020 foreclosure of the Hotel was a direct result of Plaintiffs' inability to pay the loan (purportedly due to Defendants' alleged violations of the Loan Agreement), and Plaintiffs do not claim that the foreclosure constituted an independent § 1981 violation. See Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 33 (1st Cir. 2015) ("'[T]he proper focus' for determining when a cause of action accrues for limitations purposes 'is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful.'" (quoting Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980))); see also Dkt. 30 ¶ 197 ("Had Lowell Five honored its agreements and extended the loan proceeds as promised in accordance with the Loan Agreement, including the [r]enovation [f]inancing it had contractually agreed to, then there would have never been any personal guarantees, default or foreclosure thereafter.").

Similarly, Plaintiffs allege that Lowell Five wrongly received a payout from Plaintiffs' insurer in July 2020, but that assertion is not plausibly related to Plaintiffs' allegations of discrimination geared toward preventing the Das Plaintiffs from running the Hotel, given that Lowell Five had already foreclosed on the property. Indeed, the amended complaint does not appear to

include the allegation regarding the insurance payout as part of Plaintiffs' federal discrimination claims at all. Compare Dkt. 30 ¶¶ 316-36 (federal claims premised on Lowell Five's purported discriminatory conduct related to Loan Agreement, including allegations regarding renovation financing and guarantees), with id. ¶¶ 337-53 (state-law claims explicitly premised on alleged wrongful receipt of insurance proceeds). And in any event, the amended complaint alleges no facts at all -- let alone plausible ones -- supporting an inference that Lowell Five's conduct related to the insurance payout was done with discriminatory motive.

### 2.  Notice of the Alleged Discrimination

The Das Plaintiffs also had notice by April 10, 2020, of facts purportedly demonstrating the "invidious etiology" underlying Defendants' actions with respect to the Loan Agreement. Garmon, 844 F.3d at 318 n.8 (quoting Buntin, 813 F.3d at 405). During the discussions leading to the Loan Agreement, Wallace told the Das Plaintiffs of his influence at the nearby, historically white Vesper Country Club. By 2017, the Das Plaintiffs had begun introducing cultural and ethnic diversity to the Hotel's food options and music performances, and by the end of 2018, the Hotel had gained a "reputation welcoming a diverse set of individuals of all backgrounds and ethnicities," Dkt. 30 ¶ 107. "Once Wallace and Lowell Five realized" that these changes had occurred and that the Das Plaintiffs' son had "political aspirations" -- i.e., likely in

2017 and certainly no later than 2018, when Beej's campaign ended
-- Wallace "spoke openly about the need to find the [Hotel] new
ownership and management." Id. ¶ 91 (emphasis added). Further,
Plaintiffs allege that as of 2017, Lowell Five's public website
demonstrated that the bank's Executive Committee included only
white individuals. Even if these allegations suffice to plausibly
state a claim of racial discrimination under § 1981, they all
concern known facts or events predating April 10, 2020.

Plaintiffs argue that the statute of limitations did not begin
to run until Beej's criminal trial in October 2023, contending
that "Defendants' filing of SARs regarding [Beej's] campaign
account activities . . . and the details of [Lowell Five]'s conduct
in the [federal] investigation led to Plaintiffs' discovery of key
facts that finally put the scale of [Lowell Five]'s actions into
context." Dkt. 46 at 7. In particular, Plaintiffs appear to contend
that Lowell Five's decision to file SARs related to Beej's campaign
transactions but not related to Lori Trahan's transactions
constituted racially discriminatory practices of which Plaintiffs
were unaware until Beej's trial.

Even if the Court can consider the allegations regarding SARs
filings,[7] this argument fails because the allegations are not

---

[7] Defendants argue that the Bank Secrecy Act immunizes them from
Plaintiffs' allegations regarding SARs. The Court need not decide
this issue because even considering the allegations, Plaintiffs'
§ 1981 claim is time-barred.

plausibly related to those underlying the Das Plaintiffs' § 1981
claim. The § 1981 claim is premised, as it must be, on alleged
discrimination in the performance of a contract, _i.e.,_ Lowell
Five's alleged failure to honor the terms of the Loan Agreement
and the Burn-Off Provision. The Das Plaintiffs may not manufacture
timeliness merely by identifying an allegedly discriminatory act
committed by Lowell Five against a third party (Beej), where that
alleged act has no plausible connection to the basis for the Das
Plaintiffs' own claim.[8] Cf. Domino's Pizza, 546 U.S. at 476
(rejecting notion that § 1981 is "designed to fight racial animus
in all of its noxious forms" by combating any discrimination that
is "somehow connected to somebody's contract"); Brader v. Biogen
Inc., 983 F.3d 39, 64 (1st Cir. 2020) (noting that later events
only "anchor[]" prior alleged violations for statute of
limitations purposes if the later events are "substantially
related" to the alleged violations). Indeed, the Das Plaintiffs
identify no specific facts regarding Defendants' alleged
discrimination in the credit transaction that the Das Plaintiffs
purportedly discovered during Beej's trial. Nor do the Das

---

[8] Defendants suggest a more cynical explanation for the Das
Plaintiffs' inclusion of allegations regarding the criminal
investigation: they cite the sentencing memorandum submitted by
the United States in the criminal action, in which the government
sought a sentencing enhancement for obstruction of justice due to
its belief that the Das Plaintiffs' civil lawsuit contains
"materially false" facts and "was conceived with a corrupt intent
to und[o] [Beej's] conviction." Dkt. 40-1 at 6.

Plaintiffs plausibly allege that the investigation into Beej's transactions "ha[d] some negative effect on [the Das Plaintiffs'] ability to contract." Hammond, 733 F.3d at 364 (first alteration in original) (quoting Garrett v. Tandy Corp., 295 F.3d 94, 101 (1st Cir. 2002)). In sum, the Das Plaintiffs' attempt to draw a connection between the investigation into Beej and their own alleged injury is "too meager, vague, [and] conclusory" to support their § 1981 claim. Back Beach Neighbors Comm., 63 F.4th at 130 (quoting Legal Sea Foods, 36 F.4th at 33).

Moreover, the Das Plaintiffs' contention that information regarding the criminal investigation "put the scale of [Lowell Five]'s actions into context," Dkt. 46 at 7, misses the mark for an independent reason. The statute of limitations began to run upon the Das Plaintiffs' knowledge of the "existence" of their injury and its alleged discriminatory cause, Ouellette v. Beaupre, 977 F.3d 127, 136 (1st Cir. 2020), not when the injury "became most painful," Shervin, 804 F.3d at 33 (quoting Ricks, 449 U.S. at 258); see Lareau v. Page, 39 F.3d 384, 388 (1st Cir. 1994) ("The plaintiff need not know the full extent of the injury before the statute [of limitations] begins to run."). Even if Beej's October 2023 trial provided more "context" about the "scale" of Defendants' alleged discriminatory acts, those acts were already known or knowable to Plaintiffs well before April 2020.

Accordingly, the Court concludes that the Das Plaintiffs have "fail[ed] to 'sketch a factual predicate'" providing "a basis for tolling the statute of limitations" based on the amended complaint's tangential allegations about Beej. Abdallah, 752 F.3d at 119 (quoting Trans-Spec Truck Serv., 524 F.3d at 320). The Das Plaintiffs' § 1981 claim is time-barred and therefore must be dismissed.

**B.    ECOA Claim**

As relevant here, ECOA prohibits "any creditor [from] discriminat[ing] against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race." 15 U.S.C. § 1691(a)(1).[9] A plaintiff must plausibly allege that a creditor discriminated based on a protected characteristic -- here, race[10] -- in order to state a § 1691 claim. See Rosa v. Park W. Bank &

---

[9] Because the Court concludes that Plaintiffs' ECOA claim is barred by the statute of limitations, it need not resolve Defendants' argument that the Das Plaintiffs are not "applicant[s]" under ECOA and thus lack statutory standing. 15 U.S.C. § 1691(a); see Vander Luitgaren v. Sun Life Assur. Co. of Can., 765 F.3d 59, 63 (1st Cir. 2014) (noting that courts "may bypass a statutory standing inquiry and resolve the dispute on the merits").

[10] Plaintiffs also allege in passing that Lowell Five discriminated against the Das Plaintiffs "on the basis of their marital status," but the amended complaint contains no supporting factual allegations other than that the Das Plaintiffs were "husband and wife." Dkt. 30 ¶ 335. This portion of Plaintiffs' claim is not plausibly alleged and, in any event, would be barred by the statute of limitations for the same reasons that Plaintiffs' race-based ECOA claim is barred.

24

Tr. Co., 214 F.3d 213, 215 (1st Cir. 2000); Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992).

Unlike § 1981, ECOA contains its own statute of limitations provision, which provides that "[n]o [action under § 1691] shall be brought later than 5 years after the date of the occurrence of the violation." 15 U.S.C. § 1691e(f). The Supreme Court has held that where a statutory limitations period is specifically tied to the time when a violation occurs, "[t]hat language unambiguously sets the date of the violation as the event that starts the . . . limitations period." Rotkiske v. Klemm, 589 U.S. 8, 13 (2019). The statute of limitations for an ECOA claim therefore "begins to run on the date on which the alleged [ECOA] violation occurs, not the date on which the violation is discovered." Id. at 10; accord Archer v. Nissan Motor Acceptance Corp., 550 F.3d 506, 508 (5th Cir. 2008) (holding that the language in § 1691e(f) forecloses the application of the federal discovery rule to ECOA claims). Plaintiffs' claims therefore are barred if they are premised on an alleged violation that occurred earlier than April 10, 2019, regardless of when Plaintiffs discovered that violation.

Here, the alleged violations underpinning Plaintiffs' ECOA claim -- i.e., Lowell Five's denial of renovation financing and the incorporation of personal guarantee provisions into the Loan Agreement -- occurred well before April 10, 2019. Lowell Five stopped extending renovation financing to Troca Holdings in

January 2015. By June 2015, the Das Plaintiffs had agreed to become guarantors, and the Burn-Off Provision had been added to the Loan Agreement. And in June 2017, Lowell Five declined to release the Das Plaintiffs from their guarantee obligations, despite receiving the 2017 Appraisal which allegedly evidenced that the Hotel's LTV ratio had decreased below 65%. Because the relevant alleged violations occurred before April 10, 2019, Plaintiffs' ECOA claim is barred by the statute of limitations and therefore must be dismissed.

## II.  **State-Law Claims**

Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims. See 28 U.S.C. § 1367(c)(3); Zell v. Ricci, 957 F.3d 1, 15 (1st Cir. 2020) ("[W]hen all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.'" (quoting Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017))); Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass., No. 21-cv-10523, 2022 WL 952247, at *16 (D. Mass. Mar. 30, 2022) (declining to retain jurisdiction over "dispute concerning contractual obligations arising under state law" where "[n]o discovery ha[d] been undertaken[] and no trial date ha[d] been set"), aff'd, 66 F.4th 307 (1st Cir. 2023).

26

Accordingly, the state-law claims are dismissed without prejudice to their renewal in state court.

**ORDER**

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 39) is **ALLOWED**. Plaintiffs' federal claims (Counts I and II) are dismissed with prejudice. Plaintiffs' state-law claims (Counts III, IV, and V) are dismissed without prejudice to their renewal in state court.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge